Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF ILLINOIS
2
3
4   COURTNEY LOOS,                   )
                                     )
5          Plaintiff,                )
                                     )
6   vs.                              ) C.A. No. 20-cv-1107-MAB
                                     )
7   THE COUNTY OF PERRY,             )
    ILLINOIS, and                    )
8   JAMES CAMPANELLA, in his         )
    individual capacity,            )
9                                    )
           Defendants.               )
10
11
12
13      Video 30(b)(6) Deposition of JAMES W. CAMPANELLA
             taken on behalf of the Plaintiff
14                    on July 11, 2022
15
16
17
18
19   REPORTER:  Kimberly Mueller, C.S.R., C.C.R.
20   IL Certified Shorthand Reporter #84-002718
         MO Certified Court Reporter #977(G)
21
22
23              Mueller Reporting, P.C.
                   P. O. Box 509
24            Edwardsville, Illinois 62025
                   618-692-9890
25                  mrpc@att.net
```

Page 2

```
1                 A P P E A R A N C E S
2   On Behalf of the Plaintiff:
           SilversteinWolf, LLC
3          By:  Ferne P. Wolf, Esq.
                Joshua J. Baumgart, Esq.
4          530 Maryville Centre Drive, Suite 460
           St. Louis, MO 63141
5
    On Behalf of Defendant County of Perry, Illinois:
6          O'Halloran Kosoff Geitner & Cook, LLC
           By:  Joseph Bracey, Esq.
7          2621 Montega Drive, Suite C
           Springfield, IL 62704
8
    On Behalf of Defendant James Campanella:
9          Office of the Attorney General
           By:  Thomas Ewick, Esq.
10         500 South 2nd Street
           Springfield, IL 62704
11
12  THE VIDEOGRAPHER:  Mudge Legal Video, Inc.
           By:  Mr. John Mudge
13         P. O. Box 622
           Edwardsville, IL 62025
14         (618) 656-8268
           schedule@mudgelegalvideo.com
15
16              * * * * *
17                I N D E X
18                                         Page
19  Direct Examination by Ms. Wolf           5
20
21
22
23
24
25
```

Page 3

```
1                 E X H I B I T S
2   Plaintiff's Deposition Exhibit:
3    1  Deposition Notice                                   5
4    2  Budget Documents                                   14
5    6  E-mail from Karin Anderson                          5
6    7  Resolution                                         12
7    8  Board Meeting Minutes                              13
8    9  Ordinance 2007-02                                  33
9   10  Perry County General Purpose Financial Statement   37
10  11  Bellwether Proposed Amendments                     39
11  12  Voucher                                            42
12  13  10/3/19 Karin Anderson Letter                      46
13  14  6/15/20 Karin Anderson Letter                      65
14  15  Documents for Topics 25 a. through g.              82
15  16  Documents for Topics 29 a. and b.                  89
16  17  Perry County's Second Supplemental Answers         98
17  18  Operation Review Recommendations                  101
18  19  Declaration of Financial Emergency                101
19  20  Two Affidavits                                     105
20  (Exhibits were retained by Ms. Wolf.)
```

```
21
22              * * * * *
23
24
25
```

Page 4

```
1        IT IS STIPULATED AND AGREED by and between
2   counsel for the Plaintiff and counsel for the Defendants
3   that the deposition of JAMES W. CAMPANELLA, may be taken
4   pursuant to the Federal Rules of Civil Procedure by and on
5   behalf of the Plaintiff on July 11, 2022, at the Perry
6   County Courthouse, 1 Public Square, Pinckneyville,
7   Illinois, before Kimberly Mueller, a Certified Shorthand
8   Reporter for the State of Illinois; that the issuance of
9   notice is waived and that this deposition may be taken
10  with the same force and effect as if all Federal Rules had
11  been complied.
12       IT IS FURTHER STIPULATED AND AGREED that any and
13  all objections to all and any part of this deposition are
14  hereby reserved except as to the form of questions and may
15  be raised on the trial of this cause, and that the
16  signature of the deponent is not waived.
17              * * * * *
18
19          THE VIDEOGRAPHER:  We are on the video
20  record and the time is approximately 11:03.  Today's date
21  is July 11th, 2022.  Would counsel please introduce
22  themselves for the Court and jury.
23          MS. WOLF:  Ferne Wolf for the plaintiff.
24          MR. BAUMGART:  Josh Baumgart for the
25  plaintiff.
```

1 (Pages 1 to 4)

Page 5

1        MR. BRACEY: Joseph Bracey for the Perry
2  County defendants.
3        MR. EWICK: Thomas Ewick for Defendant
4  James Campanella.
5        THE VIDEOGRAPHER: Thank you, counsel.
6  You may now swear in the witness.
7                    * * *
8        JAMES W. CAMPANELLA,
9  produced, sworn and examined on behalf of the Plaintiff,
10  deposes and says as follows:
11           DIRECT EXAMINATION
12  BY MS. WOLF:
13      Q   Could you please state your name for the
14  record?
15      A   James W. Campanella.
16      Q   Judge Campanella, you have been designated
17  to testify on behalf of Perry County today on a number of
18  topics at our 30(b)(6) deposition, correct?
19      A   Yes, ma'am.
20      Q   All right. And I'm going to hand you
21  Deposition Exhibit 1. We have another copy that's
22  actually labeled, but we'll call this one Exhibit 1, as
23  well, and that is our Fourth Amended 30(b)(6) Deposition
24  Notice to Perry County, and you also have what we will
25  call Deposition Exhibit Number 6 which is an e-mail from

Page 6

1  Karin Anderson to me, and in it there's a representation
2  that you will be testifying about a number of topics. Do
3  you see that?
4      A   Yes, ma'am.
5      Q   All right. So on Exhibit 6 it says that you
6  will be testifying about 1 A through E; 10 B; 15; 19; 20;
7  21; 22; 23 A through C; 23 F; 23 H through N; 24 A through
8  G; 25 A through G; 29 A and B; 30; 31; 33; 35; 36; 37 A
9  through E; parts of 39; 41; 42; and 44. Is that correct?
10      A   That's what's on here.
11      Q   All right. And do you consent to testify
12  about those topics?
13      A   To the best of my ability, yes.
14      Q   You understand you've been designated by
15  Franklin County to testify about those topics?
16      A   No, ma'am, I do not.
17        MR. BRACEY: Perry County.
18      Q   (by Ms. Wolf) And this is the second time
19  today I've made that mistake. Do you understand you've
20  been designated to testify by Perry County to testify
21  about those topics?
22      A   Yes, ma'am.
23      Q   And do you consent to testify on --
24      A   Yes, ma'am.
25      Q   -- behalf of Perry County? Can you let me

Page 7

1  finish my questions before you answer? Is that yes?
2      A   Yes, ma'am.
3      Q   All right. So it's important when we do
4  these depositions that you answer out loud, and so if you
5  nod your head or shake your head as an answer, one of us
6  may ask you to answer out loud, and I don't mean that to
7  be an insult if I ask you is that a yes or if that's a no.
8      A   Yes, ma'am.
9      Q   All right. So it's just for purposes of
10  getting it on the record. And I know you've had your
11  deposition taken before because I've taken it, but this
12  one is a little different because you're testifying on
13  behalf of Perry County, Illinois. Now it's my
14  understanding you do not work for Perry County, Illinois;
15  is that correct?
16      A   Correct.
17      Q   Who do you work for?
18      A   State of Illinois.
19        MS. WOLF: Is this loud enough?
20        THE VIDEOGRAPHER: Oh, I can -- I can
21  hear.
22        MS. WOLF: Okay, you can catch him, okay.
23      Q   (by Ms. Wolf) So the first topic is
24  Paragraphs 1 A through E in Deposition Exhibit Number 1.
25  Do you see that?

Page 8

1      A   Yes, ma'am.
2      Q   Okay. So you are to testify about these
3  topics, and along with Paragraphs -- Paragraph 1 A through
4  E are a couple of exhibits. This will be 7.
5        (Plaintiff's Deposition Exhibits Number 7
6  and 8 were marked for identification purposes.)
7      Q   (by Ms. Wolf) I am also handing you
8  Depositions Exhibits 7 and 8 which are referenced in
9  Topics 1 A through E. So Topic 1 is the appointment of
10  Calen Campanella as the Perry County Public Defender Part
11  Time, including but not limited to the process by which
12  the decision to appoint Calen Campanella was communicated
13  to the Board for approval. So let's start with that.
14        (Deposition was momentarily interrupted.)
15      Q   (by Ms. Wolf) How did that come about?
16      A   Called the County Clerk and had it put on
17  the agenda.
18      Q   Who called the County Clerk?
19      A   I called the County Clerk, had it put on
20  agenda.
21      Q   All right. And I said who because I didn't
22  hear the first word. And B is whether Circuit Judges
23  approved the appointment.
24      A   Yes.
25      Q   All right. And the next one is

Mueller Reporting, P.C.
618-692-9890

Page 9

1  communications with Calen Campanella about his appointment
2  before the Board appointed him.  So what communications
3  did Perry County have with Calen Campanella about his
4  appointment before the Board appointed him?
5      A  The Board would know that, but I wouldn't
6  necessarily be able to tell you how the Board consulted
7  with him.  I can only tell you how I consulted with him.
8  It was placed on the agenda and I can't even tell you
9  whether or not they consulted him.
10     Q  All right.  What communications were there
11  with Calen Campanella about his appointment before the
12  Board appointed him?
13     A  I called all seven Public Defenders that
14  were to possibly be interested in serving part time.  He
15  was one of them, and when I got to him, I said it appears
16  that the State of Illinois Department of Revenue will only
17  allow us to put one name on the PTAX form.  I would just
18  assume it be yours.  That way we will know what we're
19  supposed to do since we are father/son and he said fine.
20     Q  So when you said you called all seven, was
21  that individual calls or were they all present?
22     A  Ma'am, as I've told you before in my
23  deposition, those were meetings that we had and it
24  involved personal and it involved subsequent phone calls.
25     Q  So when you communicated with Calen

Page 10

1  Campanella about his appointment, was anyone else present?
2      A  No, it was a phone call between he and I.
3      Q  Who decided to make Calen Campanella part
4  time?
5      A  I did.
6      Q  Now ultimately it was the Board's decision,
7  is that correct?
8      A  It was their duty under the statute to
9  approve the appointment.
10     Q  So I just want to make sure I get this
11  correct.  You had the power to make it a part-time
12  position, but the Board had the duty to approve your
13  decision; is that correct?
14     A  No, you're convoluting this.
15     Q  All right.
16     A  The Board's duty is to consider and possibly
17  approve the nominated Public Defender or Defenders.  The
18  Board knew there were going to be seven.  The Board knew
19  that we had to have one designated for the PTAX form.  My
20  responsibility was to take and get the approval of the
21  other Judges which there were twelve of us, so I needed
22  seven.  I did not need it in writing.  So I called all
23  twelve and they all agreed, including myself in that
24  twelve, to nominate Calen as the PTAX representative and
25  to have seven Public Defenders part time.

Page 11

1      Q  So who decided that it would -- that Calen
2  Campanella would be part time?
3      A  Along with the other six, I did.
4      Q  Along with the other six?
5      A  Yes, ma'am.
6      Q  Who are the other six?  Other six --
7      A  Well, again that's been designated on
8  several different occasions, but I'll give them to you
9  again if you want.  Kurt Harris, Cindy Loos, Charlie
10  Kuhnert, Matt Benson, Matt Foster, Calen.  Who am I
11  skipping there?  That's just six, isn't it, Tom?
12     Q  My question is who made the decision?  Did
13  the seven make the decision or --
14     A  What decision, ma'am?
15     Q  The question is who made the decision to
16  make Calen Campanella part time?
17     A  He and I did.
18     Q  He being Calen?
19     A  Not part time, though.  That decision was
20  mine and entirely mine because we had a part-timer in
21  Courtney Loos, but the Board had bestowed benefits on her.
22  Even though she was part time, she was getting what we
23  refer to as full-time benefits.  She designated herself as
24  full time because that's all she wanted to do.  I don't
25  have a problem with the Board giving her the benefits.  I

Page 12

1  had a problem when we didn't have the money to give her
2  the benefits along with the money to have conflict
3  attorneys.  That was when we were in the financial crisis.
4  That was when I made the decision to go to seven
5  part-timers.  Instead of one part-timer who was getting
6  benefits.
7      Q  Referencing now Deposition Exhibit 7 which
8  is the resolution.
9      A  Um-hm.
10     Q  Correct?
11     A  Um-hm.
12     Q  Is that a yes?
13     A  Yes, ma'am, it is.
14     Q  All right.  So that's the resolution
15  appointing Calen Campanella as Public Defender Part Time
16  for $10,500 per month, correct?
17     A  Yes, ma'am, that's what it says.
18     Q  Who decided on the amount of the salary?
19     A  I did.  But of course this is a
20  misrepresentation and you're fully aware of that.
21     Q  What do you mean?
22     A  As you already know, there were seven at
23  1500, not one at 10,500 a month.
24     Q  So why is there a misrepresentation on a
25  Board res --

Page 13

1    A  I didn't draft this resolution if -- I'm
2 sorry to interrupt you, but I didn't draft this
3 resolution.  I didn't even see it.
4    Q  When did you first become aware that there
5 was a misrepresentation on a Board resolution?
6    A  When we got into the matter of the PTAX form
7 and it being misrepresented to us by the Illinois
8 Department of Revenue as to how we were supposed to do it.
9    Q  When is that?
10    A  When you brought this lawsuit.  And we
11 started looking into what the Department of Revenue at
12 your or your client's instance wanted us to do because up
13 until then we didn't know we were doing it wrong.  We were
14 doing it the way they told us to do it.
15    Q  Can you look at Deposition Exhibit 8 which
16 is the minutes?
17    A  Well, if I had it, I could.  Eight, you
18 said?
19    Q  I've got 8.  Here you go.  Page 2.  Do you
20 see on Page 2 Resolution to Approve Appointment of
21 Part-Time Public Defender?
22    A  Yes, ma'am.
23    Q  And can you read that part to yourself and
24 then I'm going to ask you some questions?
25    A  Okay.

Page 14

1    Q  No, I don't have any questions about that.
2 Let's move on to the next topic.  10 B.
3    MS. WOLF:  This is -- did we -- we may
4 have already marked that as 2.  Did she already --
5    MR. BAUMGART:  Yes, that's Exhibit 2.
6    MS. WOLF:  She brought -- where's the
7 stuff she brought in?  Thank you.  Remember that?
8 Remember, we took it back from her.  See if you put it
9 back in the folder.  We took it back from her when she
10 said she wasn't going to testify.
11    MR. BAUMGART:  Yeah, I only had two
12 copies.  I think we passed out the rest of those.
13    MS. WOLF:  All right.  Let me --
14    MR. BAUMGART:  Do you want me to read the
15 Bates labels?
16    MS. WOLF:  Yeah.  Okay.  So I don't know.
17 Do you remember that happening?  Oh, here it is.  Okay.
18 All right.  Here we go.
19    MR. BAUMGART:  Perry County 202 through
20 215.
21    MS. WOLF:  Right.  Okay.  The next topic
22 is 10 B which should be on Page 3 of Deposition Exhibit 1.
23 Do you all have it?  Okay.
24    Q  (by Ms. Wolf)  And that's Deposition Exhibit
25 2 and the -- it's just questions about this document which

Page 15

1 is Exhibit 2 and it's the significance of each entry on
2 these pages which are Perry County 212 through 215 and it
3 had been labeled by Perry County as Budget, cut over one
4 million dollars, when the document was prepared, the
5 purpose for which it was prepared and who prepared it.
6 So, first of all, do you know what this document is?
7    A  I've seen it before.  Do I know exactly what
8 it is?  It has something to do with the budget --
9    Q  All right.
10    A  -- and their attempt to reconcile the fiscal
11 crisis that we had if it's for the fiscal year of '18 to
12 '19, '19 to '20 and '20 to '21, one of those three years,
13 maybe even as early as '17 to '18.
14    Q  Do you understand the entries on these
15 documents?
16    A  To an extent.
17    Q  All right.  Looking at this document, at
18 Exhibit 2, can you tell -- well, do you know who prepares
19 this kind of document?
20    A  I know the people that were generally
21 involved in preparing the budgets during our fiscal
22 crisis, and that would have been Rhett Barke, the attorney
23 for the County.  It would have been Susan Hepp who was a
24 Board member at the time and took the responsibility, the
25 huge responsibility of trying to balance this budget and

Page 16

1 they would have had input from the other County Board
2 members.
