IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

COURTNEY LOOS,                          )
                                        )
                   Plaintiff,           )
                                        )
vs.                                     )     Case No. 3:20-CV-1107-MAB
                                        )
COUNTY OF PERRY, ILLINOIS, and          )
JAMES CAMPANELLA,                       )
                                        )
                   Defendants.

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the court on the motions for summary judgment filed by Defendants Perry County and James Campanella (Docs. 94, 95). For the reasons set forth below, the motions are granted in part and denied in part.

### PROCEDURAL BACKGROUND

Defendants filed their motions for summary judgment on October 3, 2022 (Docs. 94, 95). Three days later, Plaintiff Courtney Loos was granted leave to file an amended complaint (Doc. 96). However, because all of Loos' substantive allegations and claims would remain unchanged in the amended complaint, the Court noted that the motions for summary judgment already filed would not be rendered moot by the amended complaint and would remain pending (Doc. 96).

Loos filed her "Supplemental First Amended Complaint" on October 14, 2022, which is the operative complaint (Doc. 100). She maintained the following 12 counts:

Count 1 – Title VII sex discrimination against Perry County (and Dallas Bingham in his official capacity)

Count 2 – Title VII retaliation against Perry County (and Dallas Bingham in his official capacity)

Count 3 – Equal Pay Act against Perry County (and Dallas Bingham in his official capacity)

Count 4 – Illinois Equal Pay Act against Perry County (and Dallas Bingham in his official capacity)

Count 5 - 42 U.S.C. § 1983 Sex Discrimination against Perry County and Dallas Bingham, in his Official Capacity

Count 6 - 42 U.S.C. § 1983 Retaliation against Perry County and Dallas Bingham, in his Official Capacity

Count 7 - 42 U.S.C. § 1983 Sex Discrimination against James Campanella

Count 8 - 42 U.S.C. § 1983 Retaliation against James Campanella

Count 9 - Illinois Human Rights Act Sex Discrimination against Perry County and Dallas Bingham in his Official Capacity

Count 10 - Illinois Human Rights Act Retaliation against Perry County and Dallas Bingham in his Official Capacity

Count 11 – Illinois Whistleblower Act Against Perry County and Dallas Bingham in his Official Capacity

Count 12 - Illinois Wage Payment and Collection Act Against Perry County and Dallas Bingham in his Official Capacity.

## FACTS

The facts here are stated in the light most favorable to Plaintiff Courtney Loos, the non-moving party, with all reasonable inferences drawn in her favor and conflicts in the evidence resolved in her favor. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 925 (7th Cir. 2020) (citing *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014); *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). The Court does not vouch for

the objective truth of any fact or express any opinion on the weight of the evidence. *Joll*, 953 F. 3d at 925 (citing *Garofalo*, 754 F.3d at 430).

## A. THE OFFICE OF THE PUBLIC DEFENDER

In counties in the State of Illinois with less than 35,000 inhabitants, such as Perry County, the County Board has exclusive authority to decide whether to create the office of the public defender. 55 ILL. COMP. STAT. 5/3-4002. The Perry County Board adopted an ordinance in 2006 voluntarily establishing the office of the public defender (*see* Doc. 105-6, pp. 31, 33).[1]

Responsibility for certain aspects of the office of the public defender is delegated by state law to the judicial circuit in which Perry County is located. Most notably, the public defender is selected by a majority vote of the circuit judges. 55 ILL. COMP. STAT. 5/3-4004. And the public defender serves and holds office "at the pleasure of those judges." *Id.*

On the other hand, state law gives the Perry County Board exclusive authority to set the amount of its public defender's compensation, with the caveat that if the public defender is full-time, their compensation "must be at least 90% of that county's State's Attorney's annual compensation."[2] 55 ILL. COMP. STAT. 5/3-4007(a), (b) (2011). If the public defender is part-time, however, state law does not impose any requirements about

---

[1] The ordinance itself was apparently never found during the course of discovery in this case (*see* Doc. 94-5, p. 11).

[2] The Perry County state's attorney's salary is set by statute/legislature, based on the size of the county. 55 ILL. COMP. STAT. 5/4-2001(a) (2011).

the amount of the public defender's compensation. *See id. See also* SIXTH AMENDMENT CENTER, THE RIGHT TO COUNSEL IN ILLINOIS: EVALUATION OF ADULT CRIMINAL TRIAL-LEVEL INDIGENT DEFENSE SERVICES, p. 69 (2021)[3] ("With a part-time public defender, the county board can set the salary at the lowest level at which an attorney will agree to serve in the position . . . .").

The public defender's salary is paid out of the county treasury, specifically out of the county's General Fund (Doc. 94-5, p. 16). 55 ILL. COMP. STAT. 5/3-4007(a) (2011). The state "must pay" 66 2/3% of the public defender's compensation, "subject to appropriation" of funding by the legislature. *Id.* at 5/3-4007(b). The state likewise pays 66 2/3% of the state's attorney's salary, along with 100% of the increases in salary authorized by the legislature. *Id.* at 5/4-2001(a). The remaining 33 1/3% of both salaries is paid by the county. *See id.* at 5/3-4007(b), 5/4-2001(a). In other words, the county issues the public defender's and state's attorney's paychecks out of the county treasury and then seeks reimbursement for 66 2/3% of that pay from the state.

Counties seek reimbursement from the Illinois Department of Revenue ("DOR") by submitting a PTAX-450 every month with the name of the public defender and the amount of reimbursement sought (Doc. 94-1, para. 100; Doc. 114-1, para. 100). The form is signed by the treasurer and public defender, certifying that the amount sought was 66

---

[3] This report was the result of a statewide evaluation, commissioned by the Illinois Supreme Court and conducted by the Sixth Amendment Center, a non-partisan organization in Boston, in partnership with the Defender Initiative of the Seattle University School of Law, of the public defense services provided to indigent adult defendants at the trial level in Illinois. SIXTH AMENDMENT CENTER, THE RIGHT TO COUNSEL IN ILLINOIS, p. ii.

2/3% of the salary paid to the public defender (Doc. 94-1, para. 100; Doc. 114-1, para. 100; *see also, e.g.,* Doc. 114-8, p. 2 (sample PTAX-450 form)). The PTAX form is essentially "the invoice against which the county is reimbursed by the state that month." Sᴵˣᵀᴴ Aᴹᴇɴᴅᴍᴇɴᴛ Cᴇɴᴛᴇʀ, Tʜᴇ Rɪɢʜᴛ ᴛᴏ Cᴏᴜɴsᴇʟ ɪɴ Iʟʟɪɴᴏɪs, p. 29 n.117. The DOR reimburses Perry County regardless of whether the public defender is full-time or part-time (Doc. 94-1, para. 101; Doc. 114-1, para. 101).

Whenever there is a change in the person holding the title of public defender, a salary adjustment, or a change in full-time or part-time status, Perry County must submit a PTAX 451 form notifying the DOR of the change, along with the County Board minutes and resolution adopting the change (Doc. 94-1, para. 103; Doc. 114-1, para. 103).

## B.  Cᴏᴜʀᴛɴᴇʏ Lᴏᴏs Bᴇᴄᴏᴍᴇs Pᴇʀʀʏ Cᴏᴜɴᴛʏ's Pᴜʙʟɪᴄ Dᴇꜰᴇɴᴅᴇʀ

Plaintiff Courtney Loos is the former Public Defender for Perry County, Illinois. Prior to being formally appointed, Loos met with Judge James Campanella at least twice to discuss the position (Doc. 94-1, para. 4; Doc. 114-1, para. 4). Judge Campanella is the Resident Circuit Court Judge of Perry County, where he has served as a judge for 26 years (Doc. 94-1, para. 2; Doc. 114-1, para. 2). Loos was told her annual salary would be $90,000 but any costs or expenses needed to run the office would have to come out of her salary, and she would receive health insurance and be eligible for enrollment in the Illinois Municipal Retirement Fund ("IMRF") (Doc. 94-1, para. 6, 7; Doc. 114-1, para. 6, 7; *see also* Doc. 95-3, pp. 42–43 (Loos depo)). It is undisputed that Judge Campanella told Loos that her mother could cover for her if she was on vacation (Doc. 94-1, para. 7; Doc. 114-1, para. 7; *see also* Doc. 95-3, pp. 36, 39–40, 49-50 (Loos depo)). Loos admits, however, that Judge

Campanella did not say anything beyond that about vacation time, such as how many vacation days she would get per year, if and how vacation time was earned and accrued, or whether it carried over from year to year or was "use or lose time" (Doc. 95-3, pp. 49–51, 191–92). It is undisputed that the terms and conditions of Loos' employment were those communicated to her by Judge Campanella (Doc. 94-1, para. 8; Doc. 114-1, para. 8).

The circuit judges of the Twentieth Judicial Circuit unanimously signed off on Loos's appointment as public defender, in writing, effective August 17, 2016 (Doc. 94-1, para. 11; Doc. 114-1, para. 11). The Perry County Board then passed a resolution on October 6, 2016, ratifying Loos as the County's full-time public defender at an annual salary of $90,000;[4] she also received medical, dental and vision insurance and was eligible to participate in the IMRF (Doc. 94-1, para. 12; Doc. 114-1, para. 12).[5]

## C.  LOOS' PREDECESSORS

At the time Loos was hired in 2016, as well as in 2017, the Perry County State's Attorney was paid $128,959, as required by Illinois law (Doc. 114-1, p. 17, para. 11; Doc. 115-1, para. 11). In 2018, the Perry County State's Attorney was paid $130,487 (Doc. 114-1, p. 17, para. 11; Doc. 115-1, para. 11; *see also* Doc. 114-4, para. 11). It is undisputed that

---

[4] The PTAX-451 completed in September 2016, which was signed by the Chairman of the County Board and the County Clerk, indicated that Loos' position was full-time (Doc. 105-3, p. 2). Additionally, both Perry County and Judge Campanella admitted in their answers that Loos was hired as the full-time public defender (Doc. 110, para. 15; Doc. 111, para. 15).

[5] A copy of the resolution was not provided by either party, nor were the minutes from the Board meeting. The minutes, however, are available on Perry County's website, at https://perrycountyil.gov/wp-content/uploads/minutes-agendas-newsletters/Minutes_2016-10-06.pdf (last visited September 24, 2023).

as the full-time public defender, Loos' salary of $90,000 was not at least 90% of the state's attorney's salary (*see id.*).

Judge Campanella testified that he set Loos' salary based on her predecessor, Jennifer Foutch's, salary (Doc. 114-1, p. 17, para. 13; Doc. 15-1, para. 13; *see also* Doc. 95-4, p. 32). Foutch was the first female public defender in Perry County and served from 2011 to 2016 (Doc. 94-1, para. 16; Doc. 114-1, para. 16; *see also* Doc. 114-4, p. 10). Like Loos, Foutch was appointed as the full-time public defender, was paid $90,000 per year, received insurance benefits, and participated in IMRF (Doc. 94-1, para. 16; Doc. 114-1, para. 16). It is undisputed that Foutch was not paid at least 90% of the state's attorney's salary (Doc. 94-1, para. 21; Doc. 114-1, para. 21; *see also* Doc. 114-4, p. 10).