3    Q  How about the document itself; who would
4 prepare this kind of document, do you know?
5    A  That would be a guess on my part.  I'm going
6 to say Jodi once she was given the information, Jodi
7 Koester, Treasurer.
8    Q  The Treasurer?
9    A  Um-hm.
10    Q  Was she the Treasurer in 2019?
11    A  No, Mary Jane Craft was.
12    Q  All right.  Looking at this document, can
13 you tell where money comes from for paying Public
14 Defender?
15    A  Public Defender would be paid out of the
16 General Fund just like any other salary would be paid.  I
17 don't know that I can look at this document and point out
18 the exact line item, but in theory at least it comes out
19 of the General Fund.  It's a salary position.
20    Q  Directing your attention to the fourth page
21 on Exhibit 2, do you see General Fund Expense Court?  Do
22 you see that?  General Fund Expense Court, do you see that
23 topic heading on Page -- on the fourth page, Perry County
24 215?
25    A  Does it have Jail?  Mine's got four pages

4  (Pages 13 to 16)

Page 17

1  and the fourth --
2      Q  Right.
3      A  -- page is Jail.
4      Q  Jail, and then below Jail it says General
5  Fund Expense Court.  Your finger is on it.
6      A  Oh.
7      Q  Do you see that?
8      A  Yeah, that's the heading.
9      Q  Yes.
10     A  Okay.
11     Q  The heading.  Do you see that?
12     A  Yes, ma'am.
13     Q  Okay.  Below that do you see there's some
14 topics starting with Probation Office?
15     A  Yes, ma'am.
16     Q  All right.  Do you see where it says
17 Counsel, hyphen, Indigent Defendants?
18     A  Yes, ma'am.
19     Q  What is that?
20     A  In addition to the Public Defender and her
21 salary, not only her, but previous Public Defenders would
22 come in and say I can't represent Jane Smith because it's
23 a conflict.  I would have them explain the conflict, i.e.,
24 I represented her mother, whatever, and then I would
25 relieve the Public Defender and have to go to outside

Page 18

1  counsel, if you will, and say will you take Jane Smith
2  case because the Public Defender cannot.  That particular
3  category notoriously had anywhere from 40 to $60,000
4  placed in it for that particular fiscal year because I'd
5  have to estimate how many conflicts might evolve during
6  the course of that year.
7      Q  And so that's what counsel for indigent
8  defendants means?
9      A  Among other things.  You do understand that
10 if I've got a budget of a hundred thousand dollars and my
11 phone expense is $10,000 in that, when I exceed that
12 $10,000 because the phone company hiked our rates, we got
13 new phones, whatever the case might be, I can go to any of
14 those line items and detract from them an amount that is
15 not necessarily attributable to its caption as long as I
16 stay within my budgetary limits.  So if I exceed $10,000
17 in telephone expense and I need 2,000 bucks and I've got
18 an excess in indigent defendants, then I just go there and
19 take the 2 grand out as long as I stay within a hundred
20 thousand dollars for that fiscal year.  So much of what
21 you see in items attributable to that category are only
22 attributable to that category until that category runs out
23 and you might see phone expense, office expense, et cetera
24 taken out of a category that has no bearing on its
25 caption.

Page 19

1      Q  What is Contractual Court Services?
2      A  When I have a defendant that there is a bona
3  fide doubt, for instance, as to the fitness to stand trial
4  and/or be sentenced, I'd have to hire individuals, most
5  the time clinical psychologists, to come over and,
6  pursuant to statute, do a fitness examination.  They then
7  write up that fitness examination, charge anywhere from
8  800 to a thousand dollars per defendant and tell me their
9  expert opinion as to whether or not that defendant
10 understands the process, i.e., knows the charges and can
11 assist in their own defense.  We have more fitness
12 evaluations every year because the jail is no longer a
13 jail; it's a mental hospital.  State of Illinois has no
14 mental health facilities to help us out.
15     Q  How does that differ from Defendant
16 Evaluations?  There's also a line item there.
17     A  Again that would differ only to the extent
18 that when I ran out of one category, I'd go to the other
19 one.  Contractual services can also be experts that are
20 hired by the Court to satisfy an indigent defendant's need
21 for an expert, so contractual services can be fitness
22 evaluations, but again trying to balance our budget and
23 keep every category within the budgetary limits that I was
24 prescribed meant that I had to jump from category to
25 category, even if they weren't similar.  In other words,

Page 20

1  telephone expense, if I exceeded that, might come out of
2  Contractual Court Services.
3      Q  For General Fund Expense Court, was this a
4  budget that you controlled?
5      A  Every year in July or August we are asked as
6  office holders to submit our budget, so when you ask me I
7  am in control of it, I am in control only to the extent
8  that I can request certain amounts for certain categories
9  which ultimately add up to an overall amount of my budget.
10 County then comes back and says no, you can't have
11 $200,000; we don't have it; you're going to have to make
12 do with a hundred thousand dollars which in our fiscal
13 crisis was the case.  I could ask, but I did not receive.
14     Q  When you say we are asked as office holders
15 for a budget, who asks?
16     A  County Board.
17     Q  Oh, the County Board.  Okay.  And then you
18 submit something to the County Board?
19     A  It looks a lot like this.
20     Q  And when you say this, just for the record,
21 you're pointing to Exhibit 2; is that correct?
22     A  Yes, ma'am.
23     Q  Let's move on to 15.
24     A  I'm sorry, you said we're moving to --
25     Q  Number -- Paragraph 15.

5 (Pages 17 to 20)

Mueller Reporting, P.C.
618-692-9890

Page 21

1    A  On that document there?
2    Q  On Exhibit 1, so that would be on what
3  you're holding right there which is on Page 4.
4    A  Okay.
5    Q  Which reads --
6    A  Got it.
7    Q  -- payments to part-time Public Defenders
8  and other attorneys representing indigent persons
9  beginning in 2019.  This topic includes the scope of their
10  work and why the work was not handled by one of the seven
11  part-time Public Defenders being paid $1500 per month.
12  All right, so beginning in 2019, there were these seven
13  part-time Public Defenders; is that correct?
14    A  That is correct.
15    Q  All right.
16    A  Well, actually that started in July of 2019.
17  Courtney quit in May of 2019 and they worked -- they being
18  the part-time Public Defenders were free in June while I
19  got it set up to where I could pay them $1500 a month
20  starting in July of 2019.
21    Q  So once you started paying them --
22    A  Yes, ma'am.
23    Q  -- there were also -- the County was also
24  paying other attorneys.
25    A  No, ma'am, that is a misstatement.  The

Page 22

1  County was cutting checks, but it was not County money.
2    Q  Whose money was it?
3    A  It was Kim Kellerman and myself Specialty
4  Funds.  Once I submitted a budget that met the constraints
5  of our fiscal crisis, I knew that I could not run my
6  office for the amount that they had allowed me to budget.
7  It was impossible, so what we did, after we wrote a check
8  for $235,000 roughly to bail the County out of its fiscal
9  crisis where the vendors were concerned, she and I said
10  look, for the most part, outside of our budget, we're
11  going to become autonomous.  We're going to pay bills that
12  should be paid by the County, including attorney fees.
13  Anything that would exceed our budget or that wasn't
14  really thought about when we submitted our budget -- it
15  wouldn't have made any difference because they wouldn't
16  allow us to exceed it anyway -- we're going to have to pay
17  for ourself and hold onto our hind end and see if we can
18  make it work, and we've made it work for three years, all
19  the way to the extent that in the last month I have sent a
20  letter to the County Board telling them that our Specialty
21  Funds, which are funded by fines, court costs, fees and
22  assessments, will no longer be able to stand the debits
23  that we were submitting to be paid out of Specialty Funds
24  because court costs, fines, fees and assessments,
25  90 percent come out of the bond money that are posted by

Page 23

1  the defendants when they plead out.  We've already got
2  their bond money, so if you've got 2,000 up and your court
3  fine, fees and assessments' at 2500, all you owe is 500
4  and the 2,000 would go into the General Fund which would
5  then turn around and have to go into the Specialty Fund
6  per the statute, so those Specialty Funds were constantly
7  being replenished by what was ultimately bond money which
8  due to the SAFE-T Act which kicks in January 1st now
9  deprives us of the ability to refund our specialty
10  accounts.  We'll have to chase every penny that is
11  assessed for court costs, fines, fees and assessments and
12  will no longer have the ability to arrest people when they
13  don't pay.  So when that hits on January 1, I've told the
14  County no more free ride from Kim and my Specialty Funds;
15  your General Fund's going to have to sustain the entire
16  load, so expect a budget request that is at least doubled
17  what we did during the crisis.
18    Q  Are your Specialty Funds being used to pay
19  attorneys?
20    A  Absolutely.
21    Q  Which Specialty Funds?
22    A  Court fees -- let me give you the exact name
23  if I can find it.  Hers, I think, is Circuit Clerk's
24  Specialty Fund.  Mine's Court Fee Fund, I think is what
25  it's called.  She's got two or three.  I just got one.

Page 24

1    Q  Who's her?
2    A  Kim.  But she only uses the one.
3    Q  Court Fees Specialty Fund?
4    A  That's mine.  I don't know what hers is
5  called.  To be perfectly honest, we've only used mine for
6  the last two and a half years.  We used hers in part to
7  write the $235,000 bail-out for the County.
8    Q  And that was in early 2019, is that correct?
9    A  No, ma'am, that would have happened more
10  towards the end of 2019, if I'm not mistaken.
11    Q  Was that the transfer of money?
12    A  We transferred it from a combination of her
13  account and my account, Specialty Funds to the County
14  General Fund and they in turn paid all of the vendors who
15  would no longer supply us unless we had cash.
16    Q  Topic 15 was about work being performed --
17    A  Yes, ma'am.
18    Q  -- by -- about -- by attorneys beyond the
19  scope of their $1500 a month.
20    A  Okay.  You want --
21    Q  All right.
22    A  -- me to explain, I'll be more than happy.
23    Q  Right.  That's --
24    A  Okay.
25    Q  -- what I'd like to know about.

6  (Pages 21 to 24)

Page 29

1    Q   When you would pay the additional attorney's
2  fees out of the Specialty Fund, how would you authorize
3  that payment?
4    A   The attorney would come in with a petition
5  for attorney fees at $125 an hour, prearranged rate. They
6  would have every minute of their time itemized. I would
7  then look at it, do an order that would say that Ms. Wolf
8  as attorney for Joe Bracey is entitled to $5,000. We
9  would then do a voucher under the Specialty Fund line
10  item, send it down to the Treasurer. Treasurer and the
11  County Clerk would without County Board approval, because
12  it's not County money, immediately cut us a check and
13  they'd either bring it or we'd go get it and I'd hand it
14  to Ms. Wolf.
15    Q   When you say it's not County money, if it's
16  coming out of the --
17    A   Specialty Fund.
18    Q   Specialty Fund, so it's money that belongs
19  to the State?
20    A   No, ma'am. It's money that probably I
21  shouldn't be so free with, quote, not County money, but
22  it's not County money that needs to be approved before
23  it's spent. It goes into a Specialty Fund which is
24  designated for court operations, so as generic as that may
25  be, my operations were now going to pay the attorneys to

Page 30

1  operate the courtroom.
2    Q   You described some of the work that Cynthia
3  Loos does and --
4    A   Yes, ma'am.
5    Q   -- can you -- just because I know I'm going
6  to get it wrong, can you say again the general area of the
7  work that she does?
8    A   Yes. Just last week we had two different
9  occasions where DCFS called up on Monday, said we've taken
10  three kids, the house is full of dog and cat feces, mom's
11  a meth-head, we have no idea who the dads are. Me or
12  Mr. Searby, the State's Attorney, gets on the phone. We
13  call Cindy on Monday morning and we say Cindy, are you
14  available within a 48-hour period. She says of course and
15  she'll come over on Tuesday or Wednesday. Even though the
16  statute doesn't require that these people, mom and dad, be
17  represented at the initial hearing, the shelter care
18  hearing, I insist that they have counsel. I've just never
19  thought that was fair to do it otherwise. She then comes
20  over at 9:00, we'll say on Tuesday morning, drop of a hat.
21  She sits down with mom because we don't know where the
22  dads are at. She says look, this is a shelter care
23  hearing, here are your rights, et cetera, et cetera. By
24  10:30 she'll come in and say we need to listen to evidence
25  which have to constitute probable cause at that stage or

Page 31

1  she'll say the parents wish to waive. They just want to
2  fix the problem. They don't like it now that the kids are
3  gone. They want their kids back, and over a period of a
4  year, year and a half, two years, some I've got three, the
5  parents are given opportunity after opportunity after
6  opportunity to fix the problem. Cindy is there throughout
7  the entire duration of any hearings and of course to
8  counsel those people through the course of the proceeding
9  which can last two to three years normally in each case.
10    Q   Is she representing the parents?
11    A   Yes, ma'am. Until you get to a J case, then
12  she represents the child.
13    Q   When she's representing the parents in those
14  situations, is that the kind of work that a Public
15  Defender would do?
16    A   That's the kind of work that the Public
17  Defender has 20 years ago done, but now it's so involved
18  and it is so much that you can't hardly get a Public
19  Defender to say okay, I'm going to do criminal
20  misdemeanors, I'm going to do criminal felonies and then
21  I'm going to do all this juvenile work because again
22  they're designated as part time and they're over here
23  24/7.
24    Q   If you look back at Exhibit 2 and it may or
25  may not be on here, but do you see a line item that covers

Page 32

1  guardians ad litem?
2    A   No.
3    Q   Where does that come from in the budget?
4    A   You don't understand. Money that comes from
5  the Specialty Fund is not budgeted.
6    Q   So it comes -- guardians ad litem are paid
7  out of the Specialty Fund?
8    A   Yes, ma'am, along with the attorney or
9  attorneys that used to constitute conflict, juvenile
10  abuse, juvenile neglect, juvenile delinquency, juvenile
11  dependencies. Adoptions. You name it. If it's not
12  criminal misdemeanor or criminal felony, right now it's
13  being paid for out of Specialty Funds.
14    Q   When Courtney was Public Defender, were GALs
15  being paid out of the Specialty Fund?
16    A   Yes. The GAL fees have been being paid out
17  of Specialty Fund ever since we went into a fiscal crisis
18  which really you could see the handwriting on the wall
19  started about 2015, 2016 at the latest. About the same
20  time Steve Bareis was elected as sheriff. Like I say, you
21  could see the handwriting on the wall. Just nobody would
22  take the --
23    Q   I don't know when he was elected, but I can
24  look it up. It was about 2015?
25    A   No. Let me think for a second. He had two

8  (Pages 29 to 32)

Page 33

1 terms. His second term is over in 2022, so it would be
2 2014. He was reelected in 2018.
3     Q  We are going to move on to Topic 19 which is
4 on Page 5. And this will be Exhibit 9, I think, if I'm
5 doing this correctly.
6         (Plaintiff's Deposition Exhibit Number 9
7 was marked for identification purposes.)
8     Q  (by Ms. Wolf)  Handing you Deposition
9 Exhibit 9 and this is Topic -- what did I just say --
10 Topic 19 which is a question about Ordinance 2007-02,
11 including the reason for the amendment and the reason the
12 position was established as part time and when the
13 position was changed to full time. So you have before you
14 Deposition Exhibit 9 which is Perry County 332 which is
15 Ordinance 2007-02 and it's labeled an ordinance amending
16 the County Code regarding the salary of Public Defender.
17 Have you seen this before?
18     A  Um-hm.
19     Q  Okay.
20     A  Yes, ma'am.
21     Q  All right. And do you know why -- well, why
22 was this ordinance amended?
23     A  2007 Tom Mansfield was our, quote, back then
24 Public Defender who did not only our Public Defender work,
25 but did work on his own. He was at the time in a firm

Page 34

1 known as Reed, Heller, Mansfield & Gross. Okay? So Tom
2 walked into my office in 2007 and he said hey, they just
3 passed a law that said that if I'm designated a full-time
4 Public Defender, the State will reimburse me -- actually
5 the County -- 66 and two-thirds percent of my salary which
6 at the time was $70,000. He said you know what kind of
7 work I do and how it gets bigger every year. How about we
8 make this deal? You pay me $90,000 as a, quote, full-time
9 Public Defender even though I'll still be able to do what
10 I want to do on the side. We'll fall within that statute.
11 State will give you back 66 and two-thirds percent which
12 is roughly $60,000 which of course then interprets to a
13 savings for the County because they had been previously
14 paying $70,000. Simple math, but I said yeah, sound like
15 a deal, but he said here is what we'll do. If the State
16 doesn't reimburse 66 and two-thirds percent of 90, I'll go
17 back to the 70 under the old way of doing things. We
18 shook hands and that was the deal, and I submitted it to
19 the County Board as a deal and they loved it because they
20 were saving a truckload of money.