Instead, Foutch's salary was also apparently based on her predecessor's salary (*see* Doc. 94-1, para. 20; Doc. 114-1, para. 20; Doc. 95-4, pp. 102–03). Her predecessor was Thomas Mansfield, a male, and he was appointed as the *part-time* public defender (Doc. 94-1, para. 17; Doc. 114-1, para. 17). In 2007, Mansfield was making $70,000 per year, and he informed Judge Campanella of the Illinois statute that allowed the County to obtain reimbursement from the state for 66 2/3% of the public defender's salary (Doc. 94-1, para. 18; Doc. 114-1, para. 18).[6] Judge Campanella agreed to increase Mansfield's salary to $90,000 contingent upon the state issuing reimbursement to the County; if the state failed to issue the reimbursement, then Mansfield's salary would revert back to $70,000 (Doc. 94-1, para. 18, 19; Doc. 114-1, para. 18, 19; *see also* Doc. 105-6, pp. 31–32 (ordinance)). The

---

[6] The State of Illinois committed to reimbursing counties for 66 2/3% of the public defender's compensation effective July 1, 2002. Ill. P.A. 92-508 (H.B. 549) (eff. July 1, 2002) (amending 55 Ill. Comp. Stat. § 5/3-4007).

County indicated during the course of discovery that Mansfield's salary in 2010 was $90,000 (Doc. 114-4, para. 11).

As Defendants tell it, Foutch and Loos were not paid 90% of the state's attorney's salary because neither Judge Campanella nor the County was aware of the statutory requirement (Doc. 94-1, para. 38; Doc. 95-4, pp. 76, 110; Doc. 94-6, para. 21–22; Doc. 94-7, para. 15). Loos disputes that is true (Doc. 114; Doc. 114-1).

## D. LOOS' SALARY INCREASE

In October 2018, Loos received an email and learned for the first time that her salary was supposed to be 90% of the state's attorney's salary (Doc. 94-1, para. 24; Doc. 114-1, para. 24; *see also* Doc. 95-3, p. 201 (Loos depo)). Loos called County Treasurer Mary Jane Craft, and then forwarded Craft the email she had received, at Craft's request (Doc. 94-1, para. 25; Doc. 114-1, para. 25; *see also* Doc. 95-3, pp. 89-92, 202 (Loos depo)). The next day, Loos spoke to State's Attorney David Searby (Doc. 94-1, para. 27–28; Doc. 114-1, para. 27–28). Searby reviewed the statute concerning compensation for public defenders and sent a letter to the Illinois Attorney General asking for guidance as to appropriate compensation for the public defender-(Doc. 94-1, para. 27; Doc. 114-1, para. 27; *see also* Doc. 94-12, pp. 17–18 (letter)).

Loos testified that she also spoke to Judge Campanella in October 2018 about her right to be paid 90% of the state's attorney salary (Doc. 95-3, pp. 99–109; Doc. 114-11, pp. 2–3), which Judge Campanella admitted (Doc. 110, para. 28; *see also* Doc. 95, p. 2), and Perry County does not dispute (Doc. 115-1, p. 4, para. 15). According to Loos, she had multiple conversations with Judge Campanella about her pay (Doc. 95-3, pp. 100–09; Doc.

114-11, pp. 2–3). Loos claims that during one of the first conversations, Judge Campanella told her that Perry County was exempt from paying its public defender 90% of the state's attorney's salary, but according to Loos, he was changing the sentence structure and adding non-existent punctuation as he read the statute to change the meaning (Doc. 95-3, pp. 119–20). Other times, Loos says the conversations were brief, and Judge Campanella told her to drop it or stop bringing it up (Doc. 95-3, pp. 100, 103, 104, 105; Doc. 114-11, p. 3). Loos says she told Campanella that he would never ask a man to drop it (Doc. 114-11, p. 3). Loos says that at least once, Campanella told her that he was "getting pressure from the County building" (Doc. 95-3, p. 103; Doc. 114-11, p. 3). Other times, he told her that "she should be grateful for the job and salary [she was getting] and that the County could not pay her that much money" (Doc. 95-3, p. 104; Doc. 114-11, p. 3). Loos says that Judge Campanella asked her to sign a contract waiving the statutory obligation to pay her 90% of the state's attorney's compensation and agree to work for $90,000 (Doc. 95-3, p. 103; Doc. 114-11, p. 3). Loos protested that he would never ask a man to do that (Doc. 95-3, p. 104). She pointed out that if she were fired, Campanella would have to hire a man to replace her because her mother was the only other female lawyer in town, and that a man would surely insist on being paid the statutorily required amount (Doc. 95-3, p. 104; Doc. 114-11, p. 3;). Judge Campanella again told Loos that she should be grateful for the salary she had, and she should drop the issue of the salary increase (Doc. 95-3, p. 104). Loos says she responded that nobody was suggesting that a man take less than what is statutorily required (Doc. 95-3, pp. 104–05). Campanella responded that David Searby's salary was set by statute, and Loos countered, "so is mine." (Doc. 95-3, pp. 104–05; Doc.

114-11, p. 3).

It is undisputed that State's Attorney Searby told Treasurer Craft that Loos' salary needed to be corrected (Doc. 94-1, para. 31; Doc. 114-1, para. 31). Craft explained to Loos that the County could not pay the new salary amount until the budget was amended (Doc. 94-1, para. 32; Doc. 114-1, para. 32). Loos' salary increased to $121,169, effective December 1, 2018 (which was the beginning of the new fiscal year) (Doc. 94-1, para. 33; Doc. 114-1, para. 33; *see also* Doc. 114-4, para. 11).[7] The DOR required a resolution from the County Board reflecting the salary increase before it would reimburse the County for 66 2/3% of Loos' new salary (*see* Doc. 94-1, para. 34; Doc. 114-1, para. 34; Doc. 114-1, p. 18, para. 23; Doc. 115-1, para. 23). And so, on February 21, 2019, the County Board unanimously passed a resolution, approving the salary increase and reflecting Loos' new salary of $121,169, effective December 1, 2018 (Doc. 94-1, para. 35; Doc. 114-1, para. 35; *see also* Doc. 94-12, pp. 19–20 (meeting minutes)).

### E. PERRY COUNTY'S FINANCIAL CRISIS

At the same time Loos sought to increase her salary, Perry County was facing major financial issues. County Board Commissioners Robert Kelly and Dallas Bigham testified that Perry County had been "struggling financially" since 2017 (Doc. 94-6, ¶27; Doc. 94-7, ¶18; *see* also Doc. 95-3, p. 9 (Judge Campanella's testimony that "this budget crisis was starting to be recognized already in 2017")). Minutes from County Board meetings in November 2017 indicate that the budget for fiscal year 2018 "began with a

---

[7] This was 90% of Searby's salary of $134,633 (Doc. 114-4, para. 11).

deficit of $587,000" but was "finalized close to balance" after "[a]ll department heads were tasked with the goal of cutting their budgets to 2017 numbers" and a number of full-time, part-time, and seasonal staff were laid off (Doc. 114-10, pp. 156, 160). The minutes go on to say, "These cuts are not intended to completely correct the financial direction of the county, however, they are intended to slow the bleeding" (*Id.* at p. 156).

Commissioners Kelly and Bigham testified that by 2018, "the County was in a dire financial situation and could not pay its bills" (Doc. 94-6, ¶28; Doc. 94-7, ¶19). On September 20, 2018, County Clerk Josh Gross reported that the County was "struggling to make ends meet" (Doc. 114-10, p. 235). Six weeks later, Clerk Gross reported that the county budget for fiscal year 2019 had a deficit of roughly $490,000 (Doc. 114-10, p. 250). He stated that some additional cuts would be made but implied that the final budget would still have a significant deficit (*see id.*). Gross suggested forming a finance committee and consulting with labor unions and outside financial experts in order to "focus on reducing the Counties [sic] Financial difficulties long term" and to further amend the 2019 budget (*Id.*). On November 30, 2018, the budget for fiscal year 2019 was passed by the County Board with a deficit of approximately $324,000 (Doc. 114-10, p. 256). At that same Board meeting, Clerk Gross indicated that a budget committee would be formed, in part, to try to reduce the deficit (*Id.*). There is evidence the finance/budget committee had its first meeting sometime prior to December 6, 2018 (Doc. 115-5, p. 3).[8]

---

[8] The County's interrogatory response states "After [the finance/budget committee's] first meeting, Treasurer Mary Jane Craft advised the Perry County Board of Commissioners at a regular meeting on December 6, 2018, of the Finance Committee meeting" (Doc. 115-5, p. 3). The approved agenda for the December 6th board meeting indicates that Mary Jane Craft was slated to provide a "Finance Committee

While Loos attempts to dispute the extent of Perry County's financial woes and quarrels with particular representations made by county officials (*e.g.*, that the County was "broke" and on the verge of bankruptcy) (*see* Doc. 114-1, para. 39–42, 46), it is undeniable that things came to a head in April 2019. At a special meeting of the County Board on April 5, 2019, Treasurer Mary Jane Craft said, amongst other things, that there was not enough money to make upcoming payroll in May and the County had not paid any bills in five months (Doc. 114-10, p. 269). Beth Lipe testified that when she took office as the County Clerk in April 2019, the County was "basically broke" and "spending more money than it was making" (Doc. 94-13, pp. 39–40). On April 18, 2019, Bellwether, a county board financial advisor, presented a plan of action to the Board regarding the County's financial situation (Doc. 94-9, para. 9; Doc. 114-10, pp. 273–75). On April 23rd, the Board hired Bellwether (Doc. 94-9, para. 9).[9] And two days later, the Board passed Resolution 2019-R-59, declaring a financial emergency (Doc. 94-1, para. 43; Doc. 114-1, para. 43; *see also* Doc. 114-10, pp. 278–80 (minutes from County Board meeting); Doc. 94-11, p. 54 (Resolution 2019-R-59)). The Resolution required, amongst other things, that all departments and county-wide elected officials work with Bellwether to identify ways to

---

Update" (Doc. 114-10, pp. 258–59, 260). However, the copy of the minutes in the record are incomplete and do not include a summary of what Craft had to say (*see* Doc. 114-10, pp. 260–63). The minutes also also are not available on Perry County's website. *See Agenda and Minutes*, PERRY COUNTY, ILLINOIS, https://perrycountyil.gov/agenda-and-minutes/ (last visited Sept. 24, 2023).

[9] The evidence shows there were special meetings of the County Board on April 16 and 23, 2019 (*see* Doc. 114-10, p. 283), but at best the Court can tell, the minutes from those meetings are not part of the record.

increase revenue and decrease expenses and then update their budget (Doc. 94-1, para. 44; Doc. 114-1, para. 44; *see also* Doc. 94-11, p. 54).

Bellwether's initial suggestions included laying off employees and potentially closing down the entire Sheriff's office (Doc. 49-1, para. 46; Doc. 114-1, para. 46). While the Sheriff's office ultimately did not close down, it is undisputed that employees in that office were laid off, other employees were furloughed, and several departments shortened the work week to 32 hours (Doc. 94-1, para. 45, 46; Doc. 114-1, para. 45, 46). Bellwether also explained that specialty funds could be used for other purposes, such as paying bills, so Judge Campanella and the Circuit Clerk transferred about $260,000 from the court fee specialty funds to the County's general fund to pay off unpaid bills (Doc. 94-1, para.50; Doc. 114-1, para. 50; *see also* Doc. 94-13, pp. 14–24).