21     Q  So under 1-6 where it says Public Defender
22 and then A, it says the office of Public Defender is
23 hereby established as a part-time appointed office.
24     A  So he wouldn't have to get benefits.
25     Q  All right. I thought you said that he was

Page 35

1 going to be full time.
2     A  Ma'am, these Public Defenders, as Courtney
3 did, will come in and they may have an agenda to where all
4 they want to do is criminal work. When Courtney came in,
5 that was all she wanted to do. When Courtney left, that
6 was all she wanted to do. If you want to call that a
7 full-time Public Defender, you can call it that, but they
8 were never prohibited from the day that they started, be
9 it Tom Mansfield, Jennifer Foutch, Courtney Loos or any of
10 the other seven right now, from doing other work, be it
11 civil or criminal, as long as they took care of their
12 assigned Public Defender work. In order to get 66 and
13 two-thirds percent of reimbursement from the State, we had
14 to designate, quote, a full-time Public Defender, but he
15 was only full time to get back the 66 and two-thirds
16 because Tom Mansfield would represent Ferne Wolf if she
17 walked in and said I've been charged with murder. He'd
18 say bring me $50,000, I'll take your case. She would do
19 so and that would be totally separate from his full-time
20 position.
21     Q  When was the position changed on the books
22 to full time?
23     A  Well, this particular arrangement, I don't
24 know about the books --
25     Q  Well, I mean by ordinance when was it

Page 36

1 changed to full time?
2     A  In 1995 when I started, Tom Mansfield was
3 the Public Defender. I don't know if there's anything
4 that exists making him a full-time Public Defender back
5 then. I just know he was with me until 2000 roughly '10
6 or '11 when Jennifer took over, so I don't know how to
7 answer that question because I never knew it to be a,
8 quote, full-time office and then changed to a part-time.
9 These ordinances were all drafted by the Board with the
10 help of the Treasurer and the County Clerk and they say
11 what they say, but the arrangement has always been if you
12 wanted to be a Public Defender in Perry County, you came
13 in, you put in your application and if I approved it, you
14 got paid. I didn't care what else you did as long as you
15 were here and did your Public Defender work, so I didn't
16 designate you as full time, part time, was the way that we
17 were doing things because you could practice law if you
18 wanted to in any other area. The only time we used a
19 designation as full-time Public Defender was to get the
20 State to reimburse 66 and two-thirds percent. Because we
21 only had one Public Defender that did all the work and
22 that was Tom Mansfield.
23     Q  Let's move on to 20.
24         MS. WOLF: And 20 is about entries on
25 financial statements and I brought a lot of financial

9  (Pages  33 to 36)

Page 37

1 statements with me and so I think the easiest thing might
2 be to do and I didn't want to clog everybody up with a
3 bunch of copies that you probably already have, but I may
4 somewhere have multiple copies, so I think I have one
5 where there's two copies.
6      MR. BAUMGART: There it is. 687 has two
7 copies.
8      MS. WOLF: Okay. So -- do you have access
9 to any of your financial statements? Because my questions
10 are pretty simple.
11      MR. EWICK: You're fine. I don't --
12      MS. WOLF: Okay. All right.
13      MR. EWICK: Not with me, but I do.
14      MS. WOLF: Okay. I mean, or I can pull
15 them up on my computer. It's pretty generic questions,
16 but -- okay, so this will be Exhibit -- what are we on?
17      THE REPORTER: Ten.
18      (Plaintiff's Deposition Exhibit Number 10
19 was marked for identification purposes.)
20      MS. WOLF: Ten, and if you want, you can
21 look over it with me.
22     Q  (by Ms. Wolf) I'm handing you Deposition
23 Exhibit 10 which is the General Purpose -- Perry County
24 General Purpose Financial Statement for the year ending
25 November 30th, 2020, and the topic -- and Topic 20 is

Page 38

1 about entries on financial statements relating to
2 reimbursements from the State for Public Defenders,
3 payments to attorneys for Public Defender services or
4 representing the indigent and findings about vacation pay,
5 including management's response to those findings. Let's
6 start with reimbursements to the State for Public Defender
7 on Exhibit 10. Do you know where those are in the
8 financial statements?
9     A  No.
10      MR. BRACEY: Can you give the Bates
11 numbers for that?
12      MS. WOLF: Okay. This one -- I just
13 picked out of the three at random. This is the 2020, so
14 it's 687 through 806.
15     Q  (by Ms. Wolf) Can you look through and
16 find?
17     A  Wouldn't know what I was looking for.
18     Q  Okay.
19     A  I never had anything to do with
20 reimbursement. I just only knew that when they didn't
21 pay, we had to go back to the $70,000.
22     Q  Okay.
23      MS. WOLF: Topic 20 -- I'm just talking to
24 the lawyer -- Topic 20 is about the entries on the
25 financial statement. I wanted to talk to somebody who

Page 39

1 understood the entries on the financial statement and you
2 designated the Judge.
3      MR. BRACEY: 20 will also be in part the
4 third designee --
5      MS. WOLF: Oh, okay.
6      MR. BRACEY: -- Bobby Kelly.
7      MS. WOLF: He might be the better person
8 to testify. I don't really -- I can tell you that really
9 the important stuff is -- okay, so --
10      MR. BRACEY: But to the extent Judge
11 Campanella is designee here, to the extent there are
12 questions about vacation pay in relation to the Public
13 Defender's office.
14      MS. WOLF: Okay, but it has to do with
15 entries on the financial statements --
16      MR. BRACEY: Okay, then --
17      MS. WOLF: -- about that.
18      MR. BRACEY: Then in that case we'll defer
19 completely to the third designee Bobby Kelly.
20      MS. WOLF: Okay. All right. I'll take it
21 back. Let's move on to 21. Can you give me the stuff for
22 21? And this is 11, I think.
23      (Plaintiff's Deposition Exhibit Number 11
24 was marked for identification purposes.)
25     Q  (by Ms. Wolf) I'm handing you Deposition

Page 40

1 Exhibit 11 and we're moving on to Topic 21 which is about
2 Bellwether. Do you remember Bellwether?
3     A  Yes, ma'am.
4     Q  Okay. And I will represent to you that the
5 documents I've handed you as Deposition Exhibit 11 are
6 documents that you've produced in this litigation. So my
7 question is about Bellwether's proposed amendments to the
8 Perry County amended fiscal year 2019 budget, including
9 whether the proposed amendment passed and line items for
10 Public Defender reimbursement, Public Defender salary and
11 payments to counsel for indigent defendant and guardians
12 ad litem, including budgeted changes and amounts
13 remaining. So did Bellwether make any proposed amendments
14 to the Perry County budget -- well, first, did
15 Bellwether's proposed amendment to the Perry County's
16 budget pass?
17     A  The budget that was passed under the fiscal
18 crisis had a lot to do with his suggestions, but did each
19 and every suggestion get incorporated into the budget, not
20 to my knowledge.
21     Q  And when we're talking about his
22 suggestions, are we talking about what's in Exhibit 11?
23     A  Yes, ma'am.
24     Q  If you look at the Pages 52 through 57, is
25 that your -- or Pages 52 through 58, is that your

Page 41

1  handwriting?  There's some handwriting on those pages.
2      A  52?  It starts --
3      Q  At the bottom.
4      A  -- with Number 1.
5      Q  At the bottom these pages are numbered.
6      A  Okay.
7      Q  As produced by your counsel.
8      A  Okay.  Is this my handwriting?
9      Q  Yes.
10      A  Absolutely not.
11      Q  Do you know whose handwriting it is?
12      A  Do not.
13      Q  Okay, now I'm directing your attention to
14  Pages 59 and 60 and again these were in documents you
15  produced, so what are these?
16      A  Much the same of what you showed me before,
17  just perhaps a different year.  It's a comparison of some
18  of the receipts and expenses.
19      Q  These two pages talk about receipts, so is
20  this money received by Perry County?
21      A  It appears to be, yes.
22      Q  And on Page 60 --
23      A  Um-hm.
24      Q  So Page 60 would be -- where it says General
25  Corporate Fund Receipts, where it says Corporate Fund, is

Page 42

1  that the Perry County Treasury?
2      A  I -- I guess.  That would be a better
3  question for the Treasurer, but --
4      Q  All right.
5      A  -- I think so.
6      Q  That's all for this topic.  22.  We should
7  start clearing.  This is getting to be a mess.  Sorry.
8      A  That there I brought.
9      Q  Okay.
10          MS. WOLF:  What number are we on?
11          THE REPORTER:  Twelve.
12          (Plaintiff's Deposition Exhibit Number 12
13  was marked for identification purposes.)
14      Q  (by Ms. Wolf)  So this is 12.  I've handed
15  you Deposition Exhibit 12 and we're on Topic 22 and this
16  is -- the topic is information on the document labeled
17  Loos 64, the meaning of the entries, the purpose of the
18  document, whose handwriting appears on the page, the date
19  of the document, including the fax because the header is
20  deleted on the copy produced to us, and the reason the
21  document is addressed to the Perry County Board of
22  Commissioners.  Basically we want to know about this
23  document.  So, first of all, what is this?  What is Loos
24  64 or Deposition Exhibit Number 12?
25      A  Voucher.

Page 43

1      Q  A voucher?  What does that mean?
2      A  It's what we have to submit to the County
3  Treasurer and County Clerk to get the money to pay people.
4      Q  To get -- I'm sorry, I'm losing --
5      A  Get money to pay people.
6      Q  Okay.  And when you say we, who does -- who
7  is we?
8      A  Me and my court reporter Cindy Chapman.
9      Q  And you have to submit that to the County
10  Treasurer to get people paid, is that correct?
11      A  Yes, ma'am.  Which, by the way, I see
12  Jordan, my son, is the one I forgot a while ago when I was
13  naming the seven Public Defenders.
14      Q  Second child?  No.  Anyway.  Can you tell
15  the date that -- our fax was cut off, so I couldn't tell
16  the date.  Were you able to tell the date?  It's up at the
17  top.  There's a fax header.
18      A  2019, but I couldn't tell you what day.  It
19  says in here, though, invoice date 7/30 of '19.
20      Q  All right.  And there's a signature that is
21  sort of --
22      A  Stamped.
23      Q  Stamped.  Is that your signature?
24      A  Yes, ma'am.
25      Q  And what does it mean this claim shall be

Page 44

1  enduring in effect at the last Friday of each month?  What
2  are you telling?  What are you saying?
3      A  Okay.  July 30th of '19 would have been the
4  first month that the seven Public Defenders were to
5  receive $1500 each as you can see as designated.  Mary
6  Jane Craft said if we submit one voucher or invoice, that
7  down at the bottom would say look, rather than redo this
8  every month, just use this one and consider it for the
9  month that you are asked to pay the Public Defenders.  So
10  it shows very precisely that each Public Defender got
11  1500.
12      Q  At the very top it says to Perry County
13  Board of Commissioners.  Why is it addressed to the Perry
14  County Board of Commissioners?
15      A  Because this money comes out of the General
16  Fund which has to be approved by the Board of
17  Commissioners.
18      Q  So at some point would there be a vote?
19      A  The Treasurer takes the bills, be it from my
20  office, your office or somebody else's, throws them in the
21  middle of the table at the beginning of the meeting.  The
22  Treasurers then looks through the bills.  Oh, what's this
23  one for?  What's this one for?  Then there is a call to
24  vote, approve the bills, yea or nay.
25      Q  So then theoretically at some point there --

11  (Pages  41 to  44)

Page 45

1  after August 30th, 2019, there would have been a vote on
2  these bills if they -- on the bill that is Exhibit 12 if
3  it got paid?
4      A  There would be a vote each and every County
5  Board meeting to pay the bills. The problem with it was
6  it would be caveat when the money is available, so it was
7  pay the bills when the money becomes available which of
8  course where the vendors were concerned, which was
9  included in these bills, never became available. That's
10 why we had to write the check for $235,000. The only
11 things that were getting paid were priority, if you will,
12 salaries.
13     Q  So are you testifying that that $235,000
14 transfer was after July 30th, 2019?
15     A  Right around then. It was during the height
16 of the fiscal crisis. Now I can go upstairs and I can
17 tell you exactly when we wrote the check, but it was
18 between July of '19 or June of '19 till December of '19
19 because that's when the whole thing got reversed and all
20 the vendors got paid and everybody was smiling again and
21 the County tried to move towards fiscal responsibility.
22     Q  Just to be precise, when you say we wrote
23 the check --
24     A  Kim and I.
25     Q  Did you literally write a check or did you

Page 46

1  authorize a transfer?
2      A  Voucher.
3      Q  Okay. All right.
4      A  It's the only way. We can't write checks.
5      Q  Let's move on to 23 A through C, and 23 has
6  to do with the October 3rd, 2019, letter from Karin
7  Anderson to the IDHR unit.
8         MS. WOLF:  This is Exhibit Number --
9         THE REPORTER:  Thirteen.
10        MS. WOLF:  Thirteen.
11        (Plaintiff's Deposition Exhibit Number 13
12 was marked for identification purposes.)
13     Q  (by Ms. Wolf)  Okay, I'm handing you
14 Deposition Exhibit 13 and you've been testify --
15 designated to testify about some of the topics listed in
16 Item 23 which relate to some of the matters in the -- in
17 the letter, and I just want to make sure I gave you the
18 right one. I think it might have had my notes. Okay, so
19 directing your attention -- well, first of all, do you --
20 this is a letter from Karin Anderson to the Illinois
21 Department of Human Rights dated October 3rd, 2019, and so
22 my questions are about specific statements in there. On
23 Page 2 under Public Defender Act -- towards the bottom of
24 the page, there's a heading the Public Defender Act.
25 There is a sentence about a 2006 ordinance establishing

Page 47

1  the office of Public Defender. Are you familiar with that
2  ordinance?
3      A  No.
4      Q  I can tell you no one's been able to find
5  that ordinance. Have you ever seen it?
6      A  No.
7      Q  Okay. And on behalf of Franklin County, has
8  anyone seen that ordinance?
9         MR. BRACEY:  Perry County.
10     A  Perry.
11     Q  (by Ms. Wolf)  Perry County. Perry. Perry
12 County. Drinking and --
13     A  Has anyone ever seen that ordinance? I have
14 no idea.
15     Q  All right. So in this letter it says at
16 that time the Board of Commissioners set the annual
17 compensation for the full-time Public Defender and
18 adjusted it from time to time. So in this letter it says
19 that there was a full-time Public Defender. Is that your
20 knowledge or is that the knowledge of Perry County?
21     A  That's the knowledge of Perry County because
22 again they wanted to characterize Mr. Mansfield as, quote,
23 a full-time Public Defender, but that just meant he would
24 be here when we needed him full time. He did everything
25 else under the sun that he could do to generate income.

Page 48

1      Q  All right, on Page 3, in the -- under the
2  paragraph that starts Loos's employment, there is some
3  discussion about the change from the Public Defender
4  position as a contracted position to a salary position in
5  2012, so it's about five lines down. It says the Public
6  Defender had been a contracted position until 2012 when it
7  became a salary position. So what does that mean that it
8  was a contracted position?
9      A  Tom Mansfield agreed to work for $70,000 a
10 year, but I don't know of any written contract, never seen
11 anything to that extent, and I think what they're
12 referring to is again his appointment as Public Defender.
13 Quote, being contracted, I don't know what that means. I
14 didn't draft this letter.
15        MS. WOLF:  Is there somebody who knows?
16        MR. BRACEY:  Are you asking someone who
17 knows --
18        MS. WOLF:  The answer. This topic is --
19 we designated -- we asked somebody to testify about that
20 information.
21        MR. BRACEY:  I mean, to the extent you're
22 asking for what the attorney who drafted this meant, you
23 know, I think that's improper for a 30(b)(6) designation.
24        MS. WOLF:  Okay, well, there was no
25 objection, so you want to take it up with the Judge?

Mueller Reporting, P.C.
618-692-9890

Page 49

1 Well, there was no objection.  I sent this deposition
2 notice out in October.