## F.   SWITCH TO MULTIPLE PART-TIME PUBLIC DEFENDERS & LOOS' RESIGNATION

Well before the financial emergency was declared, Judge Campanella started toying with the idea of transitioning from one full-time public defender to multiple part-time public defenders to save money. It is undisputed that he contacted neighboring counties sometime between 2016 and 2018 to ask if they employed full-time public defenders (Doc. 94-1, para. 58; Doc. 114-1, para. 58). He learned they did not have full-time public defenders and instead used several part-time public defenders, with one as the lead and the other as assistants (Doc. 95-4, pp. 17–19).[10]

---

[10] Loos objected to this assertion of fact, but she does not dispute Judge Campanella's testimony that other counties used multiple part-timers or point to any evidence showing it was untrue (Doc. 114-1, para. 59). Her objection deals with the manner in which the other counties paid their part-timers and the manner in

It is also undisputed that Judge Campanella began calling the County Board members in December 2018 or January 2019 to float the idea of switching to multiple part-time public defenders (Doc. 114-1, p. 20, para. 34; Doc. 115-1, para. 34). He also sent a letter dated January 2, 2019, to group of county officials including County Board member Robert Kelly, bringing up the idea of switching to multiple part-time public defenders and outlining how it would save money (Doc. 114-1, p. 18, para. 24; Doc. 115-1, para. 24; *see also* Doc. 114-15, pp. 21–22 (letter); *see also* Doc. 115-2; Doc. 95-4, p. 64). The letter opens by referencing a meeting, the purpose of which "was to have each office holder submit a plan for possible savings to the County" (Doc. 114-15, p. 21).[11] The letter goes on to state that Judge Campanella had determined the state would continue to reimburse the County for a portion of the public defender's salary "even if we are to adopt a six or seven person part-time public defender plan," and additionally the part-timers "would not be entitled to insurance or pension plan benefits" (Doc. 114-15, p. 21; *see also* Doc. 95-4, pp. 67–68, 74).

Judge Campanella held a meeting at the courthouse on January 15, 2019, at which time he told Loos and the various County officials in attendance about the County's financial difficulties (Doc. 94-1, para. 55; Doc. 114-1, para. 55). Campanella then told the

---

which they sought reimbursement from the state, (*id.*), which is an issue separate from the fact of who they employed as public defenders.

[11] Judge Campanella indicated in an interrogatory response that the referenced meeting was a "budget crisis" meeting (Doc. 115-2, p. 2). He testified at his deposition, however, that he wrote the letter because Bellwether wanted a statement as to how the County could save money (Doc. 114-14, p. 65). But there is no evidence that Bellwether was in the picture yet in January 2019 (*see* Doc. 114-1, p. 19, para. 26; *see also* Doc. 94-6, para. 30; Doc. 115-5, p. 3; Doc. 94-11, pp. 76–78).

attendees about the *possibility* of switching from a full-time public defender to several part-time defenders in order to save money (Doc. 94-1, para. 60; Doc. 114-1, para. 60). According to Loos, Judge Campanella told the group that her benefits as a full-time county employee cost $40,000 each year, and the County also spent $25,000 each year for conflict counsel (Doc. 95-3, pp. 75, 224; *see also* Doc. 94-2, pp. 63–67 (Loos' memo); Doc. 95-4, p. 16 (Campanella depo)). Judge Campanella said that by switching to multiple part-time public defenders, the County would eliminate the cost of a full-timer's benefits and the need for/expense of conflict counsel (Doc. 94-1, para. 60; Doc. 114-1, para. 60). Judge Campanella told Loos that he would hire her and her mother, along with five other lawyers, as part-time public defenders and pay them $1,500 each per month, with no benefits or IMRF (Doc. 94-1, para. 65– 67; Doc. 114-1, para. 65–67). Loos was not interested in one of the part-time positions (Doc. 94-1, para. 65; Doc. 114-1, para. 65).

Judge Campanella held a subsequent meeting on April 4, 2019, which was attended by the attorneys who would potentially serve as part-time public defenders (Doc. 94-1, para. 72–74; Doc. 114-1, para. 72–74). Judge Campanella informed them that he was moving forward with the plan to change the public defender position from one full-time position to multiple part-timers, effective July 1, 2019 (*see* Doc. 94-1, para. 72–75; Doc. 114-1, para. 72–75; *see also* Doc. 95-3, p. 133). Loos once again declined his offer to work as a part-time public defender (Doc. 94-1, para. 72–74; Doc. 114-1, para. 72–74). Seven other attorneys, including Loos' mother and Judge Campanella's son, Calen, accepted the offer (Doc. 94-1, para. 74, 75; Doc. 114-1, para. 74, 75). Judge Campanella also attended the County Board meeting on the afternoon of April 4th and told the Board

about the changes to the public defender position, which he estimated "should save the county roughly $60,000 per year" (Doc. 114-10, p. 266).

It is undisputed that although Judge Campanella had the authority to fire the public defender, he did not fire Loos because he had no issues with her performance and he liked having Loos as the public defender; instead, he eliminated the full-time public defender position effective July 1, 2019 (Doc. 94-1, para. 68; Doc. 114-1, para. 68).

Loos submitted her letter of resignation on May 31, 2019, indicating her last day of work would be June 30, 2019 (Doc. 94-1, para. 84; Doc. 114-1, para. 84). Loos asked County Clerk Beth Lipe for a full accounting of her accumulated sick and vacation days, but Lipe said she did not keep Loos' time records (Doc. 94-1, para. 85; Doc. 114-1, para. 85). County Treasurer Mary Jane Craft and Circuit Clerk Kim Kellerman likewise confirmed they did not keep Loos' time records (Doc. 94-1, para. 86; Doc. 114-1, para. 86). Rather, it is undisputed that each department head is responsible for keeping time records for their employees, and the County considered Judge Campanella to be Loos' supervisor and department head (Doc. 94-1, para. 89; Doc. 114-1, para. 89; Doc. 114-1, p. 16, para. 7; Doc. 115-1, para. 7). Judge Campanella told Loos that she did not have any accrued sick, personal or vacation days (Doc. 94-1, para. 93; Doc. 114-1, para. 93). According to Loos, Judge Campanella said that her only option was to take off for the remaining three weeks of June 2019, which Loos considered to be a "forced vacation" (Doc. 95-3, pp. 148; Doc. 94-2, p. 72; *see also* Doc. 94-1, para. 93; Doc. 114-1, para. 93). Loos was paid through June 2019 (Doc. 94-1, para. 94; Doc. 114-1, para. 94).

It is undisputed that Treasurer Mary Jane Craft contacted the Department of Revenue to ask about how she should submit the monthly PTAX 450 forms now that there would be multiple part-time public defenders (Doc. 94-1, para. 104; Doc. 114-1, para. 104; *see* also Doc. 95-10, pp. 35–36 (Craft depo); Doc. 105-7, pp. 5–9 (Craft 30(b)(6) depo)). It is also undisputed that she was told to submit one form with one signature and one reimbursement amount (Doc. 94-1, para. 105; Doc. 114-1, para. 105; *see also* Doc. 95-10, pp. 36–37, 41 (Craft depo)). State's Attorney Searby also contacted the Department of Revenue, indicating that Perry County planned to utilize multiple public defenders "with the expectation that they would all be subject to having reimbursement . . . for the respective amounts paid to them" (Doc. 114-18, pp. 32–39; *see also* Doc. 114-1, para. 104). Searby was told the state "would only reimburse on one" public defender (Doc. 114-18, pp. 32–39; *see also* Doc. 114-1, para. 104). Searby shared the information with Treasurer Craft (but there is no indication that he also relayed it to Judge Campanella) (Doc. 95-7, pp. 38, 41 (Searby depo); Doc. 95-4, p. 62 (Campanella depo); *see also* Doc. 114-1, par. 106).

Both Craft and Campanella testified that based on the various communications with the Department of Revenue, they understood that the County could seek reimbursement for the total amount paid to all the public defenders using one PTAX 450 form in one of the part-timers' name (Doc. 95-10, pp. 47–48 (Craft depo); Doc. 95-4, pp. 54–56 (Campanella depo); Doc. 94-5, pp. 56, 60–63 (Campanella 30(b)(6) depo)). Judge Campanella decided to use his son, Calen, as the chief public defender and the name on the PTAX forms (Doc. 94-1, para. 97; Doc. 114-1, para. 97; *see also* Doc. 94-5, pp. 9, 10 (Campanella 30(b)(6) depo)). On July 5, 2019, the County Board approved the

appointment of Calen Campanella as the County's part-time public defender at a salary of $10,500 per month (or $126,000 per year) with no benefits, and the Board adopted a resolution reflecting the same (Doc. 94-1, para. 98; Doc. 114-1, para. 98; *see also* Doc. 95-1 (resolution); Doc. 114-10, p. 295 (Board meeting minutes)).[12]

County Board members, Robert Kelly and Dallas Bigham, said they understood the switch to multiple part-time public defenders was a cost-cutting measure (Doc. 114-1, p. 20, para. 35; Doc. 115-1, p. 35; *see also* Doc. 94-6, para. 39–44 (Kelly); Doc. 94-7, para. 28–31 (Bigham)). Other County officials, including the State's Attorney, the Treasurer, the County Clerk, and the Circuit Clerk stayed the same (*see* Doc. 94-1, para. 80).

It is undisputed that Judge Campanella told the County Board members that the $10,500 monthly salary was going to be divided up and used to pay *all* of the part-time public defenders, not just Calen (Doc. 114-1, p. 20, para. 36; Doc. 115-1, para. 36). Board members Kelly and Bigham confirmed they understood the $10,500 monthly salary was to be divided equally amongst the part-time public defenders (Doc. 114-1, p. 21, para. 42; Doc. 115-1, para. 42; *see also* Doc. 94-6, para. 56 (Kelly); Doc. 94-7, para. 44 (Bigham)).

---

[12] It is unclear whether a majority of the circuit judges approved the appointment of Calen Campanella as a part-time public defender (or any of the other six part-time public defenders). Judge Campanella testified at his individual deposition that the circuit judges approved the appointment of Calen Campanella in writing (Doc. 95-4, pp. 39–41). But when asked to produce the written approvals, no signature pages were produced regarding this appointment (*see* Doc. 105, p. 10). Loos then served an interrogatory to flesh out the inconsistency, and Judge Campanella responded that in June 2019, he solicited approval from seven of the circuit judges for "the appointment of Calen Campanella as Chief Public Defender" and they "*orally approved* the appointment" (Doc. 105-11, para. 4) (emphasis added). However, three months later during his Rule 30(b)(6) deposition, Judge Campanella testified that he called "all twelve" circuit judges and "they all agreed . . . to nominate Calen as the PTAX representative and to have seven Public Defenders part time" (Doc. 94-5, p. 10).

A PTAX 451 form was submitted to the Department of Revenue indicating that Calen Campanella was the part-time Public Defender with an annual salary of $126,000 (Doc. 95-5). County Board Chairman Dallas Bigham and County Clerk Beth Lipe both signed the form, certifying that the information was true (Doc. 95-5). Beginning in July 2019, Craft submitted a monthly PTAX 450 form to the Department of Revenue listing Calen Campanella as the public defender and asking for reimbursement in the amount of $6,999.30, an amount equal to 66 2/3% of the $10,500 total monthly salary paid to the seven part-time public defenders (Doc. 94-1, para. 108; Doc. 114-1, para. 108). It is undisputed that Calen Campanella was never paid $10,500 per month for his work as a part-time public defender; rather, the County issued a check to him for $1,500 per month just like the other six part-time public defenders, which collectively totaled $10,500 (Doc. 94-1, para. 99; Doc. 114-1, para. 99).