3        MR. BRACEY:  And the witness has testified
4 that there may be some confusion between the terms of full
5 time and part time that are important just to make sure
6 that the Public Defender who is not designated as full
7 time is able to seek other employment and other means, so
8 I believe he's answered the question here.
9        MS. WOLF:  Okay.  So I'm asking about the
10 sentence that says the Public Defender have been in
11 contracted position until 2012 when it became a salary
12 position, so --
13        A   I can answer this --
14        Q   (by Ms. Wolf)  Yes.
15        A   -- this way.  There was no benefits being
16 paid to the Public Defender until Courtney Loos came
17 along, then the County, based upon the fact that they
18 decided she was a salaried employee, decided in all their
19 wisdom they would include her in the benefits package.
20 Tom Mansfield never got any benefits.  He got paid 70,000
21 until the State decided to reimburse us 66 and two-thirds
22 percent.  He then went to 90,000.  During the course of
23 that, it went back to 70,000 because the State never gave
24 us the money because they were broke, too.  In the
25 meantime he resigned.  Jennifer took over the position at

Page 50

1 90,000.  State reimbursed us 66 and two-thirds percent.
2 She, I'm almost positive, like Courtney, also received
3 benefits.  So my guess is, and this is simply a guess,
4 that when whoever prepared this was preparing it, they
5 talked about contract being an independent contractor,
6 i.e., no benefits; whereas, when Jennifer and Courtney
7 took the position, they got benefits solely because the
8 County decided to bestow that upon them.
9        Q   Is that the testimony of Perry County?
10        A   No, that's my conjecture as to what that
11 might mean for Perry County.
12        Q   Okay.
13        MS. WOLF:  Can Perry County produce
14 someone whose testimony is binding?
15        MR. BRACEY:  So he's here as a Perry
16 County 30(b)(6) designee, so he is testifying in that
17 role, so that is his answer and the County's adopted it.
18        MS. WOLF:  Okay.
19        Q   (by Ms. Wolf)  Is that true?  Have you
20 consent -- you've consented to testify about this topic
21 and they have designated you.  Is -- you are testifying
22 that -- your testimony is accurate?  I thought you said it
23 was conjecture?
24        A   Ma'am, you're asking me about a letter that
25 I didn't prepare --

Page 51

1        Q   That's right.
2        A   -- that you say is the responsibility of
3 Perry County when I've just testified that the only thing
4 I can conceivably conjecture would be that that line means
5 what I said.  Up until that point there were no benefits
6 being paid and therefore they were considered as Public
7 Defenders independent contractors.
8        Q   Okay.
9        MS. WOLF:  That's insufficient to me.
10        MR. BRACEY:  We can confer about it later.
11        MS. WOLF:  Okay, you will have to produce
12 him at your own -- produce a witness at your own expense.
13 I've waited since -- this amended notice went out in
14 November.
15        MR. BRACEY:  And would you like to confer
16 about it later or now?  I mean, this is a waste of time to
17 do it on the record.
18        MS. WOLF:  Really?  It's really a waste of
19 time since November?  You can't get me somebody?  I'm
20 here.  Okay.  You can't prepare him right now with the
21 accurate information?  Why it says contracted?
22        MR. BRACEY:  He's explained that he
23 believes the term contracted --
24        MS. WOLF:  He already said he doesn't
25 know.

Page 52

1        MR. BRACEY:  -- indicates a vendor.
2        MS. WOLF:  He says he doesn't know.
3        A   No, I said that he --
4        MS. WOLF:  It's conjecture.  It's
5 conjecture.  He's inadequately prepared.
6        MR. BRACEY:  He has explained to you --
7        MS. WOLF:  I am -- I know.
8        MR. BRACEY:  -- how the various Public
9 Defenders were paid, whether they received benefits or
10 not, so these terms of art used by a lawyer in writing
11 this position statement, he has explained the factual
12 basis that underlies those terms.
13        MS. WOLF:  We will -- I consider this our
14 meet and confer.
15        MR. BRACEY:  This exhibit itself
16 references Board minutes and resolutions that provide
17 answers, as well.  Ones that we've already gone through
18 with this witness.
19        Q   (by Ms. Wolf)  Let's move on to C.  When
20 the -- when the position became salaried as referenced on
21 Page 3, whether it also became full time.  So it says here
22 became salaried.  Did it become full time when it --
23        A   It was --
24        Q   -- became salaried?
25        A   -- never full time, in my opinion, and I was

13  (Pages 49 to 52)

Page 53

1  the one that hired her.
2      Q  All right.  And when you say her, you
3  mean --
4      A  Courtney.
5      Q  All right.  So then we don't have to say and
6  if so because it never became full time.  Okay.  So moving
7  on to 23 F, with regard -- oh, let me let you turn the
8  page.  With regard to the statement on Page 4 that the
9  County was struggling with how it would pay the increased
10 salary of the Public Defender, especially since no
11 appropriations had been made, the appropriations,
12 including the source being referenced, and that is in the
13 paragraph under Perry County's budget crisis.  There's a
14 statement that the County was -- it starts with the County
15 was struggling.  I think it's in the middle of the second
16 full sentence under Perry County's budget crisis.  So I'm
17 only interested in where the -- the appropriations being
18 referenced.
19     A  I have no idea what you just asked me.
20     Q  Okay.  So here's a sentence.  Even with the
21 66 and two-thirds percent reimbursement from the
22 Department of Revenue, the County was struggling with how
23 it would pay the increased salary of the Public Defender,
24 especially since no appropriations had been made.
25     A  Right.

Page 54

1      Q  What appropriations?
2      A  The budget.
3      Q  Whose budget?
4      A  The County's.
5      Q  Now we're on to 23 H.  On Page 4 in the last
6  paragraph.  Actually it's the -- it's under Perry County's
7  budget crisis.  There's a reference to the federal
8  government pulling out 17 federal inmates.  When did that
9  happen?  What was the date that the federal government
10 pulled out 17 federal inmates?
11     A  Shortly after the layoff of roughly 17 to 20
12 employees by the Perry County Sheriff who would be in a
13 much better position to tell you what exact day that the
14 federal government said that our jail wasn't adequately
15 staffed enough to put federal inmates in there.  Any other
16 date would be a guess on my part.
17     Q  So you don't know when they were pulled out?
18     A  I know that they were pulled out some time
19 in either late '19 or early '20 because the jail staff had
20 already been laid off to the extent that it exists today.
21     Q  When did the federal government announce its
22 decision to pull out the federal inmates?
23     A  The only thing I can do is refer you back to
24 what I've already given to you and Bareis went to the
25 Board and told them that and he had the letter.  That was

Page 55

1  never produced to me, so I couldn't tell you the exact day
2  again.
3          MS. WOLF:  Do you have somebody who can
4  provide that information?
5          MR. BRACEY:  Not at this time, but we can
6  certainly look into it.
7      A  It's Steve Bareis.  He's the only one that
8  had it.
9          MS. WOLF:  Okay.  This is a not we can
10 look into it situation.  I noticed this deposition first
11 in October and then I got more specific in November to
12 make it easier.
13         MR. BRACEY:  The notice for Paragraph 23
14 says topics raised by the contents of the letter.
15         MS. WOLF:  Yes, and H --
16         MR. BRACEY:  He has --
17         MS. WOLF:  -- is --
18         MR. BRACEY:  -- provided you with
19 approximate time --
20         MS. WOLF:  -- the dates on which the
21 federal government pulled out 17 federal inmates as stated
22 on Page 4 and when the federal government announced its
23 decision.  It could not be clearer.  You've produced
24 someone who does not know.  It's not the witness's fault.
25 You did not produce an adequately prepared witness.  That

Page 56

1  was your choice.
2          MR. BRACEY:  He has provided you a general
3  time frame in which --
4          MS. WOLF:  No.
5          MR. BRACEY:  -- after the budget crisis
6  the sheriff's office deputies were laid off and the jail
7  lost federal certification.
8      Q  (by Ms. Wolf)  Let's move on.  The
9  statement on -- next is I.  The statement on Page 5.  So
10 now we're on Page 5 where it says it was decided -- it's
11 the top of the page -- it was decided that the County
12 would reduce Loos's hours to part time, thereby
13 eliminating the need to pay the statutory amount,
14 including who decided and when, the number of hours
15 reduced to make the job part time.  So where it says it
16 was decided that the County would reduce Loos's hours, who
17 made that decision?
18     A  County Board approved my suggestion.  That
19 would be the three County Board members.
20     Q  When?
21     A  July 2019 or maybe a month before.
22     Q  And was there a reduction in the number of
23 hours to make the job part time?
24     A  No, ma'am.  There was an increase of seven
25 people instead of one.  Simply divvied up the hours.  It

Mueller Reporting, P.C.
618-692-9890

Page 57

1 didn't reduce the hours.
2     Q  So now we're on to 23 J which is the
3 statement on Page 5.  The County would use attorneys from
4 other firms as it had done for years when conflicts arose
5 or coverage was needed and would try to submit PTAX forms
6 for all the Public Defenders to recoup some of the lost
7 revenue.  Do you see that?
8     A  Yes, ma'am.
9     Q  All right.  And so the first question and
10 it's right on there is who decided the County would try to
11 submit PTAX forms for all the Public Defenders to recoup
12 some of the lost revenues?
13     A  Mary Jane Craft and myself.
14     Q  When did you make that decision?
15     A  When we first initiated the program in
16 July 2019.
17     Q  What type of revenue did the County
18 anticipate losing as described in this sentence?
19     A  Lost revenues would have been the lack of
20 reimbursement at 66 and two-thirds percent.
21     Q  The next one is K.  Information about Judge
22 Campanella's late March 2019 expression of his need for
23 part-time Public Defenders to help cover cases in the
24 County.  So do you see under part-time Public Defenders
25 where it says in late March 2019 Judge Campanella

Page 58

1 expressed his need for part-time Public Defenders to help
2 cover cases in the County?  Do you see that in the letter?
3 Okay.
4     A  Yes, ma'am.
5     Q  All right.  So the question is the date.  It
6 says late March 2019, but I was asking for the exact date.
7     A  No records were kept with regard to that
8 meeting, but it happened in mid March of 2019.  It's one
9 of two or three meetings that we had.
10     Q  So the letter says late March and you're
11 testifying --
12     A  That would be approximately correct.
13     Q  And to whom were you expressing your need?
14     A  To the members of the panel of seven and to
15 the County Board in an effort to adhere to the budget
16 constraints.
17     Q  So the panel of seven was there along with
18 the County Board?
19     A  Cannot guarantee you that all seven were
20 sitting there, but we had at least three meetings.  Maybe
21 five would attend one, two would attend by phone, maybe
22 one of them wouldn't be there altogether, but when we met,
23 it was always the same agenda.  We're going to start in
24 July.  You're going to work for free in June of 2019.
25 Courtney quit in May, et cetera.  You'll be paid $1500 a

Page 59

1 month, no benefits.
2     Q  When did you express this to the County
3 Board?
4     A  Started talking to them about this as late
5 as December of 2018, January of 2019.
6     Q  At meetings?
7     A  No.  Never attended any meetings to do that.
8 Called them up individually and told them that given what
9 we were looking at in the way of a budget crisis, this
10 might be -- might be an idea to help a little from my end
11 of it.
12     Q  All right.  The next one is L.  There's a
13 statement:  By hiring part-time attorneys, the Judge
14 eliminated the cost of benefits since there was no
15 full-time Public Defender and the need for conflict
16 counsel because there were sufficient part-timers to cover
17 conflicts, including why the County used paid counsel
18 other than the seven attorneys serving as part-time Public
19 Defenders for $1500 each after July 1st, 2019.  Did we
20 already cover that?
21     A  Big time.
22     Q  Okay.  All right.  The amounts paid to
23 counsel once the County appointed Calen Campanella other
24 than the seven attorneys serving as part-time Public
25 Defenders for $1500 each.

Page 60

1     A  Estimate, somewhere between 60 to $75,000 a
2 year.  Not out of the General Fund.
3     Q  That would be out of those Specialty Funds?
4     A  Yes, ma'am.
5     Q  And communications with Judge Campanella
6 about payments to counsel after July 1st other than
7 payments of $1500 per month for Public Defender services.
8 So this deposition notice was to Perry County, so I was
9 looking for communications between you and the County
10 about paying counsel.
11     A  None.
12     Q  All right.  The next one is information
13 about the statement on Page 5.  The solution was to tally
14 the salary required for the office of Public Defender --
15 are you on Page 5?  This is under part-time Public
16 Defenders in the second paragraph, about the middle of the
17 second paragraph.  There's something about Judge
18 Campanella conferred with the Department of Revenue.  Do
19 you see that?
20     A  Yes, ma'am.
21     Q  All right.  Then the next sentence is the
22 solution was to tally the salary required for the office
23 of Public Defender for a total of $10,500 per month and
24 then submit that amount to the department for
25 reimbursement.  So who came up with the solution?

15  (Pages 57 to 60)

Page 61

1    A   Basically the Department of Revenue, like
2 I've told you on several occasions, now I'm telling you
3 for the County, was contacted by Mary Jane Craft. She
4 said I want to send in seven PTAX forms. They said no,
5 you're not. We won't accept seven PTAX forms. We'll only
6 accept one person as your part-time Public Defender. What
7 you do after that is what you do after that. She said
8 well, I got to pay $1500 to seven different people. Their
9 response, give us one name on one PTAX form. We don't
10 care what you do after that.
11    Q   So who came up with the solution of
12 submitting seven forms initially?
13    A   There was no solution of seven forms. When
14 she tried to submit seven forms, they rejected it. And
15 when she asked why, they said they need one PTAX form with
16 one name only.
17    Q   And she told you this?
18    A   Not only did she tell me that, but like I've
19 given to you on three different occasions, we have the
20 e-mail from their department saying just that.
21    Q   Who decided that it was okay to tally the
22 salary up, to add up the salaries from the seven Public
23 Defenders --
24    A   That was our only alternative, ma'am. We
25 could not get reimbursed 66 and two-thirds percent of

Page 62

1 seven PTAX forms for $1500. They would only accept one
2 PTAX form for $10,500 with one name on it each month, and
3 then they would reimburse us 66 and two-thirds percent of
4 $10,500.
5    Q   When you say it was our only alternative,
6 who decided it was our only alternative?
7    A   Once Mary Jane and I were told unequivocally
8 one PTAX form with one name, then we decided to do what
9 they had directed, one PTAX form with one name.
10    Q   When you and Ms. Craft came up with that
11 solution, when did you -- well, Ms. Craft was what at the
12 time, the Treasurer?
13    A   Yes, ma'am.
14    Q   All right. So when did that first get --
15 that solution first get communicated to David Searby?
16    A   I don't know. You'd have to ask Searby
17 that. There's no way that I would know that. He was not
18 involved in the PTAX form preparation. He was not
19 involved in the communications with the Illinois
20 Department of Revenue. That was solely me and Mary Jane
21 Craft, but I think she may have consulted him. I cannot
22 tell you for sure.
23    Q   Okay. And next -- I'm on the next page on
24 Page 9 out of Deposition Exhibit 1, so it's when did the
25 solution get communicated to the County Board?

Page 63

1    A   Okay, again this wasn't a solution. This
2 was a directive. We had to do it this way and this way
3 only. There were no variants from the Illinois Department
4 of Revenue. When did it get communicated to the County
5 Board? As far as I know, it was never communicated to the
6 County Board. The County Board would have known nothing
7 about this except that they would have seen as receipts on
8 their monthly or bimonthly meetings that the County had
9 reimbursed us 66 and two-thirds percent of $10,500 that
10 month.
11    Q   And when did the solution of how you were
12 going to do it first get communicated to Calen Campanella?
13    A   When I suggested to Calen that he be the
14 name that we put on the PTAX form which would have been
15 right at the end of July and the first of August of 2019
16 when they rejected our first seven PTAX forms, he astutely
17 came up with the fact that hey, dad, what are we going to
18 do here because it's going to look like on paper that I'm
19 getting $10,500 a month. I then went back to the Illinois
20 Department of Revenue and I said how do we keep that from
21 happening because he's not getting $10,500 a month. Their
22 response, we'll take one name on one PTAX form for
23 $10,500. What your W-2s show is what your W-2s show.
24 That was all they would say, so with that response, Mary
25 Jane issued W-2s at the end of the year showing that seven

Page 64

1 different people got $1500 a month for that year and they
2 all declared it as income on their state income tax
3 return. And federal tax return for that matter.