In October 2021, the DOR initiated an inquiry into whether Perry County was committing a possible tax crime with their reimbursement requests for the public defender's salary (Doc. 94-1, para. 111, 112; Doc. 114-1, para. 111, 112). After looking into the issue, the DOR determined it was not a criminal matter but rather an administrative matter based on a misunderstanding between the County and the DOR on how to complete the PTAX forms (Doc. 94-1, para. 114; Doc. 114-1, para. 114). Consequently, as of January 2022, the County now issues the full $10,500 monthly salary to the chief public defender, and he then divides it up, keeps $1,500 for himself, and issues checks for $1,500

to the other six part-time public defenders (Doc. 94-1, para. 116; Doc. 114-1, para. 116).[13] According to Loos, this new arrangement is also in violation of Illinois law, which provides that counties must pay assistant public defenders (*see* Doc. 114-1, para. 115). 55 ILCS 5/3-4008 ("The compensation of the assistants, clerks and employees [of the Public Defender's office] shall be fixed by the County Board and paid out of the county treasury.") The County admits to what the law says (Doc. 115-1, para. 59).

<u>ANALYSIS</u>

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if

---

[13] Calen Campanella resigned as the chief part-time public defender as of December 31, 2021, and Stuart Morgensterm was appointed as his successor with the same salary of $126,000 (Doc. 94-1, para. 116; Doc. 114-1, para. 116).

their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

### A. DALLAS BIGHAM

As an initial matter, the Court notes that in Loos' Supplemental First Amended Complaint, which is the operative complaint in this matter, Counts 1 through 6 and 9 through 12 are alleged against Perry County *and* Dallas Bigham, in his official capacity (Doc. 100). The Court previously ruled that suing both was redundant and unnecessary, and Bigham was therefore dismissed without prejudice as a defendant in this matter (Doc. 55, p. 6). To be clear, the Supplemental First Amended Complaint did not revive Bigham as a Defendant; he remains dismissed from this lawsuit and is not the subject of the motions for summary judgment.

### B. SEX DISCRIMINATION CLAIMS AGAINST PERRY COUNTY AND JUDGE CAMPANELLA

Loos alleged that Perry County and Judge Campanella committed unlawful wage discrimination on the basis of her gender in setting her initial salary at $90,000 (Doc. 100). She sued Judge Campanella under 42 U.S.C. § 1983 for violations of her rights under the Fourteenth Amendment (Count 7) (Doc. 100). She likewise sued Perry County under § 1983 (Count 5), as well as Title VII (Count 1), the Illinois Human Rights Act (Count 9), and the federal and state Equal Pay Acts (Counts 3, 4) (Doc. 100).

Discrimination claims brought under Title VII, § 1983, and the IHRA are evaluated using the same standard. *Dunlevy v. Langfelder*, 52 F.4th 349, 352, 353 (7th Cir. 2022); *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) ("The legal standard for

analyzing racial discrimination claims under Title VII and § 1983 is the same."); *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (adopting the "analytical frame-work" of Title VII cases for the Illinois Human Rights Act). But the standard, specifically the burden of proof, is different for Equal Pay Act claims. *Lauderdale v. Illinois Dep't of Hum. Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (citing *Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989)). The Court will therefore first address Loos' Equal Pay Act claims and then her claims under Title VII, § 1983, and the IHRA.

### 1. **Equal Pay Act** (Counts 3 and 4)

Loos alleges that Perry County violated the Illinois and federal Equal Pay Acts by paying her less than it paid her male successor (Doc. 100, pp. 9–10). Both the Illinois Equal Pay Act, 820 Ill. Comp. Stat. 112/10, and the federal Equal Pay Act, 29 U.S.C. § 206(d)(1), prohibit discrimination in wages based on gender. 29 U.S.C. § 206(d)(1); *Varner v. Illinois State Univ.*, 226 F.3d 927, 932 (7th Cir. 2000). The parties treat the claims in unison and do not dispute that the federal and state statutes impose the same requirements and are analyzed the same way (*see* Doc. 94, pp. 16–17; Doc. 114, pp. 17–18). *Jafri v. Signal Funding, LLC*, No. 22-2394, 2022 WL 17718429, at *3 (7th Cir. Dec. 15, 2022); *see also, e.g., Boyd v. City of Chicago*, No. 20 C 710, 2023 WL 3627708, at *4 (N.D. Ill. May 24, 2023) (citation omitted); *Ahad v. Bd. of Trustees of S. Illinois Univ.*, No. 15-CV-03308, 2021 WL 6118239, at *3 (C.D. Ill. Dec. 27, 2021) (citation omitted); *Gauen v. Bd. of Educ. of Highland Cmty. Unit Sch. Dist. No. 5*, No. 16-0207-DRH-RJD, 2017 WL 2869942, at *3 n.3 (S.D. Ill. July 5, 2017). To prevail on an Equal Pay Act claim, the employee must first establish a prima facie case by demonstrating "a difference in pay for 'equal work on jobs the performance of which

requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Lauderdale*, 876 F.3d at 907 (quoting *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012).

Perry County argues that Loos failed to establish her prima facie case because her male successor, Calen Campanella, earned $18,000 per year, which was significantly less than Loos was paid (Doc. 94, p. 17). In response, Loos argues that the Perry County Board voted and passed a resolution to pay Calen $126,000 annually, and both the minutes of the Board Meeting and the Resolution were sent to the Department of Revenue (Doc. 114, p. 18). The County also certified on the PTAX 451 form that Calen's salary was $126,000 (*Id.*). Loos argues that her claim is based on these documents and certifications, which "sho[w] how the County valued the services." (*Id.*) Loos further argues that "the County's $1,500 payments to Calen were part of a separate series of transactions, apart from the Resolution." (*Id.*).

The Court is unpersuaded by Loos' argument. The evidence in this case leaves no doubt that Calen Campanella's salary of $126,000 existed only on paper, not in reality. The County attributed the full $126,000 to Calen on official documents to maximize the amount reimbursed by the State of Illinois. But the $126,000 was actually the aggregate amount the County paid to the seven part-time defenders. The County cut checks every month to each of the part-timers for $1,500, which amounts to $18,000 per year for each, and $126,000 per year total. Loos even admitted that Calen was paid $1,500 per month, not $10,500 (Doc. 114-1, p. 13, para. 99). Accordingly, no reasonable jury could find that Loos was paid less than her male successor for equal work, and Perry County is entitled

to summary judgment on Loos' claims under the Illinois and federal Equal Pay Acts.

### 2.  **Title VII, § 1983, and IHRA** (Counts 1, 5, 7, 9)

Title VII, the IHRA, and the Equal Protection clause prohibit an employer from discriminating against an employee with respect to their compensation based on sex. 42 U.S.C. § 2000e–2(a)(1); 775 ILL. COMP. STAT. 5/1-102(A); *Lauderdale*, 876 F.3d at 910. At summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the employer took an adverse action against her because of a statutorily proscribed factor, in this case sex. *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) (citing *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). *See also Abrego v. Wilkie,* 907 F.3d 1004, 1012 (7th Cir. 2018) ("To succeed on a Title VII claim, the plaintiff-employee must prove three elements: [1] [s]he is a member of a class protected by the statute, [2] that [s]he has been the subject of some form of adverse employment action . . . and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class.").

To answer that question, the court must evaluate all of the relevant, admissible evidence as a whole. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) ("[A]ll evidence belongs in a single pile and must be evaluated as a whole."). *See also Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021) (the court must "look at the evidence holistically."); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*Ortiz* explicitly instructed district courts to stop separating

'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards.").

A discrimination claim can be analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Chatman*, 5 F.4th at 746; *Purtue*, 963 F.3d at 601–02; *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018); *David*, 846 F.3d at 224. The *McDonnell Douglas* approach requires the plaintiff to establish a prima facie case of discrimination without proving a direct causal link by showing that: (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Lauderdale*, 876 F.3d at 910 (citation omitted); *Lewis*, 909 F.3d at 866; *David*, 846 F.3d at 225 (citation omitted). If the plaintiff can establish their *prima facie* case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for paying the plaintiff less. *David*, 846 F.3d at 225. The plaintiff must then "submit evidence that the employer's explanation is pretextual." *David*, 846 F.3d at 225.

However, the plaintiff need not rely on the *McDonnell Douglas* framework to make out their case of sex discrimination. *Purtue*, 963 F.3d at 601–02; *Joll*, 953 F.3d at 929; *David*, 846 F.3d at 224. The plaintiff can instead proffer direct or circumstantial evidence that satisfies the elements of the discrimination claim and "point[s] directly to a discriminatory reason for the employer's action." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016); *see also Joll*, 953 F.3d at 929; *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) ("The direct method requires the plaintiff to simply present evidence satisfying the elements of

the [discrimination] claim . . . ."). There are three broad types of circumstantial evidence that will support an inference of intentional discrimination: "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Purtue*, 963 F.3d at 602 (quoting *Joll*, 953 F.3d at 929).

Here, Defendants employed the *McDonnell Douglas* framework in making their arguments (Doc. 94, pp. 9–12; Doc. 95, pp. 12–16). Loos resisted application of the *McDonnell Douglas* framework, but nevertheless responded to Defendants' arguments (Doc. 105, pp. 12–15; Doc. 114, pp. 9–14). She then went on to argue that she can also prove discrimination in the direct, holistic fashion advocated in *Ortiz* (Doc. 105, pp. 16–17; Doc. 114, pp. 14–15). There is considerable overlap in the evidence used for both approaches. That is, the evidence Loos submitted as direct evidence of discrimination is the same evidence she cited to establish her prima facie case of discrimination and pretext under the burden-shifting approach. *See Ortiz*, 834 F.3d at 765 (noting that "[s]ome opinions have observed that the methods largely rely on the same pieces of evidence.") (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 314 (7th Cir. 2012) ("[T]he line between circumstantial evidence under the direct method and indirect evidence of discrimination or retaliation under the burden-shifting approach has been blurred by the gradual integration of these methodologies.")). Therefore, the Court will analyze the evidence as a whole without reference to the *McDonnell Douglas* framework and assess whether a reasonable jury could conclude that the Loos would have been paid more if she was male and everything else had remained the same. *Joll*, 953 F.3d at 929; *Lisle v. Welborn*, 933 F.3d

705, 720 (7th Cir. 2019); *Ortiz*, 834 F.3d at 764.

After carefully considering all the arguments made by the parties and evaluating the evidence as a whole, the Court concludes that there is sufficient evidence for Loos to survive summary judgment on her claim that she was discriminated against based on sex when her salary was set at $90,000. To begin, Loos cited to evidence that the County treated similarly situated men better than her. Her predecessor, Tom Mansfield, held the position of public defender *part-time*, while maintaining a private practice. As a part-time public defender, Mansfield's salary was not set by law, and he was paid $90,000 annually. On the other hand, Loos held the position of public defender *full-time* and did not maintain a private practice. As the full-time public defender, her minimum salary was dictated by law, yet Loos was paid the same amount as Mansfield: $90,000.

Defendants said nothing about the considerations and thought process that went into setting Loos' salary at $90,000, other than to say it was the same amount that her predecessor Jennifer Foutch was paid, and in turn, Foutch was paid the same amount as her predecessor Tom Mansfield (*see* Doc. 94, Doc. 95). That explanation, however, ignores that Loos and Foutch were full-time, while Mansfield was part-time. And Defendants made no attempt to explain why they felt it appropriate to pay the full-time female public defenders the same amount they previously paid the part-time male public defender (*see* Doc. 94; Doc. 95). Under these circumstances, a reasonable jury could agree with Loos that the County used Tom Mansfield's salary as a ceiling for what they would pay the women, even though the law required the full-time female public defenders be paid more than $90,000 (Doc. 114, p. 11).