4    Q   When did Perry County first tell the
5 Department of Revenue that it was aggregating the $1500 a
6 month and submitting it all under one person's name?
7    A   That would have been the corrective
8 July 2019 and thereafter. When we sent in the seven and
9 they sent them back and said no deal, we're not
10 reimbursing seven times 66 and two-thirds percent of 1500,
11 we'll take one PTAX form with one name, then we had to
12 amend our July and then start submitting in August of 2019
13 one name with one PTAX form.
14    Q   Let's go on to N, 23 N, information about
15 the statement on Page 5. Right under Loos's charge of
16 discrimination, it's the bottom topic heading. Loos did
17 not want to work on a part-time basis and lose her
18 six-figure salary. When was Loos offered a part-time job?
19    A   Same time the other seven were.
20    Q   And who made that offer?
21    A   I did.
22    Q   What salary did you offer Loos?
23    A   The same as the other seven, $1500. At the
24 time her mother was not involved. She was the seventh.
25    Q   So you offered her $1500 a month?

16   (Pages 61 to 64)

Page 65

1    A  The same as the other six.
2    Q  Okay, is that yes?
3    A  Yes.
4    Q  And what were the hours she would be
5  working?
6    A  Same as what I've told you before. She'd
7  get a case, case and a half a month. She was also offered
8  additional compensation, but she declined it.
9    Q  What was that?
10   A  I could name her as GAL like I'm doing with
11 her mother. I could name her as juvenile abuse and
12 neglect as I'm doing with her mother. I could name her as
13 a J attorney as I'm doing with her mother. She could have
14 submitted a petition for attorney fees. She declined all
15 those. She said I only want to do criminal law; I'm not
16 doing the rest of that.
17   Q  Who appoints her mother for those cases?
18   A  I do.
19   Q  You've been designated for Topics 24 A
20 through G. So this is about information about matters
21 addressed in the June 15th, 2020, letter from Karin
22 Anderson to Dee Ann Hammack which is 24. Let me -- that's
23 going to be Exhibit --
24   THE REPORTER: Fourteen.
25   Q  -- 14.

Page 66

1    (Plaintiff's Deposition Exhibit Number 14
2  was marked for identification purposes.)
3    Q  (by Ms. Wolf) I'm handing you Deposition
4  Exhibit 14, and just like before, I have questions about
5  specific items in Deposition Exhibit 14. So my first
6  question is about something that is in Paragraph 4 which
7  is on Page 2. The question in Paragraph 4 of Deposition
8  Exhibit 14, it says in Judge Campanella's interview he
9  said complainant had been getting benefits in the amount
10 of $35,000. Please clarify if that was per year, what
11 amount that covered and provide documentation showing she
12 was receiving it, and my question was about the cost of
13 employing plaintiff in 2018 which is described generally
14 in Paragraph 4, so what did it cost to employ Courtney
15 Loos in 2018?
16   A  My opinion, $90,000. But as I was later
17 told, she was getting benefits as a full-time employee of
18 Perry County which came to somewhere between 20, $35,000,
19 depending upon whatever they use to determine your
20 benefits. They did that on their own.
21   MS. WOLF: So I had a specific question
22 about the cost of employing her. Is there someone who can
23 testify the specific cost? Usually we just get a piece of
24 paper with the cost.
25   MR. BRACEY: You're saying something

Page 67

1  different than the answer that's in Paragraph 4?
2    MS. WOLF: Well, this is not under oath.
3  I called for a 30(b)(6) witness. This answer is in 2018
4  the County paid $20,238.26 for complainant's health
5  insurance, dental, vision, IMRF, FICA and pharmacy,
6  medicine. I wanted someone who could testify to this.
7    MR. BRACEY: To her IRMF (sic)?
8    MS. WOLF: To the cost of employing
9  plaintiff in 2018.
10   MR. BRACEY: So the witness testified that
11 she received the $90,000 salary and that he learned later
12 that she received these ancillary benefits.
13   MS. WOLF: Yes. I want the total cost of
14 employing her in 2018.
15   MR. BRACEY: Your topic says information
16 about the cost of employing plaintiff in 2018 described
17 generally in Paragraph 4.
18   MS. WOLF: Right. It was only --
19   MR. BRACEY: The deponent --
20   MS. WOLF: -- described generally. I
21 wanted information about the total cost.
22   MR. BRACEY: Your topic does not say --
23   MS. WOLF: Okay, you're saying --
24   MR. BRACEY: -- about the specific
25 ancillary benefits paid in 2018 and whether the amount in

Page 68

1  Number 4 is accurate or not.
2    MS. WOLF: All right, we will consider
3  that a dispute.
4    MR. BRACEY: Additionally, those
5  deductions are documented in other documents that have
6  been produced in this case.
7    MS. WOLF: But this is my 30(b)(6) and I
8  got no objections.
9    MR. BRACEY: Well --
10   MS. WOLF: You've had months.
11   MR. BRACEY: -- duplicative discovery is
12 objectionable.
13   MS. WOLF: But you didn't object. You've
14 had since November.
15   MR. BRACEY: If you have the information,
16 then there's no need to have it again for a second or
17 third time.
18   MS. WOLF: You don't get to tell me how I
19 conduct my discovery. It just doesn't work that way.
20   MR. BRACEY: I understand.
21   MS. WOLF: Okay. All right. And had we
22 been able to take this in November when I noticed it, we
23 wouldn't be having this problem. All right. What else
24 are you designated for? Plus, on Friday Judge Campanella
25 was redesignated for this topic, so presumably, as

17  (Pages 65 to 68)

Page 69

1 required by Rule 30(b)(6), somebody provided him with the
2 information instead of producing him without adequately
3 preparing him which is a violation of the rules and I plan
4 to seek sanctions.
5       MR. BRACEY: The Judge has provided an
6 adequate answer.
7       MS. WOLF: We'll bring this up with the
8 Court.
9       Q (by Ms. Wolf) 25 -- 24 B. The statement in
10 Paragraph 5 that the 2019 budget was slashed by 1.3
11 million dollars, including information about the cuts
12 listed in the first paragraph. Okay. So my question is
13 about the statement in Paragraph 5 that -- and the
14 response that the budget was slashed by 1.3 million
15 dollars and these cuts, so was the budget in fact slashed
16 in 2019 by 1.3 million dollars?
17     A To my knowledge, yes.
18     Q Well, I'm asking for the knowledge of --
19     A Ma'am --
20     Q -- Perry County.
21     A -- I don't have a clue what you are asking
22 me when I'm giving you an answer. You asked me was it in
23 fact cut by 1.3. The answer was to my knowledge, yes.
24       MS. WOLF: Okay, do you understand what a
25 30(b)(6) deposition is?

Page 70

1       MR. BRACEY: Yes.
2       MS. WOLF: Okay. Do you understand the
3 problem with this testimony?
4       MR. BRACEY: He indicated he didn't
5 understand your question.
6       MS. WOLF: Okay.
7       MR. BRACEY: Perhaps you can rephrase.
8       MS. WOLF: Can you reread my question?
9       (The reporter read back the question.)
10       MR. BRACEY: He is designated here as the
11 County's witness. He answered your question.
12       MS. WOLF: He's not testifying as to --
13 for Perry County.
14       MR. BRACEY: Your notice says information
15 about matters addressed in the June 15th, 2020, letter
16 from Karin Anderson to Ms. Dee Ann Hammack.
17       MS. WOLF: A, in -- or B, the statement
18 that the 2019 budget was slashed by 1.3 million dollars,
19 including information about the cuts listed in the first
20 paragraph. My question was was the budget slashed by 1.3
21 million dollars?
22       MR. BRACEY: And he answered to his
23 knowledge, yes.
24       MS. WOLF: Okay. I am not interested in
25 Judge Campanella's personal knowledge. I am interested in

Page 71

1 the knowledge of Perry County.
2       MR. BRACEY: And your notice doesn't say a
3 designee who can say whether these numbers are accurate or
4 correct. It says about this topic. You're asking him
5 questions about this topic and he's responded to it.
6       MS. WOLF: All right. Do you consider
7 this our discovery dispute conference?
8       MR. BRACEY: I would prefer that we
9 distill all these disputes in writing at some point
10 following this deposition and then confer with the Judge
11 if needed.
12       MS. WOLF: This is actually a great way --
13 we're supposed to -- actually under the rules we must have
14 this dispute orally. In writing is not good enough.
15 Under the Judge's rules we must have this dispute
16 preferably face to face, so we're doing it on the record.
17       MR. BRACEY: That's not how -- typically
18 discovery disputes are not done on the record.
19       MS. WOLF: But it's great that we are.
20       MR. BRACEY: So we can confer by telephone
21 or by Zoom if you would prefer for this case.
22       MS. WOLF: So you're refusing to get this
23 resolved right now?
24       MR. BRACEY: We have made a record of
25 parts of the dispute.

Page 72

1       MS. WOLF: What part of the dispute
2 haven't we made a record of?
3       MR. BRACEY: Are you refusing to confer
4 after this deposition?
5       MS. WOLF: Is there something left?
6 What's left?
7       MR. BRACEY: Well, you're saying I'm
8 taking this to Court and I'm saying we can confer again.
9       MS. WOLF: About what?
10       MR. BRACEY: Are you refusing to confer
11 again?
12       MS. WOLF: What is left to confer?
13       MR. BRACEY: I assume that you are
14 indicating yes, you are refusing to confer after --
15       MS. WOLF: No.
16       MR. BRACEY: -- the deposition.
17       MS. WOLF: Don't assume anything. You
18 have nothing left.
19       MR. BRACEY: You're refusing to answer.
20       MS. WOLF: Look, you're in a bad position.
21 You have been put in a bad position. Just face it. If
22 you want to produce another witness, produce another
23 witness. Okay? Don't waste my time.
24     Q (by Ms. Wolf) All right. And I apologize
25 to you. You were not adequately prepared for this

18 (Pages 69 to 72)

Page 73

1  deposition by your counsel, so let's see if you're
2  adequately prepared for anything else. It's not your
3  fault.
4          MR. EWICK: I'm going to move to strike --
5      Q  (by Ms. Wolf)  What were we on?
6          MR. EWICK: I'm going to move to strike
7  as --
8          MS. WOLF: There's no motions to strike --
9          MR. EWICK: I can make a --
10         MS. WOLF: -- in deposition.
11         MR. EWICK: I can make motions.
12         MS. WOLF: You're not even -- you're
13  just --
14         MR. EWICK: Ferne, you're talking about
15  wasting time, but you're doing it more than anyone.
16         MS. WOLF: So what. I'm paying for this
17  deposition.
18     Q  (by Ms. Wolf)  24 -- what are we on -- 24 --
19         MR. EWICK: And actually you're supposed
20  to be asking questions --
21     Q  (by Ms. Wolf)  24 --
22         MR. EWICK: -- and letting him answer. We
23  don't need your ancillary comments about --
24     Q  (by Ms. Wolf)  24 --
25         MR. EWICK: -- his preparation level of

Page 74

1  it.
2          MS. WOLF: Well, actually we do need
3  comments about his lack of preparation.
4          MR. EWICK: You've made them and you're --
5          MS. WOLF: We do need --
6          MR. EWICK: -- doing a little bit much --
7          MS. WOLF: -- comments about these lack --
8  his lack of preparation because under the rules plaintiff
9  was serving the notice in compliance. We were supposed to
10 confer in good faith about before this was served --
11         MR. EWICK: I assure you he --
12         MS. WOLF: -- which required --
13         MR. EWICK: -- has been prepared.
14         MS. WOLF: Excuse me. I'm talking.
15         MR. EWICK: You can continue to talk, but
16 I can assure you he has been prepared for his deposition.
17 You're going --
18         MS. WOLF: Are you? So you've been
19 involved in his preparation for this deposition?
20         MR. EWICK: Ferne --
21         MS. WOLF: Have you?
22         MR. EWICK: -- I can assure you he was --
23         MS. WOLF: Were you? Were you?
24         MR. EWICK: What business is that of
25 yours?

Page 75

1          MS. WOLF: You just said you can assure me
2  he --
3          MR. EWICK: He's my client. You think I'm
4  going to not sit in on meetings with him?
5          MS. WOLF: Were you involved in his
6  preparation for this --
7          MR. EWICK: Ferne.
8          MS. WOLF: -- deposition?
9          MR. EWICK: I sit in on the preparation --
10         MS. WOLF: So is that yes?
11         MR. EWICK: -- just as I am entitled to.
12         MS. WOLF: Okay. Is that yes?
13         MR. EWICK: I don't need to -- what do you
14 mean is that a yes?
15         MS. WOLF: Were you --
16         MR. EWICK: I think it's pretty self --
17         MS. WOLF: -- involved?
18         MR. EWICK: -- explanatory.
19         MS. WOLF: No.
20         MR. EWICK: I just stated what my
21 involvement was.
22         MS. WOLF: Were you involved in his
23 preparation for this topic?
24         MR. BRACEY: These types of arguments are
25 not proper for on the record. We can take a break.

Page 76

1          MS. WOLF: Look, let me move on.
2      Q  (by Ms. Wolf)  Okay, we are on 20 -- I don't
3  want to miss anything -- 24 C. With regard to Paragraph
4  6, when Judge Campanella first communicated to County
5  officials that he planned to inquire or had inquired of
6  Judges in the surrounding circuits as to how the part-time
7  Public Defender system worked. Okay. So do you see
8  Item -- do you see Paragraph 6? Have you had a chance to
9  read Paragraph 6?
10     A  Yes.
11     Q  So in this response it says in early 2017
12 you started to inquire of Chief Judges in the circuit and
13 surrounding circuits as to how the part-time Public
14 Defender system worked as he had come to notice that
15 surrounding counties and circuits all used only part-time
16 Public Defenders. Is that accurate?
17     A  Yes.
18     Q  All right. Which -- in early 2017 which
19 Chief Judges had you contacted?
20     A  I've given you that information before.
21 I'll just refer you back to it. Same answer.
22     Q  Okay. I'm asking you now.
23     A  And I'm telling you it's the same answer --
24     Q  Okay.
25     A  -- I gave before.

Mueller Reporting, P.C.
618-692-9890

Page 77

```
1     Q  You mean in your deposition?
2     A  Yes, ma'am.
3     Q  Okay.  Well, I found that I didn't get a
4  complete answer, so I don't want to have to refer to
5  your --
6     A  And what --
7     Q  -- old transcript.
8     A  What -- what's incomplete about my previous
9  answer?
10     Q  I don't have it memorized.  Are you refusing
11  to answer my question?
12     A  No, ma'am, I'm simply telling you I've told
13  you that before and I'm getting tired of telling you same
14  thing over and over again.
15     Q  Okay.
16     A  If I can remember, how come you can't?
17     Q  All right.
18        MR. BRACEY:  Let's try to answer the
19  question if there's a question pending.  I'm not sure if
20  there is one.
21     A  I'm sure the question pending --
22        MS. WOLF:  What was my question?
23     A  What Chief Judges did I consult.  At the
24  time John Baricevic, St. Clair County.  At the time
25  Jackson County Chief Judge Bill Schwartz.  And I want to
```

Page 78

```
1  say at the time Franklin County Chief Judge, might have
2  been Tom Sutton.  I consulted the Randolph County Resident
3  Circuit Judge Richard Brown.  I consulted the Washington
4  County Circuit Judge which I think was Dan Emge at the
5  time.  That's best I can remember.  Consulted Dennis Doyle
6  on Monroe County, Resident Circuit Judge.
7     Q  (by Ms. Wolf)  This one says Chief Judge
8  Andrew Gleeson of the 20th Judicial Circuit.
9     A  Okay.
10     Q  Is that -- that's St. Clair, right?
11     A  It's St. Clair and it was either Baricevic
12  or Gleeson or both.  They switched about that time.
13     Q  That's all right.  I just happened to catch
14  that, and so Judge Gleeson is one of the people who might
15  have said that part-time Public Defenders are not
16  statutorily required to pay benefits?
17     A  He's one of the several.  What I think
18  happened was Baricevic got defeated and Gleeson hopped in
19  and I talked to both of them.
20     Q  Also in response to Paragraph 6, there's a
21  statement the State's Attorney also inquired about whether
22  the County could hire several part-time Public Defenders.
23  Do you see that?
24     A  Um-hm.  Yes.
25     Q  To whom did the State's Attorney make those
```

Page 79

```
1  inquiries?