Additionally, the County paid the male state's attorney in accordance with Illinois' statutory requirements but not Loos. Perry County argues the state's attorney is not a valid comparator and points to two differences between that office and the public defender (Doc. 94, p. 10).[14] The first difference is that "the state's attorney's salary is based on population while the public defender's salary is based, in part, on whether the public defender works full-time" (*Id.*). The County, however, did not explain, and the Court cannot readily discern, why this distinction matters. State law dictates both the amount Loos should have been paid as the full-time public defender as well as the amount the state's attorney was to be paid.

The second difference the County pointed to is that the state's attorney is elected and answers to the public while the public defender is appointed by the circuit judges and answers to the resident circuit judge (Doc. 94, p. 10). Again, the County did not explain, and the Court cannot discern, why this distinction matters (*see* Doc. 94). There is no evidence that the manner in which the public defender and state's attorney took office (*i.e.,* elected versus appointed) played any role whatsoever in determining their salaries. Therefore, neither distinction raised by the County accounts for the disparity in how the salaries for the two offices were determined. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (factors relevant to court's analysis of whether employees are similarly situated are those "the employer took . . . into account when making the

---

[14] Judge Campanella did not acknowledge Loos' assertions that the State's Attorney was similarly situated (*see* Doc. 95).

personnel decision in question."); *see also Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) ("The purpose of the similarly situated prong is to 'eliminate other possible explanatory variables [for the difference in pay], . . . which helps isolate the critical independent variable—discriminatory animus.'" (quoting *Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012)));

As the Court sees it, the state's attorney and the public defender are similar in that both offices are provided for in the Illinois Counties Code; they function as counterparts to one another in the county's criminal justice system (amongst other things); and—most crucially— the salaries for a full-time public defender and the state's attorney are both governed by statute. Yet the evidence indicates that the County treated them differently by paying the male state's attorney the statutorily required amount but not the full-time, female public defender.

Defendants claim that the reason why Loos was not paid 90% of the state's attorney's salary is that that no one, including Judge Campanella, the County Board, the state's attorney, or Loos herself, were aware of the requirement (Doc. 94, p. 10; Doc. 95, p. 13). [15] Loos argues that an employer's ignorance of the law cannot constitute a legitimate reason for an employment decision (Doc. 114, pp. 12–13) (citing *Screws v. United States*, 325 U.S. 91, 129 (1945) (Rutledge, J., concurring)).[16] Precedent, however,

---

[15] Defendants both also argue that their legitimate, non-discriminatory reason was that they were motivated to avoid the financial crisis (Doc. 94, pp. 11–12; Doc. 95, pp. 14–15). However, this argument clearly pertains to the decision to eliminate Plaintiff's full-time public defender position, not the decision as to what her initial pay would be.

[16] In *Screws,* Justice Rutledge wrote in his concurring opinion:
   Generally state officials know something of the individual's basic legal rights. If they do

suggests that an employer's mistake (or even an intentionally unfair or wrongful decision) in setting an employee's pay *can* constitute a legitimate, nondiscriminatory reason. In other words, an employer's decision can be wrong without being discriminatory.[17]

That being said, a jury is not required to credit Defendants' story that neither the County Board nor Judge Campanella knew about the relevant section of the Illinois Counties Code pertaining to the public defender's salary, and in this instance, a

---

not, they should, for they assume that duty when they assume their office. Ignorance of the law is no excuse for men in general. It is less an excuse for men whose special duty is to apply it, and therefore to know and observe it. If their knowledge is not comprehensive, state officials know or should know when they pass the limits of their authority, so far at any rate that their action exceeds honest error of judgment and amounts to abuse of their office and its function.

*Screws*, 325 U.S. at 129.

[17] *See Dionne v. Shalala*, 209 F.3d 705, 709 (8th Cir. 2000) (holding that although governmental employer applied the wrong standards in determining the plaintiff's pay grade "[t]here is absolutely no evidence" that it was due to "anything but an honest mistake" and standing alone, without something more, could not give rise to a reasonable inference of intentional discrimination). *Cf. Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009) ("Courts have held that an employer's explanation of an admitted mistake in considering and awarding a promotion to one employee over another constitutes a legitimate nondiscriminatory reason."); *Day v. N. Indiana Pub. Serv. Co.*, 987 F. Supp. 1105, 1111 (N.D. Ind. 1997) (supervisor's mistake/ignorance about the applicable policy regarding vacation days constituted legitimate, nondiscriminatory reason). *See also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993) (holding that employer's reason for adverse action might be unlawful under one statute without violating the anti-discrimination statute at issue; "an employer [does not] violat[e] the ADEA whenever its reason for firing an employee is improper *in any respect* . . . . For example, it cannot be true that an employer who fires an older black worker because the worker is black thereby violates the ADEA. The employee's race is an improper reason, but it is improper under Title VII, not the ADEA."); *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 264 (4th Cir. 2008) (holding that employee's acknowledgment he was fired to stop his internal investigation negates his claims of race and gender discrimination; "his suspension, however wrongful, is not actionable under Title VII[.]"); *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995) ("The real reasons behind an employer's action may be shameful or foolish, but unrelated to . . . discrimination, in which event there is no liability."); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); *Kier v. Com. Union Ins. Companies*, 808 F.2d 1254, 1259 (7th Cir. 1987) ("An employer can fire U.S. an employee for any reason, fair or unfair, so long as the decision to terminate is not based on . . . [a] protected category.").

reasonable jury could easily choose not to. To begin with, Illinois law has imposed a salary requirement of some type for public defenders since at least 1990. 55 ILL. COMP. STAT. § 5/3-4007 (1990); Ill. P.A. 86-962, Art. 3, § 3-4007 (amending § 4007 regarding public defender compensation effective Jan. 1, 1990). And the law has required full-time public defenders to be paid at least 90% of the state's attorney's salary since before Perry County created the office of the public defender in 2006 (*see* Doc. 105-6, pp. 31, 33). 55 ILL. COMP. STAT. § 5/3-4007 (2002) Ill. P.A. 92-508 (H.B. 549) (amending § 4007 regarding public defender compensation, effective July 1, 2002).

Furthermore, the 90% salary requirement is in the same subsection of the statute that also contained the reimbursement provision. *See* 55 ILL. COMP. STAT. § 5/3-4007(b) (2002). That subsection provides:

> (b) The State . . . must pay 66 $^2/_3$ % of the public defender's annual salary. If the public defender is employed full-time in that capacity, his or her salary must be at least 90% of that county's State's attorney's annual compensation. These amounts furnished by the State shall be payable monthly . . . to the county in which each Public Defender is employed.

55 ILL. COMP. STAT. § 5/3-4007 (2002); *see also id.* (2011).[18]

Judge Campanella admitted that he read the "reimbursement statute" when Tom Mansfield was Public Defender and therefore "knew there was . . . a law that provided for the reimbursement of 66 and two-thirds of a . . . public defender's salary" (Doc. 95-4, pp. 63–64). The "reimbursement statute" was also cited in Ordinance 2007-02, which increased Tom Mansfield's salary to $90,000 subject to reimbursement by the state (Doc.

---

[18] The 2002 version of § 4007(b) statute and the 2011 version, which is still in effect, are largely the same.

105-6, pp. 31–32).[19] That means Defendants are taking the position that while they knew about the reimbursement provision, they overlooked the 90% salary requirement sandwiched between the two sentences about reimbursement. This proposition is difficult to accept and it must be left for a jury to decide whether to do so.

In sum, the Court finds that Loos has established a genuine issue of fact as to whether Perry County and Judge Campanella discriminated against her on the basis of sex in setting her initial salary at $90,000. Consequently, neither Perry County nor Judge Campanella are entitled to summary judgment on the merits of Loos' gender discrimination claims under Title VII, § 1983, and IHRA . Her claims must be resolved by a jury.

### 3.  Statute of Limitations

Judge Campanella argues that to the extent Loos' § 1983 discrimination claim relies upon alleged discriminatory acts that occurred more than two years before she filed suit on October 20, 2020, that aspect of her claim is barred by the applicable two-year statute of limitations (Doc. 95, pp. 18–19). Loos agrees that she cannot recover for damages incurred more than two years before she sued (Doc. 405, p. 18). Thus, the Court concludes that to the extent Loos' § 1983 discrimination claim was seeking to recover for lost wages based on paychecks received prior to October 18, 2020, that aspect of her claim is time-barred and Judge Campanella is entitled to summary judgment. Loos can, however,

---

[19] The Court also notes that at least one Commissioner on the County Board, James Epplin, was serving at the time Ordinance 2007-02 was passed, when Courtney Loos was hired in 2016, and when her salary was increased in 2019 to comply with Illinois law (*see* Doc. 105-6, pp. 31–32; Doc. 94-12, p. 19).

continue to proceed on her § 1983 discrimination claim to recover lost wages based on paychecks she received after October 20, 2018, and before her pay was increased to the statutorily required amount on December 1, 2018.[20]

### 4. Qualified Immunity

Judge Campanella argues that he is entitled to qualified immunity because the facts do not show that he violated Loos' Fourteenth Amendment right against sex discrimination (Doc. 95, p. 20). *See Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) ("To determine if qualified immunity applies, the courts employ a two-prong test: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred.") (citation omitted). However, the Court has already determined summary judgment is not warranted on this issue and that a jury must decide claims. Accordingly, this aspect of Judge Campanella's motion for summary judgment is denied.

### C. Retaliation Claims Against Perry County and Judge Campanella

Loos alleged Perry County and Judge Campanella unlawfully retaliated against her because she had opposed the wage discrimination (Doc. 100, pp. 9, 12, 13, 15). She sued Judge Campanella under 42 U.S.C. § 1983 for violations of her rights under the Fourteenth Amendment (Count 8) (Doc. 100). She likewise sued Perry County under §

---

[20] As best the Court can tell, the same is true for Loos' § 1983 discrimination claim against the County. (The parties did not brief this issue (*see* Docs. 94, 114, 115)). The Court will operate on that assumption unless and until Plaintiff put forth a convincing argument otherwise.

1983 (Count 6), as well as Title VII (Count 2), and the Illinois Human Rights Act (Count 10) (Doc. 100).

**1. § 1983 claims** (Counts 6 and 8)

As Loos acknowledged, her retaliation claim under the Fourteenth Amendment's Equal Protection Clause against Judge Campanella is not a viable cause of action (Doc. 100, p. 2; Doc. 105, p. 18). *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 n.2 (7th Cir. 2020) (citing *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004) ("The right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause.")); *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100 F.3d 1287, 1296 n.8 (7th Cir. 1996) (explaining that the Equal Protection Clause "does not establish a general right to be free from retaliation."); *Gray v. Lacke,* 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."). The same is true of her § 1983 retaliation claim against Perry County. Consequently, Perry County and Judge Campanella are both entitled to summary judgment on Loos' retaliation claims under § 1983 (Counts 6 and 8).

**2. Title VII and the IHRA** (Counts 2, 10)

Loos alleges that Perry County unlawfully retaliated against her for voicing her opposition to the wage discrimination by "threatening plaintiff with consequences for refusing to acquiesce in defendant's payment of discriminatory wages, discharging and/or constructively discharging her by significantly changing her position, and refusing to pay her earned benefits" (*see* Doc. 100, pp. 9, 15). Based on the summary

judgment briefing, it appears that the real crux of her claim is the elimination of her job (*see, e.g.,* Doc. 114, pp. 16–17). This is where the Court will focus its discussion.

Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any . . . unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a). Retaliation is also "a cognizable claim under . . . the IHRA." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 887 (7th Cir. 2016) (citing 775 ILL. COMP. STAT. 5/6–101). The same analysis applies to both Title VII and IHRA retaliation claims. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 n.2 (7th Cir. 2021) (citing *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016)).

To prevail on a Title VII retaliation claim, the plaintiff must produce evidence that would allow a reasonable jury to conclude that: (1) she engaged in statutorily protected activity; (2) that her employer took an adverse action against her; and (3) there is a causal link between the protected activity and the adverse action. *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (citation omitted); *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 748 (7th Cir. 2021) (citation omitted). As with the discrimination claims discussed earlier, the Court must evaluate the evidence as a whole to determine if it would "permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action[.]" *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (internal quotation marks and citation omitted).

Retaliation must be the but-for cause of the challenged employment action. *Eaton v. J. H. Findorff & Son*, 1 F.4th 508, 511–12 (7th Cir. 2021) (citation and internal quotation marks omitted). That "does not mean that the protected activity must have been the only

cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Lesiv*, 39 F.4th at 918 (citation omitted). "Relevant evidence" that can be used to establish the causal link "may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023) (citation and internal quotation marks omitted).

The County does not dispute that Loos engaged in protected activity by complaining to Judge Campanella about sex discrimination or that the elimination of her job constituted an adverse action (*see* Doc. 94, pp. 15–16; *see also* Doc. 114, p. 4 (Loos' explanation as to how she opposed sex discrimination)). Rather, the County argues that Loos cannot succeed on her retaliation claim because:

> The Board had no role in changing the public defender position to multiple part-time positions and never voted on it because they lacked the authority to do so. The Board merely voted in July 2019 to ratify the appointment of Calen Campanella as the part-time public defender understanding that his salary was to be shared equally among the seven part-time public defenders and by that time, Loos had already resigned.

(Doc. 94, pp. 15–16). The Court understands the County to be arguing that it cannot be held liable for the decision to switch from a full-time public defender to multiple part-timers because that decision was made by Judge Campanella, and he is employed by the State, not the County. The County, however, did not cite to any evidence that the Board had *no* authority to decide whether to change the public defender position from full-time to part-time (*see* Doc. 94, p. 15). And, the evidence, state law, and logic suggest the Board

*did* have authority to decide the nature of the public defender position.

The public defender is a County employee (which Perry County does not dispute (*see* Doc. 114)). *Johnson v. Halloran*, 742 N.E.2d 741, 744 (Ill. 2000) ("Public defenders and their assistants are . . . county employees, not employees of the State of Illinois."). The County provides no explanation as to why the decision as to whether its employee is part-time or full-time would not rest with the County Board but rather with a circuit judge, who is a state employee. Moreover, it is the County Board that controls the county's purse strings,[21] decides whether the office of the public defender even exists in Perry County,[22] decides the amount of funding the county is willing to appropriate for that office, and decides what to pay the public defender. It stands to reason that the County Board would also get to make decisions such as whether the public defender is full-time or part-time and entitled to employment benefits (such as retirement, insurance, and vacation), because those decisions ultimately impact the amount of money the county is required to spend on the public defender. Indeed, the evidence in the record suggests that even if Judge Campanella made the initial decision as to whether the position was part-time or full-time, the Board ultimately had to ratify that decision in order to get

---

[21] JANICE HOLBEN, 14 ILL. LAW AND PRAC. COUNTIES § 24 (2023) ("The county board is the manager of county funds and business . . . .") (citing *Blanchard v. Berrios*, 48 N.E.3d 1218, 1221 (Ill. App. Ct, 2015), *aff'd* 72 N.E.3d 309).

[22] 55 ILL. COMP. STAT. 5/3-4002 ("In each county of this State containing less than 35,000 inhabitants, the county board may, by resolution, create the office of Public Defender and the person appointed to such office shall be known as the Public Defender."); SIXTH AMENDMENT CENTER, THE RIGHT TO COUNSEL IN ILLINOIS, p. 140 ("[T]here are 60 counties in which the county government decides whether a public defender office exists. At any time, for any reason or no reason, the county board in each of these counties can wholly eliminate the public defender office and all of its employees (both attorneys and non-attorney staff." (citing 55 ILL. COMP. STAT. 5/3-4002)).

reimbursed by the state for the public defender's salary (*see* Doc. 95-1 (resolution re: Calen Campanella); Doc. 114-10, p. 295 (Board meeting minutes re: Calen Campanella); Doc. 105-6, pp. 31–32 (ordinance re: Tom Mansfield)). *See also* SIXTH AMENDMENT CENTER, THE RIGHT TO COUNSEL IN ILLINOIS, pp. 28, 44 ("[E]*ach county* chooses whether the public defender is full-time, or is a part-time public defender who is permitted to also engage in private practice.") (emphasis added). In sum, Perry County has failed to convince the Court, on this argument, that it should be absolved of liability. *See Bank of Com. v. Hoffman*, 829 F.3d 542, 545–46 (7th Cir. 2016) (the party moving for summary judgment bears the initial burden of showing there are no genuine issues of material fact and that he is entitled to judgment as a matter of law).

That being said, the Court finds Loos has failed to demonstrate a sufficient causal link between her protected activity and the alleged retaliatory action. Perry County argues that Loos' position as the full-time public defender was eliminated in order to save the County money at a time when the County was in a precarious financial state (Doc. 94, p. 11).[23] Loos argues that the County's stated reason was not true because, first and foremost, the County knew Judge Campanella's plan would "obviously cost money," rather than save money (Doc. 114, pp. 16, 17). More specifically, she argues the switch would cost money because (1) the County could only seek reimbursement for one of the part-timer's salaries, not all seven, (2) Loos' benefits did not cost the County nearly as

---

[23] This argument was not made in the context of Loos' retaliation claim (*see* Doc. 94, pp. 11–12), but it is undoubtedly applicable to this claim. Furthermore, Loos' arguments in her response brief implicate the financial explanation (*see* Doc. 114, pp. 16–17). The Court will therefore consider it.

much as Judge Campanella had claimed, and (3) the need to pay for conflict counsel was not eliminated like the County claimed (Doc. 114, pp. 6–7, 16; Doc. 114-1, p. 23, para. 54–56). As additional evidence of a causal connection, Loos points to statements made by Judge Campanella and the County during the course of discovery that she claims are inconsistent with the other evidence in the case (Doc. 114, p. 16). She points to Judge Campanella's ambiguous comments, especially his statement that she should be grateful (*Id.* at p. 17). And she points to the fact that Judge Campanella contacted other counties about using part-timers as early as 2016 or 2017 but never made the switch until Loos opposed discrimination (*Id.*). After extensively considering the parties' arguments and the evidentiary record as a whole, the Court finds that Loos' evidence, taken together, would not permit a reasonable jury to infer a likelihood of retaliation when it is considered against the entire evidentiary picture.

Pretext is "a lie, specifically a phony reason for some action." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (citation omitted). It is "more than just faulty reasoning or mistaken judgment" and "something worse than a business error[.]" *Id.*; *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (citation omitted). It is "deceit used to cover one's tracks." *Davis*, 368 F.3d at 784 (citation omitted). The Seventh Circuit has repeatedly emphasized that "in assessing a plaintiff's claim that an employer's explanation is pretextual, we do not sit as a 'super personnel review board'" and "second-gues[s] an employer's facially legitimate business decisions." *Argyropoulos*, 539 F.3d at 736 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)). Rather, the court asks only whether the employer "honestly believed in the

nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 693 (7th Cir. 2006). *See also Davis*, 368 F.3d at 784 ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000))); *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers."). If a reasonable fact finder would be compelled to believe the employer's explanation, then the employer is entitled to summary judgment. *Argyropoulos*, 539 F.3d at 736 (citing *Culver,* 416 F.3d at 547). The plaintiff can avoid summary judgment by pointing to specific facts that place the employer's explanation in doubt. *Culver,* 416 F.3d at 547.

The Court will start with what it sees as Loos' primary argument, which is her contention that the public defender switch would actually cost money (Doc. 114, pp. 16, 17). When it comes to salary reimbursement, she argues that a jury could infer that Judge Campanella and Treasurer Mary Jane Craft each knew the County could only seek reimbursement for two-thirds of one part-timer's salary based on (1) the language of the statute, 55 ILL. COMP. STAT. 3/4007(b), which says "the State must pay 66 2/3% of *the* public defender's annual salary . . ."; (2) the language of the PTAX form, which is "geared for a single public defender"; (3) the Department of Revenue's communications to Craft and State's Attorney Searby stating that it would reimburse for only one public defender, and (4) various pieces of conflicting evidence (Doc. 114, pp. 7–8; Doc. 105, pp. 4–6; *see also*

Doc. 94-11, pp. 42–43 (Craft Rule 30(b)(6) deposition), Doc. 105-7, pp. 5–9 (Craft email);

Doc. 95-7, pp. 32–41 (Searby deposition); Doc. 105-8, pp. 9–11 (Searby email)). (Doc. 114,

pp. 7–8; Doc. 105, pp. 4–6).

While the Court appreciates Loos' argument, it is critically flawed in that it ignores

the reality that Perry County *has* been receiving reimbursement for 66 2/3% of the total

amount paid out to the part-timers since the switch was made. Whether the County is

pursuing reimbursement in the proper manner is not an issue this Court needs to decide.

Making the public defender part-time is an acknowledged strategy for reducing the cost

of the public defender's salary.[24] Even if the County botched their execution of that

strategy, it does not make it a pretext for sex discrimination. *See Balderston v. Fairbanks*

*Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 323 (7th Cir. 2003) ("To show that an

employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that

the employer made a mistake . . . .").

Loos attempts to demonstrate that the County's decision was pretextual by

suggesting there was a conspiracy between Judge Campanella and county officials. As

Loos tells it, Judge Campanella had no problem with her work, so "he had to come up

with some other plausible, apparently legitimate way to get rid of [her] that was within

his power," and he devised the plan to eliminate the public defender as a full-time

position and switch to multiple part-timers (Doc. 114, p. 16). But the County knew Judge

---

[24] *See* SIXTH AMENDMENT CENTER, THE RIGHT TO COUNSEL IN ILLINOIS, p. 46 (acknowledging that counties make their public defenders part-time and deny them employment benefits as a way to reduce the cost of having a public defender).

Campanella's plan would "obviously cost money," rather than save money (*Id.* at 17). The County could not make a public defender switch that increased costs at a time when it was claiming financial insolvency, so "the County had to cover its tracks" and come up with a way to get more money from the State while eliminating Loos' job (*Id.* at pp. 7, 16, 17). They devised the scheme to name one public defender whose salary totaled the seven part-timers' salaries, $10,500 per month, and to seek reimbursement for 66 2/3% of that amount (*Id.* at pp. 7–8, 17). Loos states that the plan "seemed to be working" until shortly after the DOR's investigation (*Id.* at p. 17). The County then came up with a new plan of paying one public defender the full amount of $10,500 per month and having him pay the other six part-timers their share, which Loos contends is still unlawful under Illinois law (*Id.*).