2     A  Me.
3     Q  When?
4     A  Probably May or June of 2019.
5     Q  And was there any writing of those --
6     A  No.
7     Q  -- about those conversation -- okay.  And
8  what did you tell him?
9     A  That my consultations with the Chief Judges
10  and the Resident Circuit Judges all confirmed that you
11  could.
12     Q  Okay, let's move on to E and this is
13  Paragraph 7.  According to Paragraph 7, the IDHR asked for
14  supporting documentation relating to Judge Campanella's
15  statements about a January 2019 meeting.  In the response
16  there's information about two meetings, one in March and
17  one in April.  Do you see that?
18     A  Yes, ma'am.
19     Q  Were there any written records of a
20  January 2019 meeting?
21     A  No, ma'am.
22     Q  In the response the listed attendees at the
23  March meeting are Judge Campanella, the Circuit Clerk and
24  the probation supervisor.  Where was this meeting?
25     A  Jury room.
```

Page 80

```
1     Q  Do you know the date?
2     A  No.
3     Q  All right.  So we just -- this is one of
4  those March meetings; is that correct?
5     A  Yes.
6     Q  All right.  And are there any documents
7  reflecting the contents of the meeting or the attendees?
8     A  No.
9     Q  And in the response the attendees at the
10  late April meeting are Judge Campanella and the candidates
11  for the part-time Public Defender program.  What was the
12  date of that meeting?
13     A  Late April.
14     Q  And who attended that meeting?
15     A  Most, if not all, of the part-time Public
16  Defenders, Kim Kellerman, myself, the Probation Department
17  designee.
18     Q  And --
19     A  Maybe Mr. Searby.
20     Q  Are there any documents reflecting the
21  contents?
22     A  No.
23     Q  The attendees?
24     A  No.
25     Q  Moving on to Paragraph 11.
```

20  (Pages 77 to 80)

Page 81

1      MR. BAUMGART: Exhibit 8.
2      MS. WOLF: Okay.
3      **Q**  (by Ms. Wolf) So we're going to be using
4  Exhibit 8 again, referring to Exhibit 8 which I think you
5  have. It's those minutes. So in Paragraph 11, the IDHR
6  asks for documentation that the County was having
7  financial problems in 2018 and continuing to 2019. In
8  part of the answer, the County referred to minutes from
9  the July 5th, 2019, meeting that said that there was no
10 Bellwether update at this time. This topic relates to
11 Bellwether's updates. Did Bellwether provide any update
12 after July 5th, 2019?
13     **A**  At some point we stopped paying Bellwether
14 and they stopped giving updates. Don't know exactly what
15 day that was, but when they put in for another amount,
16 which again was not coming from the County because they
17 didn't have any money to pay Bellwether, we decided we had
18 enough of what was superficial advice and that was the end
19 of Bellwether, so I'm going to guess again there probably
20 were no updates after July of 2019.
21     **Q**  Do you know?
22     **A**  Do not know for sure.
23     MS. WOLF: Joe? Can you supply me someone
24 who knows?
25     MR. BRACEY: I'll look into it.

Page 82

1      **Q**  (by Ms. Wolf) Paragraph 13. So you can --
2  which is Page 6 of this. Right. And I may not ask you
3  because it may be repetitive, so let me look. We'll skip
4  that one. I've already asked enough questions about that.
5  So let's move on to 25.
6      MS. WOLF: Which exhibit number is it?
7      THE REPORTER: Fifteen.
8      (Plaintiff's Deposition Exhibit Number 15
9  was marked for identification purposes.)
10     **Q**  (by Ms. Wolf) Okay, I'm handing you
11 Deposition Exhibit 15 and you have been designated about
12 Topics 25 A through G which it starts on Page 11 of
13 Deposition Exhibit 1, so it's information relating to
14 matters in Deposition Exhibit 15, and the first one is 25
15 A which is with regard to Item L.1 which is on Page 3 of
16 Deposition Exhibit 15, I think we're on. What?
17     MR. BAUMGART: Fifteen.
18     **Q**  (by Ms. Wolf) Fifteen, yeah. There's a
19 reference to a January meeting. The exact date, it says
20 there's a mention Loos was informed of the pending change
21 in her employment status at a meeting in January 2019.
22 I'm looking for the date of the meeting.
23     **A**  Approximate, January 15th, middle of
24 January.
25     **Q**  Who was there?

Page 83

1      **A**  Same people as I said before, that they were
2  just office holders now.
3      **Q**  Pardon?
4      **A**  These were just office holders, Kim
5  Kellerman, my court reporter, Beth Cassidy in Probation,
6  David Searby from State's Attorney's office. Might have
7  been one or two others because I was throwing out an
8  idea -- Courtney was there because it affected her
9  position, and I said I'm looking at the numbers here and
10 it appears my contribution to the budget crisis is going
11 to be to go to part-time Public Defenders.
12     **Q**  Was this a meeting with -- where the other
13 part-time Public Defenders were at?
14     **A**  No, I said they weren't there yet. I hadn't
15 even figured out who they were going to be.
16     **Q**  All right. And I gather there's no written
17 record of --
18     **A**  Nothing.
19     **Q**  -- this meeting. And is there a record of
20 the attendees?
21     **A**  No.
22     **Q**  Let's move on to L.2, 3 and 6 -- and X.6.
23 The County discusses paying wages out of Specialty Funds,
24 and we may have already covered this to some extent, but
25 the topic includes the meaning of Specialty Funds, the

Page 84

1  source and permissible use of such funds and out of what
2  funds wages were paid if not out of Specialty Funds. So
3  **L.2,** for example, the last sentence refers to paying
4  somebody out of the department's Specialty Funds. I was
5  trying to find out what that term meant when wages are
6  being paid out of Specialty Funds. What does that mean?
7      **A**  Give you an example. Fiscal crisis, County
8  Board comes to the Circuit Clerk, says you got five
9  employees. We're not going to pay for 40-hour work weeks.
10 Two of the five will have to go to 32-hour work weeks.
11 Circuit Clerk says no deal, I'm willing to see to it they
12 get the same 40 hours as everybody else. So to date,
13 those eight hours plus the benefits is attributable to
14 eight hours being paid out of Specialty Funds so that the
15 employees will get a full 40-hour work week.
16     **Q**  Where does the money for Specialty Funds
17 used for salaries come from?
18     **A**  I explained that to you before. Fines,
19 fees, costs and assessments distributions.
20     **Q**  Not taxes, correct?
21     **A**  No, ma'am.
22     **Q**  All right. And that's yes, not taxes?
23     **A**  Yes, not --
24     **Q**  Okay.
25     **A**  -- taxes.

21 (Pages 81 to 84)

Mueller Reporting, P.C.
618-692-9890

Page 85

1      Q   All right. All right, and let's move on to
2   C. In L.2 the County said that every department was
3   reduced to a 30-hour work week. How many employees were
4   reduced to 30 hours?
5      A   First of all, I don't think it was 30. It
6   was 32, but I may be wrong. I know they said 30 here, but
7   I -- I can't verify that. It could have been 30, but I'm
8   looking at what I see every month, and right now I'm
9   thinking that eight hours for two employees is what we are
10  paying. When did that happen? Same time that the County
11  said that they were going to slash the budget and part of
12  it was going to be salaries and two of the employees, the
13  bottom of the totem pole, would only be working 32 hours.
14     Q   So how many employees? It says -- it says
15  that every department was reduced to a 30-hour work week
16  which I understand might have been 32, but how many
17  employees were reduced?
18     A   Here it was only two in the Circuit Clerk's
19  office. The Sheriff's Department had to lay off 17. And
20  again you can raise your objections, but I don't know what
21  happened in the Treasurer's office or the County Clerk's
22  office, so those type of questions, even though they are,
23  quote, County questions, could obviously be answered
24  better by Jodi Koester, Bobby Kelly who's the current
25  County Clerk. People of that nature would have a better

Page 86

1   understanding.
2      Q   Okay.
3      MS. WOLF: Joe?
4      MR. BRACEY: We'll follow up to see if
5   there's another designee to answer the question.
6      MS. WOLF: Okay. Thank you. I
7   appreciate. That's very helpful.
8      Q   (by Ms. Wolf) Let's see. So for the
9   employees you know about, did they have benefits like
10  group insurance?
11     A   Of course they do.
12     Q   All right.
13     A   Full-time employees.
14     Q   And did they have IMRF benefits before the
15  reduction?
16     A   Yes.
17     Q   Did they have IMRF benefits after the
18  reduction?
19     A   Because we paid for them.
20     Q   Okay. So the answer is yes?
21     A   But not out of the General Fund.
22     Q   Okay. But the answer is yes?
23     A   Yes. They maintained their status quo even
24  though the County refused to pay for eight of their hours.
25  Four-day work week is what they called it. That's why I

Page 87

1   think it's 32.
2      Q   This question relates to the sentence in L.2
3   that -- the sentence says every department was reduced to
4   a 30-hour work week and then the next sentence if a
5   department requires an employee to work 40 hours per week,
6   that office holder pays for the additional 10 hours per
7   week out of the department Specialty Funds.
8      A   Um-hm. Yes, ma'am.
9      Q   Okay. I'm gathering you probably don't know
10  the answer to this based on your other testimony, but how
11  many of the employees reduced to a 30-hour work week were
12  in departments that required a 40-hour work week as
13  described in L.2?
14     A   Circuit Clerk's office for sure, and again I
15  don't know what the Treasurer or County Clerk did.
16     Q   What I was looking for is was 40-hour
17  standard?
18     A   Forty-hour is standard under the contract,
19  yes, ma'am.
20     Q   And by that, you mean collective bargaining
21  agreements?
22     A   Yes, ma'am.
23     Q   D which is L.4 and it's at the bottom of
24  Page 4 of the exhibit, the County said that each of the
25  seven part-time Public Defenders -- let me see if we can

Page 88

1   skip some of this, all right? We can skip D. All right.
2   Let's move to 25 G which is about Item X.4. It's on Page
3   7 of the Exhibit --
4      MR. BAUMGART: Fifteen.
5      MS. WOLF: Fifteen?
6      MR. BAUMGART: Yes.
7      MS. WOLF: Okay.
8      Q   (by Ms. Wolf) The Illinois Department of
9   Human Rights numbers their questions this way. That's why
10  they're this way. So X.4 was the Illinois Department of
11  Human Rights's questions about how complainant hours were
12  ranked within respondent's formula criteria in comparison
13  to other employees' hours, and this question related to
14  Item X.4 and the statement that -- let me see.
15  Plaintiff's hours had already been reduced. What were her
16  required hours?
17     A   Are we speaking about Courtney Loos now?
18     Q   Yes, yes, Plaintiff Courtney Loos's hours.
19  What were her required --
20     A   There were no hourly requirements. There
21  were an attendance and do your job requirements. She was
22  here on an as needed basis. There were no designated
23  days. There were no designated hours. She served when
24  she was needed. It could sometimes be three days in a row
25  and sometimes it could go a week with nothing.

Page 89

1    Q  So when it says here complainant resigned
2 rather than work in a part-time capacity and she received
3 her full-time salary until the date of her resignation
4 even though her hours had already been reduced, what does
5 that mean?
6    A  I don't know that that's an accurate
7 statement.
8    Q  Okay.
9    A  First of all, she did not get any kind of
10 reduced salary, and she quit a month and a half before her
11 salary was nullified.  She quit in mid May of 2019.  We
12 paid her through June of 2019.  She did no work after her
13 resignation letter.  I had to reassign all of her cases to
14 the seven part-time Public Defenders who served a month
15 and a half on a pro bono basis.
16    Q  Okay.  Let's see if I can -- try to see if I
17 can skip some more.  25 A through G.  29, I think, is the
18 complaint.  The answer.  Which I don't know if you need
19 this, but --
20       MS. WOLF:  This is 16?  Is this 16?
21       MR. BAUMGART:  Yes.
22       MS. WOLF:  Okay.
23       (Plaintiff's Deposition Exhibit Number 16
24 was marked for identification purposes.)
25    Q  (by Ms. Wolf)  I'm handing you Deposition

Page 90

1 Exhibit 16 and this relates to Topics 29 A and B which are
2 on Page 14 of the deposition notice and it's about
3 Paragraph 48 of the answer, so it is -- up at the top of
4 the answer the pages are numbered, so you can see it's
5 Page 12 of 30 -- or Page 13 of 30?  Right, Page -- in
6 Paragraph 48, plaintiff alleged in responding to
7 plaintiff's IDHR retaliation, the County claimed that it
8 changed the Public Defender position to part time to cut
9 costs, and in the answer the County and Board Chair
10 admitted that as part of the IDHR proceedings, the County
11 explained that one of the many measures taken to lessen
12 the County's financial crisis was to change the full-time
13 Public Defender position to part time, but Defendants
14 County and Board Chair deny the remaining allegations in
15 Paragraph 48.  Who took the measure to change the
16 full-time Public Defender position to part time?
17    A  It was not a full-time Public Defender's
18 position.  I keep saying that.  It was in her mind her
19 full-time job.  We took the part-time Public Defender
20 position of Courtney Loos and changed it to where there
21 would be no benefits to seven part-time Public Defenders.
22 That was because the County took the initiative on their
23 own to put her on the payroll as a full-time employee and
24 give her benefits.  No good deed goes unpunished.
25    Q  30.  We'll skip 30.  31.  Okay, go to 31.

Page 91

1 Plaintiff's request to be compensated in accordance with
2 the Illinois statute relating to Public Defender salaries
3 and the County's response, including how it was decided
4 when to begin paying her 90 percent of the State's
5 Attorney salary and who had input into that decision.  So
6 when did plaintiff first request to be compensated in
7 accordance with the Illinois statute relating to Public
8 Defender salary?
9    A  Probably a month before she actually started
10 getting the salary which would have been March, April
11 possibly, 2019, maybe a month before that, February or
12 March.
13    Q  And how did the County respond to her
14 request?
15    A  Did not have communication directly with the
16 County Board.  David Searby did.  He is the one that
17 without consultation with me, as far as I know, anyone
18 else, called up the Treasurer, told the Treasurer they
19 need to start cutting Courtney a check based on a salary
20 of $121,000 based on a statute.  I didn't find out about
21 it until later that month when I got my budget reports.
22 Never confronted him about it because it wasn't my
23 decision.  Like I said a hundred times before, she wasn't
24 a full-time Public Defender, so I didn't think she
25 qualified under that statute, but he apparently did.

Page 92

1    Q  And you didn't think she qualified because?
2    A  She wasn't a full-time Public Defender.  She
3 could have done whatever she wanted to do.
4    Q  Did she make the request to you, also?
5    A  What request?
6    Q  The request to be compensated.
7    A  Absolutely she did.  She's the one that
8 walked in and said hey, I went to a seminar, I found this
9 statute says I'm supposed to be getting paid 90 percent
10 of what the State's Attorney makes as a full-time Public
11 Defender.
12    Q  And did she make that request about a month
13 before she started getting it, the full-time?
14    A  I would say it would have been a month.
15 Possibly six weeks.  Took a little while to generate that.
16    Q  What did you say when she told you she
17 wanted to get the salary?
18    A  Same thing I've told you lot of times
19 before.  I said hmm, that comes at a rough time, I don't
20 know how the County's going to handle it, something to
21 that effect.  We were broke and she was entitled to a
22 salary of maybe 30 to $40,000 more than what she was being
23 paid.
24    Q  Did you talk to her about not being entitled
25 to it because she wasn't full time?

23  (Pages 89 to 92)

Page 93

1    A  Did not.
2    Q  Did you and she ever discuss -- no,
3  that's -- how many times did you and she talk about her
4  request to be compensated in accordance with the Illinois
5  statute?
6    A  I'm going to say three.
7    Q  Do you have any notes?
8    A  No.
9    Q  Did you have authority to change her salary?
10   A  Salary was set by she and I by agreement, so
11 I guess the answer would be yes, just like I had the
12 authority to hire her or to not retain her.  That, of
13 course, lied in the discretion of all twelve of the
14 Circuit Judges.
15   Q  Then how was David Searby able to go around
16 you and contact the Treasurer to get the raise?
17   A  Simply picking up the phone and calling Mary
18 Jane and saying hey, look, I'm the State's Attorney of
19 Perry County; I've looked at the law and you should be
20 paying her $120,000.  He bought the concept without
21 thinking about it, in my opinion, that she was a full-time
22 employee of the County because she was getting benefits
23 and therefore qualified under that statute which I've
24 never agreed with, but that's just the difference between
25 his opinion and mine.