Loos' story requires a jury to believe that Judge Campanella not only concocted an illegal reimbursement scheme, but that he also made his own son the face of the illegal scheme and involved Treasurer Mary Jane Craft and the County Board members in the scheme, all on the pretense that replacing the full-time public defender with multiple part-timers would save money, just so he could cover his tracks with respect to the elimination of her job. In other words, he chose subterfuge, at great personal risk to himself and the potential expense of many other people, even though he had a simpler and much more straightforward option to just oust Loos. After all, Loos was an at-will employee who served "at the pleasure" of the circuit judges.[25] Loos' story also requires a

---

[25] *See Zerante v. DeLuca*, 555 F.3d 582, 586 (7th Cir. 2009) ("A city employee may be fired for a good reason or for no reason at all, as long as she was not fired because of her constitutionally protected activities."

jury to believe that Mary Jane Craft and the County Board members knowingly went along with the illegal scheme at their own potential expense, without any evidence as to why they would be willing to do so (*see* Doc. 114). And then when the State of Illinois put an end the first illegal scheme, they knowingly turned to a second illegal scheme that is still ongoing today.

Loos' attempt to spin the events at issue into a wide ranging conspiracy is simply not enough to create a genuine dispute about the honesty of the County's stated reason. *See e.g., Davis v. Con-Way Transp. Cent. Express, Inc.,* 368 F.3d 776, 785 (7th Cir. 2004) ("[W]e think it ridiculous to suggest that Con–Way would terminate nine other employees from Davis's facility, not to mention forty others from around the state of Indiana, on the pretense of economic hardship, just so it could cover its tracks with respect to Davis."); *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1007 (7th Cir. 2002) ("We have typically been wary of allegations based on nothing but an attempt to come up with a conspiracy theory."). The Court believes the only reasonable inference a jury could draw from the evidence is that Judge Campanella truly believed the County could seek reimbursement for two-thirds of the money paid to all seven part-timers. In hindsight, it is apparent that Judge Campanella's assessment was plagued by incomplete information and untested assumptions. But even so, that is not enough to establish pretext. *See Merillat*, 470 F.3d at 693; *Davis*, 368 F.3d at 784; *McCoy*, 957 F.2d at 373.

---

(quoting *Garrett v. Barnes,* 961 F.2d 629, 633 (7th Cir. 1992)); Sixth Amendment Center, The Right to Counsel in Illinois, p. 62 ("[T]he appointed public defender holds office at the pleasure of the appointing judges, and so can be removed at any time by those judges with or without a reason.")

As for Loos' benefits, she claims that Judge "Campanella knew he was overstating the cost by almost double" (Doc. 114, p. 5). But this is not supported by the cited evidence. Specifically, Loos offers alternative numbers as to the cost of her benefits (Doc. 114-1, pp. 19–20, para. 31; *see* Doc. 114-8, pp. 7–10; *see also* Doc. 115-1, para. 31). But those numbers were taken from information provided by defense counsel to the IDHR in 2020 during the course of the IDHR's investigation, which was well after the public defender switch was made. Furthermore, there is nothing in the record to suggest that Judge Campanella was provided with, or otherwise had access to, that information at the time he was debating whether to eliminate the full-time public defender position (*see* Doc. 114-8, pp. 7–10). The only evidence as to what Judge Campanella knew about the cost of Loos' benefits is that he asked Mary Jane Craft for the cost and then represented that the cost was $40,000. To the extent that was not actually true, Loos simply does not offer any evidence from which a reasonable jury could infer that Judge Campanella was aware of the inaccuracy.

The Court thinks it is also worth mentioning that the figures Loos provided as to the "true" cost of her benefits are based on unreliable evidence.[26] As one example, Loos asserts that the projected cost of her benefits in 2019 was $24,687.40 (Doc. 114-1, p. 19, para. 31). This number was derived from a rudimentary spreadsheet provided by defense counsel to the IDHR in 2020 during its investigation (Doc. 114-8, pp. 7, 8–9; *see* Doc. 115-

---

[26] *But see Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) ("[A]rguing about the accuracy of the employer's assessment is a distraction . . . because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*.") (citations and internal quotation marks omitted) (emphasis in original).

1, para. 31). The spreadsheet shows that during the first six months of 2019, the County contributed $955 for Loos' health insurance, $52 for dental/vision, $532.68 toward IMRF, $288.94 for FICA, and $67.58 for "med" *per month* in 2019 (Doc. 114-8, p. 9). But Perry County later submitted payroll records showing that its IMRF, FICA, and "med" contributions were actually made *per paycheck* (Doc. 115-3, pp. 39–41), not *per month* like the spreadsheet indicates and the parties assumed to be true. If the County's IMRF, FICA, and "med" contributions were made *per paycheck*, not *per month* like Loos thought, then the total projected cost of her benefits in 2019 was actually much higher than the $24,687.40 figure she put forth. The Court thus concludes Loos has not put forth evidence from which a reasonable jury could find that Judge Campanella knew that her benefits did not truly cost $40,000.

Turning next to the issue of conflict counsel, Loos argues that since the public defender switch, the County has spent between $60,000 and $75,000 annually for defense counsel services in addition to the $126,000 it paid to the seven part-timers' for their monthly salaries (Doc. 114, p. 7; *see also id.* at p. 16; Doc. 114-1, p. 23, para. 54-56).[27] Crucially, however, Loos does not offer any evidence that Judge Campanella knew at the time he decided to make the public defender switch that this additional spending would be necessary (*see* Doc. 114, Doc. 114-1). The evidence shows that Judge Campanella

---

[27] The additional money is not necessarily spent on conflict counsel in the true sense of the term; rather it is primarily spent on additional compensation to the seven part-timers for work above and beyond what was envisioned for a normal case (*see* Doc. 114-8). As Plaintiff stated, the $1,500 monthly salary paid to each of the part-timers is not enough to cover the needed representation (Doc. 114, p. 7).

believed switching to multiple part-time public defenders would eliminate the need for conflict counsel based on his discussions with judges from other counties (Doc. 95-4, pp. 38, 40). From the Court's perspective, it certainly seems like a reasonable presumption that one of the seven part-timers would always be able to represent a given defendant without a conflict. There is nothing in the record from which a reasonable jury could infer that while Judge Campanella thought he could eliminate the cost of conflict counsel, he knew that $1,500 a month was not always going to be enough to compensate the part-timers for the work they put in each month, and that the County would need to make additional payments to them.

The Court questions the reliability of Loos' assertion that the County has been spending $60,000 to $75,000 per year, on top of the part-timers' salaries, on defense counsel services. Loos cites only to Judge Campanella's bald assertion at his deposition that the cost is between $60,000 and $75,000 each year (Doc. 114, p. 7; Doc. 114-1, para. 78; *see* Doc. 94-5, pp. 59–60).[28]  There does not appear to be any documentation in the record that backs up that number (*see* Doc. 114), despite the plethora of evidence regarding the County's finances (*e.g.*, Doc. 105-3, p. 3; Doc. 105-10, pp. 10–13; Doc. 114-10, pp. 1–138; Doc. 114-21; Doc. 115-6; Doc. 115-7). Rather, the evidence appears to show that, after the switch to multiple part-time public defenders, the amount spent from the General Fund on additional defense services was under $10,000 per year in 2020, 2021, and 2022 (Doc.

---

[28] The Court also finds it curious Loos is willing to accept and fully rely on this particular assertion from Judge Campanella when she went to great lengths to point out other inaccuracies in his testimony (*see, e.g.*, Doc. 114, p. 9; Doc. 114-1, p. 21, para. 39, 41; Doc. 105, pp. 8–10).

115-6, pp. 22–27). That is far less than was spent from the General Fund per year when there was a full-time public defender (*see id.* at pp. 1–21 ($38,143 in 2014; $38,984 in 2015; $29,254 in 2016; $34, 350 in 2017; $17,304 in 2018).

In sum, there is simply no evidence from which a reasonable jury could conclude that the public defender switch actually cost the County money. That leaves Loos with inconsistent statements made by Judge Campanella and the County, Judge Campanella's ambiguous comments, especially his statement that Loos should be grateful, and Judge Campanella's delay in implementing the public defender switch as her evidence of causation.

With respect to the inconsistent statements, the first is that Judge Campanella testified that he wrote the letter discussing the potential public defender switch in January 2019 because the consultant Bellwether wanted a statement of how to save money, but Bellwether "wasn't on the scene until April 2019" (Doc. 114, p. 16). The next is the County's sworn discovery response denying that it knew Campanella's motive in making the public defender switch was to save the County money, even though Campanella wrote the January 2019 letter to County officials, including a Board member (*Id.*). Loos apparently believes these inconsistencies demonstrate the County is dissembling evidence and serves as evidence that the reason the County gave for eliminating her job is untrue (Doc. 114, p. 16).

However, no reasonable jury would view these inconsistencies as anything other than immaterial in the context of the entire evidentiary picture. The evidence overwhelmingly shows that by January 2019, the County was desperately searching for

ways to save money and that message had been communicated to Judge Campanella. The overwhelming evidence also shows that between late 2018 and mid-2019, Judge Campanella had communicated to various County officials in phone calls, a letter, in-person meetings, and at County Board meetings his proposal to make the public defender switch in an effort to save money. While the subsequent, inconsistent statements that came out years later during the course of discovery are certainly curious, they are not enough to create an issue of material fact.

As for the delay in implementing the public defender switch, Loos pointed to the fact that Judge Campanella began contacting other counties about using part-timers as early as 2016 or 2017, but he never made the switch in Perry County until after she had opposed discrimination (Doc. 114, p. 17). But Loos fails to offer any further explanation as to why she thinks this is evidence of causation (*see id.*). Indeed, Judge Campanella testified that he started asking around in 2016 or 2017 about using part-timers because he could already see the writing on the wall regarding the County's financial trajectory (Doc. 95-4, pp. 17–19; *see also id.* at pp. 9–11). But he was not completely convinced moving to part-timers was the way to go and there were certain things that made him uneasy (*Id.*). Plus, he stated multiple times that he liked having a full-time public defender, and he particularly liked having Courtney Loos as the full-time public defender because he thought she did good work (Doc. 95-4, p. 32 (Campanella depo); Doc. 94-2, pp. 63–67 (Loos' memo); Doc. 95-3, pp. 103–04 (Loos depo)). On this evidence, and absent an explanation from Loos, the Court cannot see how the delay in implementing the public defender switch is evidence of causation.

So Loos is left with only Judge Campanella's statement that she should be grateful for her $90,000 salary. She argues that this statement "smacks of a discriminatory attitude" and is evidence that Judge Campanella was "angry with [her] for opposing discrimination" (Doc. 114, pp. 15, 20). While it has long been acknowledged that a statement that a woman should be grateful can reflect gender animus, such statements "do not inevitably prove that gender played a part in a particular employment decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). In order to determine the evidentiary value of such statements, the circumstances in which they were made must be considered. *See id. See also Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 722 (E.D. Pa. 2021) (citing *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)).

But here, Loos does not account for the circumstances in which Judge Campanella's statement was made (*see* Doc. 114, pp. 16–17). The Court believes the circumstances here are crucial and inevitably dictate the way a jury would view Judge Campanella's statements. As the County said, it "was in dire financial straits" by October 2018 when Loos (rightfully) sought to increase her salary to 90% of the state's attorney's salary. In other words, Loos was advocating for a $30,000 raise at a time when the County was having difficulty paying bills, had already laid off multiple employees and made difficult budget cuts, and its financial state was still worsening. Loos herself indicated there were times Campanella "said she should be grateful for the job and salary *and that the County could not pay her that much money*" (Doc. 114-11, p. 3) (emphasis added). Furthermore, by the time Loos sought to increase her salary, Judge Campanella was already considering the possibility of switching from a full-time public defender to

multiple part-timers in order to save money. He knew that increasing her salary would make it even more expensive for the County to employ her, which in turn would make it all the more likely that her job would be eliminated in the near future. Against this backdrop, the Court believes the evidence can only support an inference that Judge Campanella's resistance to Loos' request to increase her pay and his comment that Loos needed to drop the issue and be grateful for her $90,000 salary were a reflection of the County's precarious financial state rather than any gender animus, and he would have made the same statement he made to Loos to a man. The Court's belief is further strengthened by the fact there is no evidence that Loos (or any other woman) experienced gender discrimination by Judge Campanella on other occasions (*see* Doc. 114). In fact, the female Circuit Clerk and the male State's Attorney both testified that they frequently attended court with Judge Campanella and Loos and "never" observed him say or do anything discriminatory toward her because she is a woman (Doc. 94-1, para. 81–82; Doc. 114-1, para. 81–82).