Page 94

1    Q  So it was your understanding that if you
2  were part time, you didn't get benefits?
3    A  Nobody that was part time got benefits.
4    Q  Like IMRF?
5    A  Until the County decided that they would put
6  the Public Defender, this one, the only one, and Jennifer
7  Foutch before that on the benefits list.  Jennifer came
8  more naturally because she was an assistant prosecutor and
9  had been a full-time assistant prosecutor, so she was
10 already in the benefits column.  When she came to the dark
11 side, as we used to call it, and decided to be the Perry
12 County Public Defender part time, all she did was Public
13 Defender work and she stayed on the benefits column.  When
14 Courtney came in, it was just more or less a substitution
15 and nobody ever questioned that she was getting benefits
16 as a part-time Public Defender because the only thing she
17 was doing was Public Defender work.
18   Q  In the answer -- well, it's actually not
19 your answer, but there's an allegation that plaintiff has
20 failed to mitigate her damages, and you've been designated
21 as Franklin County's representative --
22   A  Ma'am, one more time, we are in --
23   Q  Okay.
24   A  -- Perry County.
25   Q  Perry -- I am sorry.  So that's three.

Page 95

1  Right.  Okay.  So you have been designated on behalf of
2  Perry County to testify about plaintiff's failure to
3  mitigate her damages.
4    A  Yes, ma'am.
5    Q  What facts do you base that allegation on?
6    A  When we decided to offer positions to seven
7  people, I asked Courtney Loos if she would like to be one
8  of the seven.  She respectfully declined.  I said then,
9  well, if the 1500, like she told me, isn't going to cover
10 her mortgage, I said let me help you and I'll appoint you
11 as GAL.  Same thing we went through an hour and a half
12 ago.  She respectfully declined.  Her response, I only
13 want to do criminal law; I'm not going to learn anything
14 else.  I said okay, thank you.
15   Q  For purposes of assessing mitigation of
16 damages, who did you appoint GAL instead?
17   A  Her mother.  After I consulted her mother
18 and she said she'd take the position willingly.
19   Q  Anybody else?
20   A  As a GAL?
21   Q  Yeah.
22   A  Yeah, we still use other people as GALs.
23 Charlie Kuhnert, Stuart Morgenstern.  You can't use the
24 same GAL in all the cases because again you've got
25 conflicts involved.

Page 96

1    Q  So she would not have been able to be GAL in
2  all the cases either, is that correct?
3    A  Well, she would have been had there not been
4  a conflict, but when she transgressed, if you will, or
5  transformed to a GAL from a Public Defender, she's going
6  to have conflicts that I would have had to recognize
7  because she just represented some of the people that she
8  might be appointed GAL where the people's kids are
9  concerned.
10   Q  So if I understand what you're saying,
11 because she had already been a Public Defender, that
12 sometimes even as GAL she might have some conflicts?
13   A  She might have some conflicts, yeah.
14   Q  All right.
15   A  Stands to reason.
16   Q  Topic 35 is communications with other
17 Counties and Judges about their participation in the
18 reimbursement program for Public Defender salaries for the
19 period of January 1st, 2017, to the present.  So what
20 communications have there been for Perry County with other
21 Counties and Judges about their participation in the
22 reimbursement program, the Public Defender reimbursement
23 program?
24   A  Only time I had any communication with any
25 Judges from other counties about the reimbursement was

24   (Pages  93 to 96)

Page 97

1  when I discussed with them their procedure with the PTAX
2  forms. Because that's what triggers the reimbursement.
3      Q  And which Judges were those?
4      A  Again would be the ones, Andrew Gleeson out
5  of St. Clair, and Franklin County -- actually I talked to
6  the Circuit Clerk there, Jim Muir. Jackson County, I
7  talked to the Circuit Clerk down there, Cindy Svanda.
8  Talked to Dennis Doyle, Judge in Monroe County. All in an
9  attempt to figure out how they were doing it to see if we
10  were doing it either illegally or without any criminal
11  intent incorrectly, and by that, I mean when your client
12  brought up the prospect of Calen saying he was getting
13  10,5 when he was only getting 1500, I had to inquire about
14  how everybody else did it.
15      Q  So some of these communications were after
16  Courtney Loos filed this lawsuit, is that --
17      A  With regard to what you just said and the
18  communications about how they gotten paid -- the
19  reimbursement, that was after.
20      Q  Did you talk to any of the Clerks or Judges
21  about how they did reimbursement before Courtney Loos
22  filed this lawsuit?
23      A  No, because we didn't know we were doing
24  anything wrong.
25      (Plaintiff's Deposition Exhibits Number 17

Page 98

1  through 19 were marked for identification purposes.)
2      Q  (by Ms. Wolf)  Okay. This is Topic 36 and
3  relates to Interrogatory 9, the answer to Interrogatory 9,
4  and 17 is Defendant Perry County's Second Supplemental
5  Answers to Plaintiff's First Set of Interrogatories and
6  Interrogatory 9 is -- these pages aren't numbered. Here
7  we go. Have you or anyone on your behalf analyzed whether
8  eliminating the full-time Public Defender job saved money?
9  If so, who, when and what were the results of the
10  analysis, including all items considered and the dollar
11  values attached to each. So that's what 36 and 37 are
12  about. So in the original answer -- oh -- the County
13  stated it hired Bellwether to perform a detailed
14  operational review of the County and offer recommendations
15  on getting out of debt. This topic relates to that
16  answer. The information supplied to Bellwether about the
17  Public Defender position, including who supplied it and
18  when, Bellwether's recommendations about the Public
19  Defender position and communications with Bellwether about
20  the Public Defender position. So what information was
21  supplied to Bellwether about the Public Defender position?
22      A  The amount of salary and benefits.
23      Q  Who supplied that information to Bellwether?
24      A  Mary Jane Craft.
25      Q  When would she have done that?

Page 99

1      A  When Bellwether first inquired about what we
2  were paying so that he could put together a sheet to
3  determine where we could make our cuts.
4      Q  Would that have been in early 2019?
5      A  I'm going to guess about March is when we
6  wrote the check to Bellwether for $17,000 because the
7  County didn't have it.
8      Q  One of these exhibit is -- exhibits is that
9  Bellwether report and that might refresh. Oh, this is
10  loose. These must be your documents. I'm sorry. I
11  messed up your documents. Well, that's all right.
12  Bellwether's recommendations about the Public Defender
13  position, did he -- was it Bruce DeLashmit, DeLashmit --
14  did he make any recommendations about the Public Defender
15  position?
16      A  Not to me.
17      Q  Do you -- how about to the County?
18      A  Along with his other recommendations, yes.
19      Q  What did --
20      A  Generically he just simply wanted all the
21  salaries to -- that were capable of being cut to be cut
22  which made no sense because it was illegal to do what he
23  had suggested to do in one respect and that was to cut the
24  salary of the Commissioners which you can't do with an
25  elected official while they're in office. Pointed him out

Page 100

1  to him and then he kind of said oh, shoot.
2      Q  Were there any other communications with
3  Bellwether about the Public Defender position?
4      A  That communication was in the meeting in
5  which he announced he was the Grand Poobah for Bellwether
6  and we were going to have to cut our budget by 1.3 million
7  dollars in that dissertation upstairs. There were several
8  people, all of which were County employees or officials
9  that attended. That was the only communication really
10  that I ever had with DeLashmit.
11      Q  I don't have those Board meeting minutes
12  with me, but was it at a big Board meeting?
13      A  No, ma'am.
14      Q  Okay.
15      A  This was an impromptu meeting that
16  Bellwether called to give us an idea of what he was going
17  to suggest. It was in that meeting that he said that he's
18  going to suggest to the Commissioners, who were there, by
19  the way, that they cut their salary from 3,000 a month to
20  $1500 a month.
21      Q  The County Commissioners were there?
22      A  (Nodding head)
23      Q  All three of them?
24      A  I don't know that all three were there. I
25  want to say Bobby Kelly was there and that might have been

25  (Pages 97 to 100)

Page 101

1  their only representative because of the Open Meetings
2  Act. But there was definitely a representative there
3  because he was wanting to advocate that they cut their
4  salaries. Could have been Dallas Bigham. I'm not sure
5  which one was there. Epplin, I think, was sick by then
6  and he didn't attend.
7      Q  I'm handing you Deposition Exhibit 18 and
8  maybe this will refresh your recollection about some
9  things. In the Second Supplemental Answer to
10  Interrogatory 9, Defendant stated in part that Bruce
11  DeLashmit of Bellwether presented a plan of action to the
12  Board on April 28th, 2019, Perry County 217-233, for
13  recommendations. The Board hired Bellwether on
14  April 23rd, 2019, and the Board officially declared a
15  financial emergency with the County on April 25th, 2019,
16  and that's Exhibit 19. Regarding that answer, are the
17  plan of action and recommendations the same thing? So in
18  the -- so if you look at the interrogatory answer --
19      A  Are the plan -- which I don't know about
20  that syntax -- are the plan of action and recommendations
21  the same thing?
22      Q  Right.
23      A  The recommendations were more than the
24  actual plan that was implemented, to my recollection. He
25  had recommended more than what they actually did, but it

Page 102

1  still came to 1.3 million.
2      Q  What part of the plan of action covered the
3  Public Defender position?
4      A  My budget eliminating the conflicts line
5  item of some 40 to $60,000.
6      Q  In the Operation Review Recommendations --
7      A  Um-hm.
8      Q  -- is there something -- which is Exhibit
9  18 -- is there something in here that affects --
10      A  Exhibit 18? Okay.
11      Q  Yes.
12      A  Go ahead.
13      Q  You have that --
14      A  Got it.
15      Q  -- in front of you? Okay. So is there
16  something in Exhibit 18 about the Public Defender
17  position?
18      A  No. That would be way too specific for what
19  he was doing. He was simply taking everyone's budget and
20  saying look, you're going to have to do something and not
21  telling us exactly what all the time to reduce it. They
22  wanted them all reduced by 33 and a third percent. My
23  reply back was I think I can do that if I go to seven
24  part-time Public Defenders.
25      Q  Is your budget somewhere in --

Page 103

1      A  No.
2      Q  -- Exhibit 18?
3      A  No. Not that I'm aware of anyway.
4      Q  I see some mention of security fees?
5      A  Yeah, but that's got nothing to do with my
6  budget. That's another fund that is funded by court
7  fines, fees and assessments and is to be used for, quote,
8  court security. He wanted to use those funds and apply
9  them towards the debt.
10      Q  Was it after Exhibit 18 that there was that
11  transfer about -- of about a quarter of a million dollars
12  that you --
13      A  Oh, yeah.
14      Q  -- referenced?
15      A  Had to be shortly after that. We took those
16  recommendations, implemented a budget that would be
17  commensurate with it, then paid off all of our vendors so
18  we could try to keep our head above water.
19      Q  As a result of the Declaration of Financial
20  Emergency which is Exhibit 19 which is somewhere here --
21      A  Right here, ma'am.
22      Q  Right. Okay. Which departments and
23  County-wide elected officials participated in an
24  operational review that included the Public Defender
25  position?

Page 104

1      A  Treasurer's office, the County Clerk's
2  office, the Assessor's office, the Circuit Clerk's office,
3  the State's Attorney's office and my office. Probation
4  Department.
5      Q  Okay. The next topic I'm going to ask you
6  about is --
7          MS. WOLF: What part of 39 is he
8  designated for?
9          MR. BRACEY: To the third semicolon.
10  Looks like some of this may have been touched upon --
11          MS. WOLF: Yeah --
12          MR. BRACEY: -- previously.
13          MS. WOLF: -- it may have already been, so
14  it -- so the first two was Jodi? The first two
15  semicolons -- I should have numbered these --
16          MR. BRACEY: No --
17          MS. WOLF: -- was Jodi. Of 39.
18          MR. BRACEY: I'm sorry, yeah, he is
19  designated up until -- so I guess the first --
20          MS. WOLF: Or, no, did -- did we end up
21  changing it, that it's all him?
22          MR. BRACEY: That's a good question.
23          MS. WOLF: I don't remember. Do you know?
24          MR. BAUMGART: I don't have a note of
25  that.

26  (Pages 101 to 104)

Page 105

1        MS. WOLF: Okay. Let's see. But I may
2   have all of this already. Let me see.
3        MR. BAUMGART: The one we skipped with
4   Jodi was 10 B.
5        MS. WOLF: Okay. We already did that, but
6   I thought we also --
7        MR. BAUMGART: Yeah.
8        MS. WOLF: -- skipped --
9        MR. BAUMGART: I think that was --
10       MS. WOLF: -- 39.
11       MR. BAUMGART: -- the only one.
12       MS. WOLF: But let me read it again
13  because we may have covered this already. I don't have to
14  ask anything more -- I've already covered this in 39,
15  so -- okay. So we can go to 41.
16       (Plaintiff's Deposition Exhibit Number 20
17  was marked for identification purposes.)
18       Q   (by Ms. Wolf) I've handed you Deposition
19  Exhibit 20 which is two affidavits, one of Kimberly
20  Kellerman -- well, it says affidavit on the top. Let's
21  just say that. It says affidavit on the top. One is
22  Kimberly Kellerman and the other is Beth Cassidy, and
23  Topic 41 is information about Kimberly Kellerman and Beth
24  Cassidy's affidavits, including about -- information about
25  how they were prepared, who called the meeting described,

Page 106

1   who attended, whether anyone took notes or otherwise
2   recorded or summarized the meeting, the purpose of the
3   meeting, how the meeting was publicized. So, first, are
4   you familiar with these documents, Perry County 235 and
5   Perry --
6        A   Yes.
7        Q   -- County 236? Okay. Are you familiar with
8   how these documents were prepared?
9        A   Yes.
10       Q   Okay. How were they prepared?
11       A   On a typewriter.
12       Q   All right. Whose typewriter?
13       A   I believe the individual people that signed
14  off, but it's possible that they sit down with a court
15  reporter who has a much better typewriter and she typed
16  what they told her to say.
17       Q   Were you present?
18       A   No.
19       Q   Do you know why Kimberly Kellerman prepared
20  Perry County 235?
21       A   Yes.
22       Q   Why?
23       A   At the request of the investigator for the
24  Department of Human Rights. They wanted to know about the
25  meeting in which I offered some respite, some possible

Page 107

1   help to Courtney if we did go to the part-time Public
2   Defenders, and she replied are you firing me.
3        Q   All right. And is that the same thing for
4   the document signed by Beth Cassidy, Perry County 236?
5        A   I understand it is, yes.
6        Q   Okay.
7        A   Because they were both in attendance when
8   that conversation took place.
9        Q   Do you know how Kimberly Kellerman knew to
10  write this document?
11       A   Yes, the attorney for the County who I think
12  was Karin Anderson who was heading up the defense of the
13  Department of Human Rights's investigation told her we
14  needed these documents.
15       Q   Okay. I'm not asking for privileged
16  information. I was asking -- okay. Did you talk to
17  Kellerman about preparing her document?
18       A   No.
19       Q   Okay.
20       A   I mean, that was Karin that told her that we
21  needed an affidavit.
22       Q   All right. And did you talk to -- before
23  Kellerman prepared Exhibit -- the first page of Exhibit
24  20, did you talk to her about the contents?
25       A   I definitely talked to her as to whether or

Page 108

1   not she remembered when we first were requested to find
2   people to do affidavits to shore up our answers, Kim, do
3   you remember sitting in there, and the answer was yes.
4   There were two or three that I asked that did not
5   remember.
6        Q   All right. And was the same thing true with
7   Beth Cassidy?
8        A   Yes. Those are the only two that seemed to
9   remember the conversation. The others that I thought were
10  there said they weren't there or they didn't remember.
11       Q   So the contents of these describe a meeting
12  in early to mid March of 2019, and who called the meeting
13  that they're describing?
14       A   I did.
15       Q   And neither one of the women says who all
16  attended. For this, are they both talking about the same
17  meeting?
18       A   Yes.
19       Q   Do you know who attended the particular
20  meeting they're talking about?
21       A   I know who I thought attended, but it was
22  obviously an error because when I asked some of those,
23  they told me they weren't there.
24       Q   Okay. Well, based on what you now know, who
25  do you believe attended the meeting?