The Court believes this case is the type of situation where "the nondiscriminatory reason so overwhelms that no reasonable jury could infer the protected activity was the but-for cause." *Xiong v. Bd. of Regents of Univ. of Wisconsin Sys.*, 62 F.4th 350, 356 (7th Cir. 2023). The record in this case demonstrates the County was not dealing with normal, everyday, run-of-the-mill financial concerns that might require small adjustments to stay within budget. Rather, the County was facing a financial emergency and drastic action was required. Every department head and elected official was required to look into ways to increase revenue and reduce their budget (Doc. 94, pp. 11). The workweek was

shortened for some employees, others were furloughed, and some were laid off, all in an effort to save money. It was within this context that the decision was made to switch the public defender from one full-timer to multiple part-timers to save the County money. Loos' evidence is simply not enough to place the County's explanation for the public defender switch in any real doubt or to convince a reasonable jury that her position as full-time public defender would not have been eliminated had she not complained that she thought her $90,000 salary was discriminatory. Consequently, Perry County is entitled to summary judgment on Loos' claims of retaliation.

### D.  WHISTLEBLOWER CLAIM AGAINST PERRY COUNTY (Count 11)

In Count 11, Loos alleges that Perry County violated the Illinois Whistleblower Act by "discharging and/or constructively discharging her by significantly changing her position" and by "refusing to pay her earned benefits" in retaliation for her disclosing that the County was violating state law by not paying her 90% of the state's attorney's salary and because she refused to acquiesce in the County's failure to pay her in accordance with state law (Doc. 100, p. 16). 740 ILL. COMP. STAT. 174/15(b), 174/20.

The Illinois Whistleblower Act Section provides that an employee may not be retaliated against for disclosing information about a violation of a state or federal law, rule, or regulation to a government or law enforcement agency. 740 ILL. COMP. STAT. 174/15. Similarly, an employee may not be retaliated against for refusing to participate in an activity that would result in a violation of a state or federal law, rule, or regulation. 740 ILL. COMP. STAT. 174/20. To succeed on a claim under the Whistleblower Act, the plaintiff must show an adverse employment action by her employer which was in

retaliation for her disclosure to a government or law enforcement agency of a suspected violation of an Illinois or federal law, rule, or regulation or her refusal to participate in a violation of an Illinois or federal law, rule, or regulation . *Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. Ct. 2017) (citation omitted).

Perry County makes three arguments as to why Loos cannot succeed on her whistleblower claim (*see* Doc. 94, pp. 17–19). The Court opts to address only the second—that Loos cannot establish causation—which it finds meritorious. The County points out that it did not eliminate Loos' position after learning of her demand for a pay increase (*Id.* at p. 18). Rather, the County gave her the pay increase (*Id.*). It was not until several months later that the decision was made to eliminate her position as the full-time public defender (*Id.*). As explained above with respect to Loos' retaliation claims, the decision to switch from one full-time public defender to multiple part-timers was made in the midst of the County's financial emergency and no reasonable jury would find that the decision was in retaliation for Loos complaining about discrimination. The same logic applies here. No reasonable jury would find that the decision to eliminate Loos' position as the full-time public defender was because she informed the County it was violating state law with respect to her pay and/or refused to accept pay that was less than the statutorily required amount. Consequently, Perry County is entitled to summary judgment on Loos' claim under the Whistleblower Act.

E. **W**AGE **P**AYMENT AND **C**OLLECTION **A**CT **C**LAIM **A**GAINST **P**ERRY **C**OUNTY (Count 12)

In Count 12, Loos alleges that Perry County violated the Illinois Wage Payment and Collection Act ("IWPCA") by failing to pay her the vacation time she had earned and was due at the time she left her position as public defender (Doc. 100, p. 17).

The IWPCA requires employers to pay the "final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILL. COMP. STAT. 115/5. "Final compensation" includes "the monetary equivalent" of earned but unused vacation time owed to the employee pursuant to an employment contract, agreement, or policy. 820 ILL. COMP. STAT. 115/2, 115/15. Thus, to state a claim under the IWPCA, the employee is required to demonstrate the employment contract, agreement, or policy that governed their employment provided for paid vacation. *See* 820 ILL. COMP. STAT. 115/5. *Cf. Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021) ("To state a claim under the IWPCA, employees are 'required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement.'" (quoting *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016))). It "need not be a formally negotiated contract." *Chagoya*, 992 F.3d at 624 (citing *Landers-Scelfo v. Corp. Off. Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005)). Rather, the employee need only show "mutual assent to terms that support the recovery." *Chagoya*, 992 F.3d at 624 (citing *Landers-Scelfo*, 827 N.E.2d at 1059). "The IWPCA, however, 'provides no substantive relief beyond what the underlying employment contract requires.'" *Chagoya*, 992 F.3d at 624 (quoting *Enger*, 812 F.3d at 570). *See also Wharton v. Comcast Corp.*, 912 F. Supp. 2d 655, 658 (N.D. Ill. 2012) ("The IWPCA therefore does not provide an independent right to payment of wages and benefits;

instead, it only enforces the terms of an existing contract or agreement."). "[T]he IWPCA holds the employer only to its promise under the employment agreement." *Chagoya*, 992 F.3d at 624 (citing *Enger*, 812 F.3d at 570).

Perry County argues that it is entitled to summary judgment on this claim because the terms of Loos' employment as public defender did not include earned vacation time (Doc. 94, pp. 19–20). The Court agrees. It is undisputed that most salaried employees of the county are not entitled to a set number of vacation, sick, or personal days (Doc. 94-1, para. 89; Doc. 114-1, p. 12, para. 89), unless they were part of a department that was unionized and subject to a collective bargaining agreement that governed their vacation, sick, and personal days (Doc. 94-1, para. 89; Doc. 114-1, p. 12, para. 89). It is also undisputed that Loos was an at-will employee of Perry County—she did not have an employment contract, she was not part of a union, and she was never given an employee handbook or personnel manual (Doc. 94-1, para. 8, 92; Doc. 114-1, pp. 2, 12, para. 8, 92). Rather the terms and conditions of her employment as public defender were explained to her by Judge Campanella (Doc. 94-1, para. 8; Doc. 114-1, p. 2, para. 8). Loos admitted that during initial meetings with Judge Campanella, before she was formally appointed as public defender, Judge Campanella did not talk about if and how vacation days were accrued or the number of vacation days she would receive per year (Doc. 95-3, pp. 49–50, 191–92). She testified that the only thing he said about vacation was that her mother could cover for her if she were on vacation or out (Doc. 95-3, pp. 36, 49–50). Based on that statement, as well as Loos' own knowledge that her predecessor took vacation every year and her own observations that other county employees routinely took vacation, Loos

believed that she had vacation days to use (Doc. 95-3, pp. 49–50; *see also* Doc. 94-1, para. 88; Doc. 114-1, p. 12, para. 88). After she resigned, she asked for an accounting of her accumulated vacation days, and Judge Campanella told her that she had no formally accrued time for which she was entitled to reimbursement (Doc. 95-3, p. 230; Doc. 95-3, pp. 70, 72–73).

Loos nevertheless contends that her employment *did* include accrued vacation time (Doc. 114, p. 19). In support of her argument, she cites to three pieces of evidence (*Id.*). First, the form that was filled out to enroll Loos in IMRF included the question "Does your employer provide the same fringe benefits to this person (for example: sick time, vacation time, and insurance) as are available to other full-time employees?" and it was answered "Yes." (Doc. 114, p. 19; *see also* Doc. 114-7, p. 18; Doc. 95-10, p. 18). Second, according to Loos, near the end of her employment as public defender, she asked the County Clerk Josh Gross how many vacation days she earned per year, and he told her that everyone earned two weeks of vacation per year (Doc. 114, p. 19; *see also* Doc. 114-11, p. 5; Doc. 95-3, pp. 192–93). And third, the County "admitted to the [Illinois Department of Human Rights] that Plaintiff . . . took two weeks paid vacation for the last two weeks of June [2019]" (Doc. 114, p. 19; Doc. 114-1, p. 12, para. 93; *see also* Doc. 114-8, p. 12), which Loos takes to mean she must have been earning vacation time (Doc. 114, p. 19).

Loos' evidence, however, is simply too thin to survive summary judgment. There is simply no evidence from which to infer that there was any sort of agreement or policy, either written or unwritten, that she would earn and accrue vacation days. For one, there is no explanation from the employee from the treasurer's office who filled out the IMRF

form as to *why* she answered in the manner she did or what she knew about the terms of Loos' employment. The same goes for County Clerk Josh Gross. Furthermore, it is clear that neither the Treasurer's Office employee or the County Clerk played any part in setting the terms of Loos' employment, and she was not part of either office. Rather it is undisputed that Loos was part of the judiciary, Judge Campanella was the department head, and the terms and conditions of her employment were those relayed to her by Judge Campanella, which did not include earned time off. As for the IDHR report, it states only that Loos took two weeks of paid vacation in June 2019 (Doc. 114-8, p. 12). The report does not indicate who provided that information, so it can hardly be viewed as an "admission" from the County. But even assuming the County did "admit" that Loos took two weeks of paid vacation, that does not lead to the inexorable conclusion that she "must have been earning vacation time," as she contends (Doc. 114, p. 19). Simply put, there is no contract, no collective bargaining agreement, no handbook, and no oral representations from Judge Campanella regarding earned time off. Nor is there any evidence as to the basic rules of Loos' alleged earned vacation time, such as the rules for accrual, use, and carryover. The only evidence and reasonable inference that can be drawn from the evidence is that Loos had gratuitous time off.

Accordingly, Perry County's motion for summary judgment as to Loos' claim under the Illinois Wage Payment and Collection Act is granted.

CONCLUSION

Perry County's motion for summary judgment (Doc. 94) and Judge Campanella's motion for summary judgment (Doc. 95) are **GRANTED in part and DENIED in part.**

Perry County's motion is granted as to Plaintiff Courtney Loos' claims under the Illinois Equal Pay Act and the federal Equal Pay Act (Counts 3 and 4), Plaintiff's retaliation claims under Title VII, § 1983, and the IDHR (Counts 2, 6, 10), Plaintiff's claim under the Illinois Whistleblower Act (Count 11), and Plaintiff's claim under the Illinois Wage Payment and Collection Act (Count 10). Perry County's motion is denied as to Plaintiff's sex discrimination claims under Title VII, the IHRA, and the Equal Protection Clause (Counts 1, 5, 9).

Judge Campanella's motion is granted as to Plaintiff's § 1983 claim for retaliation (Count 8) and denied as to Plaintiff's § 1983 claim for sex discrimination (Count 7).

This matter shall proceed to trial on Plaintiff's Title VII, IHRA, and § 1983 discrimination claims against Perry County (Counts 1, 5, 9) and Plaintiff's § 1983 sex discrimination claim against James Campanella.


**IT IS SO ORDERED.**

**DATED: September 30, 2023**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**