27  (Pages 105 to 108)

Page 109

1    A   Based on what I now know, David Searby who
2  did not want to do an affidavit, myself, Beth Cassidy, Kim
3  Kellerman, Courtney Loos.  I thought there were others,
4  but now that you say based on what I now know, I cannot
5  sit here and tell you that people are lying to me when
6  they tell me they weren't there.
7    Q   Who told you they weren't there?
8    A   Cindy Chapman, my court reporter, said she
9  was not in attendance.
10   Q   Anybody else?
11   A   I personally thought Mary Jane Craft was
12  there, but no, she said she wasn't, so I guess I'm in
13  error.
14   Q   Okay.  That's all I have on that one.  I
15  thought we had already gotten this already from somebody
16  else, but in June of 2020 who employed Kim Kellerman?
17   A   Kim Kellerman is not employed.  She was
18  elected by the public and of course she's a County
19  employee, so I guess you can say who employed her, but she
20  had to run for election to get the position.  Beth
21  Cassidy, on the other hand, is paid by the State as a
22  probation officer.  She's not an elected official.
23   Q   So the State of Illinois pays Beth Cassidy's
24  salary?
25   A   Yes, ma'am.

Page 110

1    Q   Okay.
2    A   Actually they reimburse the County, but yes.
3  County pays it, then the State reimburses, that kind of
4  nonsense.
5    Q   Okay.  Let me get this straight.  Is Beth
6  Cassidy another one of those reimbursed --
7    A   No.
8    Q   -- jobs?
9    A   No.
10   Q   Okay.
11   A   No.  Probation officers are 100 percent
12  salaried employees by the State of Illinois.
13   Q   Okay.  So --
14   A   I think what happens is that they pay the
15  salary and we pay the benefits, I think is the way it
16  works, so she gets a check and it might be a County check,
17  but it's actually paid by the State of Illinois because
18  they reimburse the County for all your probation officers.
19  You wouldn't believe it.  You wouldn't believe it.
20   Q   Well, we just heard that the sheriffs are
21  now going to be --
22   A   90 percent of the State's Attorney's salary.
23   Q   Oh, okay.  Yeah.
24   A   Here we go again.
25   Q   We just heard that in our last set of

Page 111

1  depositions.
2    A   Yeah.
3    Q   So anyway, and Kimberly Kellerman is
4  elected, but the -- she is a Perry County official; is
5  that correct?
6    A   Absolutely.
7    Q   Okay.
8    A   She's paid only by the County.  She does
9  receive a stipend, the way I understand it, from the State
10  of Illinois, but for what and how much, I don't know, so
11  they might, you know, give her a little bit of money for
12  this or that, but whatever.
13   Q   And we don't have to do 44.  We've already
14  covered it, so I have nothing further.
15       MR. BRACEY:  Tom, do you have any
16  questions?
17       MR. EWICK:  No, I don't have any
18  questions.
19       MR. BRACEY:  I don't have any follow-up
20  and we'll reserve signature.
21       THE VIDEOGRAPHER:  We're off the record
22  and the time is approximately 2:07.
23
24       (Signature not waived)
25

Page 112

1              REPORTER'S CERTIFICATE
2
3
4        I, KIMBERLY MUELLER, a Certified Shorthand Reporter
5  in and for the State of Illinois, do hereby certify that,
6  pursuant to agreement of counsel, there appeared before me
7  on July 11, 2022, at the Perry County Courthouse, 1 Public
8  Square, Pinckneyville, Illinois, JAMES W. CAMPANELLA, who
9  was by me first duly sworn to testify to the whole truth
10  of his knowledge touching the matter in controversy
11  aforesaid, so far as he should be interrogated concerning
12  the same; that he was examined, and his examination was
13  taken by me and afterwards transcribed into typewriting,
14  to be signed by the deponent, his signature not having
15  been waived, and his deposition is herewith returned.
16      BY THE AUTHORITY BESTOWED UPON ME, I have hereunto
17  set my hand on this 21st day of July 2022.
18
19
20
21              _____
21              Illinois CSR #84-002718
22
23
24
25

Mueller Reporting, P.C.
618-692-9890

Page 113

```
 1                      ERRATA SHEET
 2   WITNESS:  JAMES W. CAMPANELLA
 3   DATE OF DEPOSITION:  7/11/22
 4   IN RE:  COURTNEY LOOS vs. THE COUNTY OF PERRY, ILLINOIS,
             and JAMES CAMPANELLA, in his individual capacity
 5           (20-cv-1107-MAB)
 6   After reading the deposition and before subscribing
     thereto, the deponent indicated the following changes
 7   should be made:
 8   Page     Line                Should read:
 9
     Reason assigned for change:
10
11   Page     Line                Should read:
12
     Reason assigned for change:
13
14   Page     Line                Should read:
15
     Reason assigned for change:
16
17   Page     Line                Should read:
18
     Reason assigned for change:
19
20   Page     Line                Should read:
21
     Reason assigned for change:
22
23
24                      DEPONENT SIGNATURE
25
```

Page 114

```
 1                    SIGNATURE PAGE
 2
 3          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 4
 5   COURTNEY LOOS,                )
                                   )
 6          Plaintiff,             )
                                   )
 7   vs.                           )  C.A. No. 20-cv-1107-MAB
                                   )
 8   THE COUNTY OF PERRY,          )
     ILLINOIS, and                 )
 9   JAMES CAMPANELLA, in his      )
     individual capacity,          )
10                                 )
            Defendants.            )
11
12
13          I, JAMES W. CAMPANELLA, being first duly sworn,
14   on oath say that I am the deponent in the aforesaid
15   deposition taken on the 11th day of July 2022; that I have
16   read the foregoing transcript of my deposition, consisting
17   of Pages 1 through 114 inclusive, and affix my signature
18   to same.
19
                        JAMES W. CAMPANELLA
20
21
          NOTARY PUBLIC
22
23   Subscribed and sworn to
24   before me this      day of
25                  , 20   .
```

29  (Pages 113 to 114)

Ordinance 2007-02

## AN ORDINANCE AMENDING THE COUNTY CODE
## REGARDING THE SALARY OF THE PUBLIC DEFENDER

WHEREAS, the County of Perry did adopt an ordinance establishing the office of Public Defender on June 27, 2006; and

AND WHEREAS, the Perry County Board of Commissioners desires to adjust the level of compensation for the Public Defender and clarify certain other changes regarding salary;

NOW, THEREFORE BE IT ORDAINED by the County Board of Commissioners of the County of Perry that the County Code is hereby amended as follows:

1-6   PUBLIC DEFENDER
(A)    The office of County Public Defender is hereby established as a part-time appointed County office.

(B)    ~~The annual compensation for the office of Public Defender shall be such amount as established by the County Board from time to time.~~
   i.    An annual base salary of $70,000 is established for Public Defender.
   ii.   The salary of the Public Defender shall increase to $90,000 annually so long as the State of Illinois reimburses Perry County as is required by 55 ILCS 5/3-4007.
   iii.  Should Perry County fail to be reimbursed in the amount required by 55 ILCS 5/3-4007 for the salary of the Public Defender by the State of Illinois for more than sixty (60) days after the submission of the required documentation to the State of Illinois, the salary of the Public Defender shall revert to the base salary of $70,000 per year for so long a period of time as there is either a failure to reimburse or the reimbursement is at a rate less than two-thirds (2/3) of the salary of the Public Defender. This clause shall be effective retroactive to February 1, 2007.
   iv.   If Perry County has not been reimbursed by the State of Illinois by June 30, 2007, the Public Defender shall pay the difference of the $90,000 and $70,000 salary received between February 1, 2007 and June 30, 2007 back to the County treasury. Such payment shall be made by July 31, 2007.

(C)    The Public Defender shall keep a record of the services rendered by him and furnish a monthly written report to the County Board and the Clerk of the Circuit Court showing the number of cases and the time applied to each case.

(D)    This article establishing the office of Public Defender shall be reviewed annually each June and shall be renewed, revised or abolished at the discretion of the County Board.

EXH. #9

RESOLUTION 2019-$\underline{R\text{-}78}$

## RESOLUTION FOR APPOINTMENT

### Calen Campanella as Perry County
### Public Defender, Part Time

WHEREAS, a vacancy exists as the Perry County Public Defender, Part Time; and

WHEREAS it is the duty of the Chairman of the Perry County Board of Commissioners to make an appointment to fill said part time vacancy; and

WHEREAS it is the duty of the Perry County Board of Commissioners to offer advice and consent to the Chairman and ratify said appointment; and

WHEREAS the Chairman has appointed Calen Campanella to fill the vacancy as the Perry County Public Defender, Part Time for an unexpired term of office with a set salary of $10,500.00 per month;

NOW, THEREFORE, BE IT RESOLVED by the Perry County Board of Commissioners that Calen Campanella is hereby ratified as the Perry County Public Defender, Part Time for an unexpired term of office with a set salary of $10,500.00 per month and shall have all rights and privileges granted thereto;

BE IT FURTHER RESOLVED that the County Clerk is hereby directed to issue a Certificate of Appointment to said appointee.

PASSED, APPROVED, AND ADOPTED by the Board of County Commissioners of Perry County this 5th day of July 2019.

APPROVED BY:

DALLAS BIGHAM, Chairman
Board of County Commissioners
County of Perry, State of Illinois

AYES    2
NAYS    -
ABSENT    1

ATTEST:

BETH LIPE, County Clerk
Clerk of the Board of County Commissioners
County of Perry, State of Illinois

(SEAL)

Perry County 295

EXH. # 7



## Minutes of the Perry County Board of Commissioners
## Regular Meeting
## 2:00 p.m. – Friday, July 5, 2019
## County Board Room – Perry County Government Building

A regular meeting of the Perry County Board of Commissioners was convened at 2:00 p.m. on Friday, July 5, 2019 in the County Board Room at the Perry County Government Building in the City of Pinckneyville.

### OPENING

Chairman Dallas Bigham called the meeting to order at 2:00 p.m. The Pledge of Allegiance to the Flag of the United States of America was recited by those in attendance.

County Clerk Beth Lipe called the roll. The following members answered the call of the roll: Commissioner Bobby Kelly and Chairman Dallas Bigham were present. Commissioner Susan Hepp was absent.

The following department heads were also present: States Attorney David Searby, Supervisor of Assessments Becky Winter and Chuck Genesio, Emergency Services.

### APPROVAL OF AGENDA

Chairman Bigham asked for the approval of the meeting agenda.

Commissioner Kelly moved the agenda for the meeting be approved. Chairman Bigham seconded the motion. On voice vote, the motion was approved.

### APPROVAL OF MINUTES

Chairman Bigham asked for the approval of the Board of Commissioners meeting minutes of the June 20, 2019 regular meeting July 2, 2019 special meeting be approved. Chairman Bigham called for corrections. There were none.

Commissioner Kelly moved the minutes of the June 20, 2019 regular meeting the July 2, 2019 special meeting be approved. Chairman Bigham seconded the motion. On voice vote, the motion was approved.

**BELLWETHER UPDATE** – Clerk Lipe reported that the County has not been given an updated report as this time.

### ORDINANCE – APPROVE ORDINANCE AMENDING 2019 BOARD MEETING TIMES

Chairman Bigham stated with this Ordinance the County Board of Commissioners would like to move the second meeting of each month from 2:00 p.m. to 6:00 p.m., beginning with the Thursday, August 15, 2019 meeting. One of the reasons being that it would give the taxpayers a chance to make at least one meeting per month, if they choose to do so. It's something that we think needs to be done.

Commissioner Kelly – I did that the whole time I was Chairman. We had one meeting during the day at 2:00 & one in the evening at 6:00 each month. That gave everyone an opportunity to attend.

Chairman Bigham – We wanted to give everyone plenty of time to make this adjustment that's why the first one to be held at 6:00 will be the August 15th meeting.

Commissioner Kelly moved that the Ordinance be approved Amending 2019 Board Meeting Times. Chairman Bigham seconded the motion. Chairman Bigham requested a roll call vote. Upon call of the roll, the following members voted aye: Commissioner Kelly and Chairman Bigham. The motion was passed on a vote of 2-0 and the Ordinance was adopted.

**Perry County 162**

EXH. #8

**RESOLUTION -- TO APPROVE GIS CONTRACT WITH SIDWELL**

Assessor Becky Winter and State's Attorney David Searby met and went over the terms of the contract. Everything looks to provide the services and support that Becky will need.

Commissioner Kelly moved that the Resolution be approved for the GIS contract with Sidwell. Chairman Bigham seconded the motion. Chairman Bigham requested a roll call vote. Upon call of the roll, the following members voted aye: Commissioner Kelly and Chairman Bigham. The motion was passed on a vote of 2-0 and the resolution was adopted.

**RESOLUTION -- TO APPROVE APPOINTMENT OF PART TIME PUBLIC DEFENDER**

Clerk Lipe – I received a letter from Treasurer Mary Jane Craft that the Public Defender has resigned, which was Courtney Loos and they are wanting Calen Campanella as a part time Public Defender with a salary of $10,500.00 per month. With the part time, he would not be eligible for County benefits. When Courtney Loos was the Public Defender, with her being full time, she qualified for County benefits. The State does reimburse a portion of the salary.

State's Attorney David Searby – I know that Mary Jane said that the Department of Revenue requests a copy of the Resolution and the meeting minutes for the reimbursement to continue even on a part time appointment.

Clerk Lipe – Yes, the Department of Revenue requires that both the Resolution and the Board meeting minutes state that it is a part time position, the salary that has been imposed and the Attorney that has been appointed.

Commissioner Kelly moved that to appoint Calen Campanella as Perry County Public Defender, part time with a salary of $10,500.00 per month. Chairman Bigham seconded the motion. Chairman Bigham requested a roll call vote. Upon call of the roll, the following members voted aye: Commissioner Kelly and Chairman Bigham. The motion was passed on a vote of 2-0 and the resolution was adopted.

**DISCUSSION:**

Group Benefit Services was on the Agenda for a presentation and a representative from that Company was not present.

**PUBLIC COMMENTS**

**EXECUTIVE SESSION**

**PAYMENT OF CLAIMS**

Board members examined claims presented for payment.

Commissioner Kelly moved that all claims be paid when the monies are available. Chairman Bigham seconded the motion. Chairman Bigham requested a roll call vote. Upon call of the roll, the following members voted aye: Commissioner Kelly and Chairman Bigham. The motion was approved on a vote of 2-0 and payment warrants were granted to pay the claims when the monies are available.

**ADJOURNMENT OF MEETING**

There being no further business to come before the Board, the Chairman said he would entertain a motion to adjourn the meeting.

Commissioner Kelly moved the Board adjourn the meeting and convene the next meeting on Thursday, July 18, 2019 at 2:00 p.m. Chairman Bigham seconded the motion. On voice vote, the motion was approved and the Board stood adjourned at 2:07 p.m.

Submitted:

*Beth Lipe*

**BETH LIPE, County Clerk**
Clerk of the Board of Commissioners
County of Perry, State of Illinois
Approved: July 18, 2019

County of Perry
State of Illinois
To Perry County Board of Commissioners

| To | PERRY COUNTY ASSISTANT PUBLIC DEFENDERS | $ 10,500.00 |
| --- | --- | --- |
| | INVOICE DATE:  7/30/19 | |
| | Description: Matt Foster: $1,500; Charlie Kuhnert: $1,500; | |
| | Cynthia Loos: $1,500; Matt Benson: $1,500; Calen Campanella: $1,500; | |
| | Jordan Campanella: $1,500; Kurt Harris: $1,500 | |
| | ACCOUNT # | |
| | THIS CLAIM SHALL BE ENDURING AND EFFECTIVE THE LAST FRIDAY OF EACH MONTH | |

Set up an Invoice for the year

STATE OF ILLINOIS
) SS.
COUNTY OF PERRY,

I, JAMES W. CAMPANELLA, do solemnly swear the several items mentioned in the annexed account are just and that the services were rendered or articles furnished as therein charged, and that the amount claimed to-wit: the sum of $ 10,500.00 is due and unpaid after allowing all just c...

CAMPANELLA, Perry County Circuit Judge

X____ Please return check to subm

Account #

To be taken from account number(s):

Authorized Perry County Board Chairman

Date approved

Amount Claimed:  $ 10,500.00

Against Perry County

VENDOR NO.

PERRY COUNTY ASSISTANT PUBLIC DEFENDERS

Claim of

LOOS 64
EXH. #12